In re:

KIEBLER RECREATION, LLC,

           Debtor.

Chapter 11

Case No. 10-15099

Judge Randolph Baxter

# MOTION OF HUNTINGTON NATIONAL BANK
# FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT
# TO 11 U.S.C. § 362(d) TO CONTINUE FORECLOSURE ACTION
# AND EXERCISE RIGHTS WITH REGARD TO CASH COLLATERAL

      The Huntington National Bank ("Huntington"), the largest secured creditor of Kiebler Recreation, LLC (the "Debtor") and a party in interest herein, by and through its attorneys, Bond, Schoeneck & King, PLLC, hereby moves ("Motion") for an order modifying the automatic stay imposed by section 362(a) of title 11 of the United States Code ("Bankruptcy Code") pursuant to section 362(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") to allow Huntington to continue the foreclosure proceedings that it commenced against the Debtor prepetition and exercise its rights with regard to cash collateral. In support of the Motion, Huntington respectfully states as follows:

**PRELIMINARY STATEMENT**

      1.     On May 26, 2010 ("Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the Bankruptcy Code. Since the Petition Date, the Debtor has been operating its

businesses and managing its assets as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. An Official Committee of Unsecured Creditors (the "Committee") was appointed in this case on June 9, 2010 by the United States Trustee. Hahn Loeser & Parks, LLP has been appointed council for the Committee.

3. This chapter 11 case was filed on the day Huntington commenced a foreclosure proceeding in New York State County Court, Chautauqua County (the "State Court") against the Debtor's property and the State Court appointed a receiver to take possession of the Debtor's assets. Since the Petition Date, Huntington has worked with the Debtor to seek a possible resolution through the bankruptcy process including consenting to the use of cash collateral. Huntington understands that the Debtor has engaged in a marketing process, to seek strategic and/or financial buyers to ensure the best outcome for the Debtor's estate and all parties in interest.

4. Unfortunately, the Debtor has been unable to operate its business in a viable manner during this case. In fact, based on the Debtor's own financial disclosures, the Debtor's chapter 11 case is administratively insolvent. Although the normal monthly payment due Huntington under its loan documents exceeds $70,000.00 per month, the Debtor has made no adequate protection payments to Huntington with the exception of a single $30,000.00 adequate protection payment. Further, none of the other two secured creditors have been paid adequate protection payments except for a single small payment.

5. As set forth in greater detail below, Huntington's secured claim against the Debtor, with accrued postpetition interest and expenses, exceeds $17.3 million. In addition, real estate tax liens on the property subject to Huntington's liens total $1,458,680.00 (including

2

1769274.6 11/8/2010

10-15099-rb    Doc 320    FILED 11/08/10    ENTERED 11/08/10 17:34:58    Page 2 of 18

unpaid postpetition school taxes). Huntington's appraisals place a fair market value in the amount of $17.7 million on all the real and personal property in which Huntington has a mortgage lien and/or security interest, which real and personal property constitutes all of the Debtor's assets except for the Fairways Condominiums[1] and three motor vehicles. Moreover, as will be explained in more detail below, even the Debtor's own appraisal of all of its assets demonstrates that there is no equity in the Debtor's assets for the payment to unsecured creditors.

6. Because the Debtor has not been able to provide Huntington with adequate protection, Huntington now seeks to modify the automatic stay pursuant to (a) section 362(d)(1) of the Bankruptcy Code, for "cause", or alternatively, (b) section 362(d)(2) due to the Debtor's lack of equity in its property and because the property is not necessary for an effective reorganization.

7. The parties are scheduled for evidentiary hearings on valuation of the Debtor's business assets commencing on November 24, 2010. The Court set the hearing after the Debtor's counsel declared at an early cash collateral hearing (without any support), that the Debtor's property was worth $50 million. The Debtor has provided Huntington with its appraisal which sets the property value at approximately $31 million. The parties are presently engaged in discovery. Huntington respectfully submits that even if the Debtor's own appraisal is accepted in full, it establishes that there is no equity in the Debtor's property over the liens of the secured creditors. In addition, as discussed more fully herein, the Debtor cannot operate profitably and thus the property is not necessary for an effective reorganization. In the alternative, the Debtor is unable to make adequate protection payments to Huntington, which, Huntington submits is grounds to modify the automatic stay for cause.

---

[1] The Fairway Condominiums property is the only real property owned by the Debtor on which Huntington does not have a lien. PNC Bank has a first secured lien on the Fairways Condominiums in the amount of $3.1 million, as set

1769274.6 11/8/2010

## BACKGROUND

8. Prior to the Petition Date, as a result of, among other things, payment defaults to Huntington and the Debtor's failure to pay more than three (3) years past due real property taxes, Huntington commenced a foreclosure proceeding to foreclose certain mortgages, which mortgages and security interests are first liens on all of the Debtor's real and personal property assets except for the Fairways Condominiums and three motor vehicles (the "Foreclosure Action").

9. On September 1, 2010, Huntington filed a secured proof of claim in the amount of $16,978,539.78 as of the Petition Date (the "Huntington Claim"), attached hereto as Exhibit 1, which with continued postpetition interest and expenses now exceeds $17,300,000.00.

**Huntington's Security Interest in Real Property, Personal Property, and Cash**

10. The Huntington Claim is secured by first priority mortgages and security interests in substantially all of the Debtor's real property and all personal property including equipment, cash, accounts receivable and all rents and other proceeds emanating from the operation of the Debtor's property. Collectively, all of Huntington's collateral is referred to as (the "Property"). The Huntington Claim arises from the following obligations:

- Note, dated February 14, 2006, in favor of Peek'n Peak Recreation, Inc. ("PNP") in the amount of $11 million (the "$11 Million Note"), assigned to Huntington on April 6, 2006, and amended and restated in two promissory notes executed by the Debtor in favor of Huntington on April 6, 2006 in the amounts of $6.81 million (the "Restated $6.81 Million Note") and $4,190,000.00 (the "Restated $4.19 Million Note"). Copies of the $11 Million Note, the Restated $6.81 Million Note, and the Restated $4.19 Million Note are attached to the Huntington Claim respectively as Exhibits A, B, and C.

    o A total of $7,049,276.73 is due and owing on the Restated $6.81 Million Note, consisting of $6,810,00.00 in principal, $107,588.53 in interest, and $131,688.20 in late charges.

---

fort in a proof of claim filed by PNC Bank.

- o A total of $2,738,073.93 is due and owing on the Restated $4.19 Million Note, consisting of $2,716,714.42 in principal, $13,243.97 in interest, and $8,115.54 in late charges.

- Note, dated September 7, 2006, in favor of Huntington, in the amount of $1,000,000 (the "$1 Million Note"). A copy of the $1 Million Note is attached to the Huntington Claim as Exhibit D.

  - o A total of $1,020,098.87 is due and owing on the $1 Million Note, consisting of $1,000,000.00 in principal, $15,798.60 in interest, and $4,300.27 in late charges.

- Note, dated December 17, 2007, in favor of Huntington, in the amount of $1,440,000.00 (the "$1.44 Million Note"). A copy of the $1.4 Million Note is attached to the Huntington Claim as Exhibit E.

  - o A total of $1,465,872.75 is due and owing on the $1.44 Million Note, consisting of $1,440,000.00 in principal, $22,750.00 in interest, and $3,122.75 in late charges.

- Construction Loan Agreement, dated October 31, 2006, in favor of Sky Bank, the predecessor in interest to Huntington, in the amount of up to $5,040,000.00, and amended on March 13, 2008 (the "Ridgeview Note"). A copy of the Ridgeview Note is attached to the Huntington Claim as Exhibit F.

  - o A total of $3,636,305.14 is due and owing on the Ridgeview Note, consisting of $3,299,210.73 in principal, $324,610.50 in interest, and $12,483.91 in late charges.

Additional obligations include:

- Master Equipment Lease between the Debtor and LeaseNet, Inc. dated July 12, 2006, and identified by Huntington as Lease No. 200-0094801-01 for which $165,426.54 was due and owing as of the Petition Date (the "94801 Lease"). A copy of the 94801 Lease is attached to the Huntington Claim as Exhibit G.

- The Huntington National Bank Master Lease Agreement No. 4801 dated September 30, 2006 (the "Huntington Master Lease"), together with Acceptance Certificate and Tax Lease Schedule No. 2, identified by Huntington as Lease No. 101-0004801-002 for which $882,589.85 was due and owing on the Petition Date (the "4801-02 Lease"). A copy of the Huntington Master Lease is attached to the Huntington Claim as Exhibit H. A copy of the 4801-02 Lease is attached to the Huntington Claim as Exhibit I.

- The Huntington Master Lease, together with Acceptance Certificate and Tax Lease Schedule No. 3, identified by Huntington as Lease No. 101-0004801-003

for which $20,895.97 was due and owing on the Petition Date (the "4801-03 Lease"). A copy of the 4801-03 Lease is attached to the Huntington Claim as Exhibit J.

The 94801 Lease, the 4801-02 Lease, the 4801-03 Lease shall collectively be referred to as the "Equipment Leases").

The Huntington Claim is secured by the following:

- $11 Million Note. (i) Mortgage, Security Agreement, Assignment of Lease and Rents and Fixture Filing (the "$11 Million Mortgage"), in favor of PNP, dated February 14, 2006, assigned to Huntington on April 6, 2006, granting a lien on certain real property, together with all buildings, improvements and fixtures located thereon, and all personal property consisting of, *inter alia*, a ski resort, two golf courses, several restaurants and banquet facilities, a hotel, health spa, gas station and convenience store, condominiums and apartments ("Kiebler The Property"); (ii) assignment of Leases and Rents, in favor of PNP, dated February 14, 2006, assigned to Huntington on April 6, 2006; (iii) Assignment of Permits, Contracts and Warranties, in favor of PNP, dated February 14, 2006, assigned to Huntington on April 6, 2006; and (iv) the assignment of UCC financing statement filed in the New York Secretary of State's Office, PNP filing # 200604040296120, dated April 4, 2006, and assigned to Huntington by filing #200604140325706, dated April 14, 2006, covering all of the assets of the Debtor located on, and arising out of the operation of, the Kiebler Mortgaged Premises. Attached to the Huntington Claim as Exhibit K.

- Restated $4.19 Million Note and the Restated $6.81 Million Note. (i) Amended and Restated Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing, in favor of Huntington, dated April 6, 2006 (the "Restated $11 Million Mortgage") granting a lien on the Kiebler Mortgaged Premises and all personal property; and (ii) UCC financing statements filed in the New York Secretary of State's Office covering all of the assets of the Debtor located on, and arising out of the operation of, the Kiebler Mortgaged Premises, filing #s 200604140325629, dated April 14, 2006, and 200604140325580, dated April 14, 2006. Attached to the Huntington Claim as Exhibit L.

- $1 Million Note. (i) Mortgage, Security Agreement, Assignment of Lease and Rents and Fixture Filing, in favor of Huntington, dated September 7, 2006 (the "$1 Million Mortgage") granting a lien on the Kiebler Mortgaged Premises and certain real property, together with all buildings, improvements and fixtures located thereon and all personal property (the "Ridgeview Mortgaged Premises"). Attached to the Huntington Claim as Exhibit M.

- $1.44 Million Note. Mortgage, Security Agreement, Assignment of Lease and Rents and Fixture Filing, in favor of Huntington, dated December 17, 2007 (the "$1.44 Million Mortgage"), granting a lien on the mortgaged premises and all personal property. Attached to the Huntington Claim as Exhibit N.

- Ridgeview Note. (i) Mortgage, in favor or Sky Bank, Huntington's predecessor, dated October 31, 2006 (the "Ridgeview Mortgage") granting a lien on the Ridgeview Mortgaged Premises; (ii) Assignment of Rents, Mortgages, Leases, and Profits, dated October 31, 2006; (iii) Commercial Security Agreement, dated October 31, 2006; and (iv) UCC financing statement filed in the New York Secretary of State's Office covering all of the real and personal property assets of the Debtor located on, and arising out of the operation of, the Ridgeview Mortgaged Premises, filing # 200611020874759, dated October 31, 2006. Attached to the Huntington Claim as Exhibit O.

- The Equipment Leases are secured by certain of the Debtor's equipment. Attached to the Huntington Claim as Exhibit P is a summary of the UCC-1 statements perfecting Huntington's security interests.

11. The Huntington Claim is secured by the Property. Further, Huntington's security interests in the Property are properly perfected pursuant to the loan documents, security interests and financing statements attached to the Huntington Claim.

Huntington's liens against the Property specifically extend to: "all proceeds, products, situations and accessions (including claims and demands therefore) of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including proceeds of insurance or condemnation awards." Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing in favor of Peek'n Peak Recreation, Inc., dated February 14, 2006, assigned to Huntington on April 6, 2006, p.3, Section (O).

**The Debtor is Administratively Insolvent**

12. As evidenced by the most recent operating report for the Month of September 2010, filed by the Debtor on October 20, 2010 ("September Operating Report") attached hereto as Exhibit 2, the Debtor is administratively insolvent. The September Operating Report shows that the Debtor has incurred a net operating loss of $760,746.00 since the Petition Date, which loss does not include the more than $619,000.00 in restructuring costs which have apparently

accrued since the Petition Date (see Form 2). The monthly net operating loss, excluding any of the accrued restructuring costs, was $282,280.00 in September 2010.

13. The Balance Sheet reveals that since the Petition Date, the Debtor has amassed unpaid postpetition accounts payable in the amount of $889,979.00, which is an approximately $560,000.00 increase in the accounts payable from the preceding month. In addition, the taxes payable increased by $200,000.00 between August 2010 and September 2010, as the Debtor currently owes past due real estate taxes in the amount of $385,995.00. The total postpetition liabilities of the Debtor increased to $2,223,220.00 in September. These liabilities do not include the unpaid amounts owed to secured creditors since the Petition Date. Huntington alone is owed in excess of $650,000.00 in accrued interest and fees since the Petition Date.

14. Finally, according to Form 5 of the September Operating Report, the Debtor's total cash decreased approximately $250,000.00 in the month of September, leaving it with only $105,861.00 in total cash.

15. The September Operating Report clearly demonstrates that the Debtor is administratively insolvent and is unable to pay its debts when due.

## RELIEF REQUESTED

16. Huntington seeks an order from this Court (a) pursuant to section 362(d) of the Bankruptcy Code modifying the automatic stay to allow Huntington to continue the Foreclosure Action. Cause clearly exists in this case, as Huntington does not have a significant equity cushion in the property, if one exists at all. Furthermore, the Debtor is administratively insolvent and Huntington has not received regular adequate protection payments from the Debtor, nor does it appear that the Debtor is able to make adequate protection payments to Huntington or any other secured creditor. Furthermore, the Debtor has no equity in the Property

and will not be able to confirm a chapter 11 plan under these circumstances.[2] Consequently, the Property is not necessary for an effective reorganization.

**A.      Relief from the Automatic Stay**

17.     Section 362(d) of the Bankruptcy Code sets forth the requirements to obtain relief from the automatic stay.  Section 362 (d) provides in part:

> (d) On the request of a party in interest and after notice and a hearing, the court shall grant relief from the automatic stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if –
>
> (A) the debtor does not have equity in such property; and
>
> (B) such property is not necessary to an effective reorganization….

11. U.S.C. §362(d)(1-2).

**(i)      Huntington is Entitled to Stay Relief For Cause Pursuant to Section 362(d)(1).**

18.     Huntington respectfully submits it is entitled to relief from the stay pursuant to section 362(d)(1) "for cause, including the lack of adequate protection of an interest in property of such party in interest."  The Property is not maintaining its value and the Debtor's postpetition performance shows that Huntington's liens covering the Property are not being adequately protected, in part because the Debtor continues to use the Property in its daily operations.  The Bankruptcy Code does not define "cause" as used in section 362(d)(1).  Therefore, under section 362(d)(1), "courts must determine whether discretionary relief is appropriate on a case by case basis."  *Laguna Associates L.P. v Aetna Casualty & Surety Co. (In re Laguna Associates L.P.)*, 30 F.3d 734, 737 (6th Cir. 1994) (citing *In re Zick*, 931 F.2d 1124, 1129 (6th Cir. 1991)) ("As

---

[2] In fact, Huntington believes its secured claim is undersecured according to the appraisals it has received on the Mortgaged Premises.  However, even if Huntington were to accept the Debtor's appraisal, the Debtor has no equity

9                                                       1769274.6 11/8/2010

10-15099-rb    Doc 320    FILED 11/08/10    ENTERED 11/08/10 17:34:58    Page 9 of 18

used in § 362(d)(1), the term 'cause' is a broad and flexible concept which permits a bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations.").

19. Courts have noted a shifting burden on a motion to lift or modify the automatic stay. The movant must make an initial showing of cause pursuant to section 362(d)(1) but section 362(g) then shifts the burden to the debtor to prove that it is entitled to further protection on all issues other than the Debtor's equity in the property. *In re Holly's, Inc.*, 140 B.R. 643, 683 (Bankr. W.D. Mich. 1992) (quoting *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.*), 907 F.2d 1280, 1281 (2d Cir.1990)).

20. There is "cause" to lift the automatic stay whenever the stay harms the moving creditor and lifting the stay does not harm the debtor or other creditors. *In re Priestly*, 93 B.R. 256 (Bankr. D.C. Mn. 1988). Here, the Debtor is administratively insolvent and its continued operation under current management will not yield the best possible outcome for all creditors. Huntington and all parties in interest in the case are being harmed due to the Debtor's administrative insolvency because the Debtor will not have the ability to repay these accruing post-petition debts without an infusion of a significant amount of cash.

21. Although Huntington acknowledges that there is a seasonal component to the Debtor's business, Huntington respectfully submits that revenues from in-season activities cannot adequately offset the significant accruing losses and postpetition debt. As set forth in the Affidavit of Barry P. Lefkowitz (the "Lefkowitz Affidavit") sworn to on November 5, 2010 and filed in the above-captioned case as Docket #311, "the Debtor has alleged that it will accumulate significant cash flow through the end of ski season and has ignored the fact that it will be necessary to fund the significant operating losses for the time between the ski and golf seasons and has not accounted for funding such operating losses." Lefkowitz Affidavit at ¶17.

---

in the Mortgaged Premises that would remain after all of the secured claims were paid.

1769274.6 11/8/2010

22. Huntington's cooperation during this case has helped the Debtor to take advantage of the "breathing room" afforded by the Bankruptcy Code, notwithstanding Huntington's serious concerns about the Debtor's management, its finances and the accuracy of its financial information. However, after more than five months into the Debtor's chapter 11 case it appears that the Debtor will be unable to propose a confirmable chapter 11 plan. Together with the lack of adequate protection payments and Huntington's undersecured status, "cause" exists for this Court to modify the automatic stay to allow Huntington to exercise its state law rights as a secured lender.

23. Furthermore, the Debtor is unable to provide Huntington with adequate protection for Huntington's interest in the Property. Huntington is entitled to adequate protection for all of the rights that Huntington could exercise. All of Huntington's legal and equitable interests in the Property must be protected. *See In re Offerman Farms, Inc.*, 697 B.R. 279 (Bankr. N.D. Iowa 1986); *In re Glinz*, 69 B.R. 916 (Bankr. D.C. ND 1987); *In re Grieves*, 81 B.R. 912 (Bankr. N.D. Ind. 1987).

24. As noted, Huntington has had the Debtor's operations appraised. As part of the valuation, Huntington retained an appraisal firm to appraise the fair market value of the Debtor's Peak 'n Peak Resort, including all related personal property, as a going concern. Huntington also retained an appraisal firm to appraise certain vacant land which is part of its collateral and is the subject of possible further residential development adjacent to the Peak 'n Peak Resort. The Huntington appraisals of <u>all</u> of the Property, total $17.7 million. Huntington is owed approximately $17.3 million with interest and expenses continuing to accrue. Moreover, there are real estate tax liens on the Property totaling $1,458,680.00 (including the unpaid postpetition school taxes). Based on the Huntington appraisals, Huntington is undersecured.

1769274.6 11/8/2010

25. In view of (i) the Debtor's lack of equity in the Property, (ii) the Debtor's failure to pay real property taxes on the Property for several years, including the post-petition school taxes which were due in September of this year, and (iii) the Debtor's failure to provide Huntington with adequate protection, the automatic stay should be lifted. *See In re Roberts*, 63 B.R. 372 (Bankr. E.D. Mich. 1986); *In re Jones*, 26 B.R. 142 (Bankr. E.D. Pa. 1983).

26. It is not in the interest of the Debtor's creditors in general to allow this chapter 11 case to proceed. As demonstrated above, the Debtor is administratively insolvent. To allow the Debtor to continue to operate and incur additional debt not only harms the pre-petition creditors, as there will be no funds from which to pay them any distribution, but it also unfairly harms the post-petition creditors as the Debtor has neither the cash nor the ability to pay these debts. It is clear that the impact of the automatic stay and balance of harm weighs in favor of granting Huntington relief from the automatic stay.

**(ii)** **Huntington is Entitled to Stay Relief Because the Debtor has no Equity in Property that Would be Necessary for an Effective Reorganization Pursuant to Section 362(d)(2).**

27. In the alternative, Huntington is entitled to obtain relief from the automatic stay pursuant to Bankruptcy Code section 362(d)(2), as the Debtor does not have any equity in the property and the property is not necessary for an effective reorganization. As the Sixth Circuit has stated: "Equity is the value, above all secured claims against the property, that can be realized from the sale of the property for the benefit of unsecured creditors." *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 392 (6th Cir. 1986), citing *In re Mellor*, 734 F.2d 1396, 1400 n. 2 (9th Cir. 1984).

28. Courts consider all encumbrances against the subject property and the cost of a foreclosure and sale, including brokerage, escrow and title costs when determining whether there

is any equity in the encumbered property. *See In re Cablehouse, Ltd,* 68 B.R. 309 (Bankr. S.D. Ohio 198); *In re Sutton,* 904 F.2d 327 (5th Cir. 1990); *In re Fidelity America Mortgage Co.*, 25 B.R. 171 (Bankr. E.D. Pa. 1982).

29.     According to the Debtor's schedules, there is $30,879,135.21 in secured debt with only $76,775.17 of the debt disputed. Moreover, since the filing of the Debtor's schedules approximately five months ago, interest and fees have continued to accrue on the $30.8 million secured debt. In fact, over the more than five months since the Petition Date, approximately $800,000.00 of interest has accrued using interest at six percent per annum. Consequently, the secured debt equals at least $31.6 million and thus even if the Debtor's valuation is correct, the Debtor has no equity in the Property and personal property.

30.     The Debtor has provided Huntington with a copy of its appraisal which provides the fair market value of all of the Debtor's assets at $31.6 million. Upon information and belief, the Debtor's appraisal is flawed because it is based on extremely optimistic assumptions and uses an aggressive cap rate. However, even under the Debtor's own appraisal, the Debtor has no equity in its property. The Debtor's appraisal also sets its value based on assumption of a significant infusion of hundred of thousands of dollars to update its worn out and dated hotel furnishings.

31.     As stated above, based on the Debtor's own schedules, the secured debt in the amount of $30,802,360.04, together with interest for the postpetition five month period, equals the fair market value of the Debtor's asset as determined by its own appraisers[3]. While Huntington believes that the value of all of the Debtor's assets is approximately $20 million (approximately $2.3 million for the Fairways Condominiums and the $17.7 million for all of the

---

[3] $30,879,135.21 - $76,775.17 disputed amount = $30,802,360.04 undisputed secured amount.

13                                                              1769274.6 11/8/2010

10-15099-rb    Doc 320    FILED 11/08/10    ENTERED 11/08/10 17:34:58    Page 13 of 18

rest of the Debtor's property), even under the overly optimistic value of the Debtor's own appraisal the Debtor has no equity in its assets.

32. It should also be noted in addition to the secured debt in the amount of $31.6 million, additional amounts of administrative expense claims for professional fees continue to accrue.

33. It is clear that based upon the Schedules and Monthly Operating Reports filed by the Debtor, the Debtor does not have equity in the Property. A creditor seeking relief from the automatic stay is entitled to rely upon financial data provided by a chapter 11 debtor, and if that information reveals that the value of assets is less than the debt, a creditor is entitled to relief from the automatic stay. *In re New American Food Concepts, Inc.*, 70 B.R. 254 (Bankr. N.D. Ohio 1987). The Debtor does not have equity in the Property according to its own assessment of its undisputed secured debt and its own appraisal.

34. Pursuant to 11 U.S.C. Section 362(d)(2)(B), Huntington respectfully submits the Property is not necessary for an effective reorganization as the Debtor can not successfully reorganize its operations. At the outset, the mere indispensability of property to a debtor's survival is not enough to demonstrate that the property is necessary for an effective reorganization. A debtor must demonstrate that there is a reasonable possibility of a successful reorganization within a reasonable time and that the property at issue will be necessary for that reorganization. 3 COLLIER ON BANKRUPTCY ¶362.07[4][b] (Alan N. Resnick et al. eds., 16th Ed.) citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 484 U.S. 365 (1988).

35. The lack of a reasonable likelihood of reorganization can be due to either the Debtor's inability to successfully reorganize the business or because "creditor dissent makes a

1769274.6 11/8/2010

successful plan unlikely." *Id.* *See also In re New American Food Concepts, Inc.*, 70 B.R. 254 (Bankr. N.D. Ohio 1987). *See also In re Vieland*, 41 B.R. 134 (Bankr. N.D. Ohio 1984); *In re Cambridge Woodbridge Apts, L.L.C.*, 292 B.R. 832 (Bankr. N.D. Ohio 2003); *In re Taylor*, 28 B.R. 691 (Bankr. S.D. Ohio 1983).

36. Here, there is no reasonable possibility that the Debtor can reorganize. The Debtor is administratively insolvent as it is unable to provide for payments for post-petition trade debt, to secured creditors for adequate protection, for ongoing tax obligations, or for other administrative expenses. Furthermore, the Debtor will be unable to propose, let alone confirm a reasonable plan to cure the arrearages owed to the secured creditors and fund a payment to the pre-petition unsecured creditors in this case without the support of its secured creditors.

37. Pursuant to an Intercreditor and Subordination Agreement dated as of December 17, 2007 by and between Huntington as senior lender and Peak 'N Peak Recreation, Inc. (the "Subordination Agreement") as subordinate mortgagee (the "Cross Estate") and the Debtor as borrower, the Cross Estate has fully subordinated its rights to Huntington. The Cross Estate also granted to Huntington, as part of the Subordination Agreement, an irrevocable power of attorney, coupled with an interest and its proxy:

> for the purpose of exercising any and all rights and taking any and all actions available to the Cross Estate in connection with any case by or against the Borrower under United States Bankruptcy Code, 11 U.S.C. § 101 et seq., as from time to time amended, including the right to vote to accept or reject a plan, to make any election under Section 1111(b) and to file a motion to modify the automatic stay.

Subordination Agreement at ¶3(b).

38. As senior lender, Huntington retains senior payment and lien priority, including the ability to exercise voting rights and interests of the subordinated secured debt held by the

Cross Estate. As the Debtor cannot propose an acceptable reorganization Plan, it is anticipated that Huntington will reject any such Plan and as it controls the Cross Estate, these interests will also reject the Debtor's Plan.

**B.    Use of Cash Collateral**

39.    Huntington will also require, in exchange for allowing the Debtor to continue to use cash collateral, adequate protection payments and an agreement acknowledging its security interest in the Debtor's accounts.

40.    As noted, Huntington holds perfected real and personal property concerning the Property. As such, Huntington has an absolute first perfected security interest in all cash proceeds of the Property these cash proceeds constitute cash collateral under 11 U.S.C. Section 363(a) and such cash collateral may not be used without the permission of Huntington. To the extent the Debtor or any other party in interest may wish to argue that Huntington's interest in cash collateral is not perfected because the funds are not in accounts under which Huntington has "control," this position would be in direct conflict with Revised Article 9 of the Uniform Commercial Code (the "UCC"). Although Huntington's interest in the accounts could be perfected by control, the funds in the Debtor's deposit accounts with First Niagara, First National and PNC Banks are substantially all comprised of "proceeds" of collateral on which Huntington has a perfected security interest.

41.    The term proceeds is broadly defined by NY UCC § 9-102(a)(64) as follows:

> (64) "Proceeds", except as used in Section 9-609(b), means the following property:
> (A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
> (B) whatever is collected on, or distributed on account of, collateral;
> (C) rights arising out of collateral;

> (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or
> (E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

NY UCC § 9-102(a)(64). With the exception of the Fairway Condominiums and three motor vehicles, the Property is subject to Huntington's mortgages and security interests. Therefore, all funds generated from such real and personal Property are proceeds as defined in the UCC, which includes substantially all of the cash in the Debtor's account. To the extent that such proceeds are commingled with other property of the Debtor, such proceeds are traceable and Huntington maintains a perfected security interest in all such cash proceeds.

42. As adopted by New York, UCC § 9-315 provides that a property perfected security interest in collateral perfects the security interest in proceeds of that collateral, even if such proceeds are commingled with other property, where the proceeds are identifiable by a method of tracing under any equitable principles permitted under law, including the "lowest intermediate balance rule" which provides that the last funds left in an account after other expenditures are made constitute the "proceeds" for purposes of § 9-315. *See* Restatement (2d) Trusts § 202.

43. Section 9-315 provides as follows:

> (b) <u>When commingled proceeds identifiable</u>. Proceeds that are commingled with other property are identifiable proceeds:
> (1) if the proceeds are goods, to the extent provided by Section 9-336; and
> (2) if the proceeds are not goods, to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles,

1769274.6 11/8/2010

> that is permitted under law other than this article with respect to commingled property of the type involved.
> (c) Perfection of security interests in proceeds. A security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected.

NY UCC § 9-315(b-c).

44. Huntington, therefore, has a first priority security interest in the Debtor's cash, accounts receivable and all proceeds from the operation of the Property.

**WHEREFORE**, Huntington respectfully requests that the Court grant Huntington Bank's request for relief from the automatic stay and grant such other and further relief as the Court deems just and proper.

Dated: Syracuse, New York  BOND, SCHOENECK & KING, PLLC
November 8, 2010  Attorneys for The Huntington National Bank

By: /s/ Stephen A. Donato
Joseph Zagraniczny, Esq.
Stephen A. Donato, Esq.
Ingrid Palermo, Esq.
Office and P.O. Address
One Lincoln Center
Syracuse, NY 13202
Telephone: (315) 218-8000