## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO

------------------------------------------------------x
                                          :
In re                                     :          Case No. 10-15099
                                          :
KIEBLER RECREATION, LLC,                  :          Chapter 11
                                          :
            Debtor.                       :          Judge Randolph Baxter
------------------------------------------------------:x

---

## DISCLOSURE STATEMENT
## TO DEBTOR'S PLAN OF REORGANIZATION

---

Robert C. Folland
Andrew L. Turscak, Jr.
Curtis L. Tuggle
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, OH  44114-1291
(216) 566-5500

Counsel to Debtor, Kiebler Recreation, LLC

Dated:  November 24, 2010

# DEBTOR'S DISCLOSURE STATEMENT

Kiebler Recreation, LLC (the "Debtor") hereby files its Disclosure Statement (the "Disclosure Statement") in connection with the Debtor's Plan of Reorganization (the "Plan"), which has been filed contemporaneously herewith.

## I.

## INTRODUCTION

### 1.01   Overview of Chapter 11.

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  It allows a business debtor to remain in operation and work out its financial difficulties.  Unlike a case under chapter 7 of the Bankruptcy Code, which automatically results in the appointment of a trustee to manage a debtor's affairs, the debtor in a chapter 11 case maintains control of the estate as a "debtor in possession," generally with the same powers and duties as a trustee, unless the Court appoints a trustee to operate the business.

Upon filing a petition for chapter 11 reorganization and during the pendency of a reorganization case, the Bankruptcy Code imposes an automatic stay against creditors' attempts to collect or enforce, through litigation or otherwise, claims against a debtor.  The automatic stay provisions of section 362 of the Bankruptcy Code will generally restrict attempts by secured or unsecured creditors or other claimants to collect or enforce any claims against the debtor that arose prior to the commencement of the chapter 11 case, unless the court lifts the stay.

Other significant aspects of chapter 11 are a debtor's right to seek avoidance of certain pre and post-petition transfers of interests in the debtor's estate and the right of a debtor to evaluate all prepetition executory contracts and unexpired leases and to assume or reject such contracts and leases.

### 1.02   Filing of the Plan.

The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on May 26, 2010 (the "Petition Date") in the Northern District of Ohio, Eastern Division, Judge Baxter, Case No. 10-15099.  Since the Petition Date, the Debtor has managed its business and property as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

On November 24, 2010, the Debtor filed its Plan.  The Plan specifies the classes of the Debtor's Creditors and holders of Interests, and it sets forth the proposed treatment of such Claims and Interests.  A copy of the Plan is attached hereto as Exhibit A.  Pursuant to section 1125 of the Bankruptcy Code, the Debtor is soliciting acceptances of the Plan by the classes that are entitled to vote under the Plan.  As explained below, the purpose of this Disclosure Statement is to provide holders of Claims with adequate information about the Debtor and the Plan to enable them to arrive at a reasonable, informed decision in their exercise of the right to vote for acceptance or rejection of the Plan.

2

The Plan reflects the Debtor's determined effort to preserve the economic integrity of its business and promote the greatest value for the benefit of its Creditors. The Debtor believes that the Plan offers prospects for the highest and best recovery to Creditors that can be obtained.

1.03    Purpose of Disclosure Statement.

This Disclosure Statement has been prepared by the Debtor pursuant to the provisions of section 1125 of the Bankruptcy Code, which requires that there be submitted to holders of Claims against the Debtor a copy of a reorganization plan, or summary of such plan, and a written disclosure statement containing "adequate information" about the Debtor to enable creditors to make an intelligent, informed decision regarding the plan of reorganization.

CAPITALIZED TERMS HEREIN, IF NOT DEFINED IN THIS DISCLOSURE STATEMENT, SHALL HAVE THE SAME MEANING AS DEFINED IN THE PLAN.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specifically set forth. The delivery of this Disclosure Statement and/or any exchange of rights made in connection herewith shall not, under any circumstances, create an implication that there has been no change in the facts set forth since the date hereof.

Any benefits offered to Creditors according to the Plan which may constitute "securities" have not been approved or disapproved by the federal Securities and Exchange Commission ("SEC"), the Ohio Division of Securities ("ODS"), or any other relevant government authority in any state of the United States. In addition, neither the SEC, ODS nor any other government authority has passed upon the accuracy or adequacy of this Disclosure Statement or upon the merits of the Plan.

In accordance with section 1124(d) of the Bankruptcy Code, this Disclosure Statement is exempted from the requirements of the securities laws of the United States, including the Securities Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 ("1934 Act") as well as the Blue Sky Laws of the State of Ohio and the state securities laws of each state in which the Debtor has transacted business.

**NO REPRESENTATIONS CONCERNING THE DEBTOR, THE VALUE OF ITS PROPERTY, OR THE VALUE OF ANY BENEFITS OFFERED TO THE CREDITORS IN CONNECTION WITH THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN BY THE CREDITORS WHICH ARE CONTRARY TO INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON IN VOTING ON THE PLAN, AND ANY SUCH REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, CURTIS L. TUGGLE, ESQ., AT THOMPSON HINE LLP, 3900 KEY CENTER, 127 PUBLIC SQUARE, CLEVELAND, OHIO 44114, (216) 566-5904.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. CONSEQUENTLY, THE DEBTOR**

IS UNABLE TO WARRANT OR REPRESENT THAT ALL THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE.

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN; NOR DOES IT GUARANTEE THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

ALL CREDITORS ARE URGED TO CAREFULLY READ THIS DISCLOSURE STATEMENT IN ORDER TO ACQUIRE ADEQUATE INFORMATION IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.

This Disclosure Statement, the Plan, and all related exhibits and schedules remain subject to modification and amendment in their entirety. All financial information contained herein constitutes the best information available to the Debtor as of the date of the filing of this Disclosure Statement and remains subject to revision.

1.04    Voting on and Confirmation of the Plan.

Ballots will be sent to the known holders of all Claims against the Debtor as of the commencement of this Chapter 11 Case on May 26, 2010, including those Claims that have been or will be objected to by the Debtor. After carefully reviewing the Plan and the exhibits and schedules attached to the Plan, and this Disclosure Statement and its exhibits, you will be asked to indicate your vote with respect to the Plan on a ballot and to return it by the voting deadline to counsel for the Debtor. If you have a Claim in more than one voting class, you are entitled to vote each Claim.

Creditors may vote with respect to the Plan by completing and mailing the enclosed ballot to the Debtor's counsel at the address set forth above. See INTRODUCTION, § 1.03 Purpose of Disclosure Statement. A facsimile transmission of the ballot may be sent to the attention of Carla Winters at (216) 566-5800. All ballots must be received not later than [#####], 2010 at 5:00 p.m., Eastern Standard Time, or such ballots cannot be counted in voting on the Plan.

THE BANKRUPTCY COURT HAS SET [#####], 2010, AT   :00 A.M., AS THE DATE AND TIME FOR HEARING ON CONFIRMATION OF THE PLAN ("CONFIRMATION HEARING"). THE CONFIRMATION HEARING WILL BE HELD IN THE UNITED STATES BANKRUPTCY COURTROOM OF THE HONORABLE RANDOLPH BAXTER, UNITED STATES BANKRUPTCY JUDGE, IN CLEVELAND, OHIO.

1.05    Purpose of the Plan.

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11, a debtor attempts to either liquidate or reorganize its business for the benefit of creditors, equity interest holders and other parties in interest. Formulation of a plan of reorganization is the purpose of a chapter 11 reorganization case. A reorganization plan sets forth the means for satisfying the claims against, or interests in, the debtor.

4

After a chapter 11 plan has been filed, it must be accepted by the creditors and equity interest holders of the debtor. Section 1125 of the Bankruptcy Code requires full disclosure before solicitation of acceptances of a chapter 11 plan. This Disclosure Statement is presented to the creditors of the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

1.06    Requirements for Confirmation of Plan.

At the hearing on confirmation of the Plan, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied. If the requirements have been satisfied, the Bankruptcy Court shall enter the Confirmation Order. To confirm the Plan, the Bankruptcy Court must find that:

(1)    the Plan complies with the applicable provisions of the Bankruptcy Code;

(2)    the Debtor has complied with the applicable provisions of the Bankruptcy Code;

(3)    the Plan has been proposed in good faith and not by means forbidden by law;

(4)    any payment made or promised by the Debtor, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with the case, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(5)    the Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan with the Debtor, or a successor to the Debtor under the Plan, and that the appointment to, or continuance in, such office of such individual, is consistent with the interests of holders of Claims and Interests, and with public policy, and the Debtor has disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtor, and the nature of any compensation for such insider;

(6)    any regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval;

(7)    with respect to each Class of impaired Claims, either the holders of Claims or Interests of such Class have accepted the Plan, or will receive or retain under the Plan, on account of such Claims or Interests, property of a value, as of the Effective Date, that is not less than the amount that such holders would so receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code;

(8)    each Class of Claims or Interests has either accepted the Plan or is not impaired under the Plan;

(9)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administration expenses will be paid in full on

5

the Effective Date, that priority claims (other than tax claims), to the extent the applicable class has accepted the Plan, will receive deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims or, to the extent the applicable Class has not accepted the Plan, will receive cash on the Effective Date equal to the allowed amount of such claims, and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five years after the date of assessment of such Claim, of a value, as of the Effective Date, equal to the allowed amount of such Claim;

(10)     at least one Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any Insider holding a Claim of such Class;

(11)     confirmation of the Plan is not  likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan;

(12)     all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for payment of all such fees on the Effective Date; and

(13)     the Plan provides for the continuation, after the Effective Date, of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at required levels and for the duration of the period the Debtor has obligated itself to provide such benefits.

The Debtor believes that the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, that it has complied with or will have complied with all of the requirements of chapter 11, and that the proposal of the Plan is made in good faith.

The Debtor believes that holders of all Claims impaired under the Plan will receive payments under the Plan having a present value as of the Effective Date in amounts materially exceeding the amounts likely to be received if the Debtor was liquidated in a case under chapter 7 of the Bankruptcy Code.  The Debtor also believes that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

1.07     Creditors Entitled to Vote and Impairment of Claims.

Each impaired Class shall be entitled to vote to accept or reject the Plan.  Any unimpaired Class shall be deemed to have accepted the Plan, and shall not be entitled to vote to accept or reject the Plan.

Any individual creditor of the Debtor whose Claim is impaired under the Plan is entitled to vote, if either (i) its Claim has been scheduled by the Debtor (and such Claim is not scheduled as disputed, contingent or unliquidated or provided similar treatment by the Plan), or (ii) it has filed a proof of Claim on or before the last date set by the Bankruptcy Court for such filings. Any holder of a Claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the Claim in an amount which it deems proper for the purpose of accepting or rejecting the Plan, upon application by a creditor whose Claim is subject to such an objection.  Such application must be heard and determined by the Bankruptcy Court on or before the Confirmation Hearing.  A

6

creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or made in good faith or in accordance with the provisions of the Bankruptcy Code.

ONLY THE VOTES OF CREDITORS HOLDING IMPAIRED CLAIMS OR INTERESTS WILL BE COUNTED FOR THE PURPOSE OF CONFIRMING THE PLAN. UNDER SECTION 1124 OF THE BANKRUPTCY CODE, A CLASS OF CLAIMS OR INTERESTS IS IMPAIRED UNLESS, WITH RESPECT TO EACH CLAIM OR INTEREST IN SUCH CLASS, THE PLAN:

(1)     leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or

(2)     notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to receive accelerated payment of his claim or interest after the occurrence of a default:

(a)     cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code;

(b)     reinstates the maturity of such claim or interest as it existed before the default;

(c)     compensates the holder of such claim or interest for damages incurred as a result of reasonable reliance of such contractual provision or applicable law; and

(d)     does not otherwise alter the legal, equitable, or contractual rights to which the holder of such claim or equity interest is entitled; or

(3)     provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash, equal to:

(a)     with respect to a claim, the allowed amount of such claim; or

(b)     with respect to an interest, if applicable, the greater of:

(i)     any applicable fixed liquidation preference; or

(ii)    any fixed price at which the debtor, under the terms of the security, may redeem the security.

1.08    Acceptance of Plan and Cramdown of Dissenting Claims.

Acceptance of the Plan by Creditors is extremely important. In order for the Plan to be accepted by each Class of Claims, the parties that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims voting on the Plan in such Class must vote for the Plan. Chapter 11 does not require that every Creditor vote in favor of the Plan in

order for the Bankruptcy Court to confirm the Plan. The Plan, however, must be accepted by at least one Class of holders of impaired Claims by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims of such Class actually voting in connection with the Plan. Any impaired Class of Claims in which no holder votes to accept or reject the Plan will be deemed to have accepted the Plan.

The Bankruptcy Court may confirm the Plan even though fewer than all Classes of Claims and Interests have accepted the Plan. Confirmation of the Plan over the objection of one or more Classes of Creditors or equity Interest holders is generally referred to as a "cramdown." Section 1129(b) of the Bankruptcy Code sets forth the circumstances in which the Bankruptcy Court may confirm the Plan over the objection of a Class of Creditors or equity Interest holders pursuant to "cramdown."

Generally, the Bankruptcy Court may cramdown a plan on dissenting, impaired classes if the plan "does not discriminate unfairly" and is "fair and equitable." A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity interests. "Fair and equitable" has different meanings for secured claims, unsecured claims and equity interests.

With respect to a secured claim, "fair and equitable" means either (i) the impaired secured creditor retains its lien to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claim with a present value as of the effective date at least equal to the value of such creditor's interest in the property securing its lien, (ii) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with that lien attaching to the proceeds of the sale, and such lien proceeds must be treated in accordance with clauses (i) or (iii) hereof, or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

With respect to an unsecured claim, "fair and equitable" means either (i) each impaired unsecured creditor receives or retains property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

With respect to a class of equity interests, "fair and equitable" means either (i) each holder of an interest receives or retains property of a value, as of a plan's effective date, equal to the greatest of the allowed amount of (a) any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled, or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interest of the equity holder will not receive or retain any property on account of such junior interest.

In the event one or more Classes of impaired Claims or Interests rejects the Debtor's Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of Claims or Interests. The Debtor reserves the right to confirm the Plan through a cramdown of dissenting, impaired Classes at the Confirmation Hearing, without additional notice to holders of Claims and Interests.

1.09    Effect of Confirmation of Plan.

On the Effective Date, the provisions of the Plan shall be binding on the Debtor, the Estate, the Committee, the Reorganized Debtor, any person or entity acquiring property under the Plan, and all Creditors of the Debtor and parties in interest in the Chapter 11 Case, whether or not such Creditor or party has accepted the Plan.

## II.

## OVERVIEW OF THE PLAN AND THE CHAPTER 11 CASE

2.01    General.

This Disclosure Statement is qualified in its entirety by the more specific treatment contained in the Plan.

2.02    General Concept of the Plan.

The Debtor's purpose in seeking relief under chapter 11 and proposing the Plan is to pay substantially all of its secured, priority, and unsecured creditors in a timely fashion.  The Debtor proposes to retain substantially all of its existing property and continue its business as a Reorganized Debtor.

The holders of Claims against the Debtor will be classified and receive the treatment specified in the Plan.  Classification of such Claims, distributions to claimants, and other aspects of the consummation of the Plan are discussed in greater detail herein.

The Plan divides Claims into various Classes in accordance with the Bankruptcy Code. Secured claims, priority unsecured claims and non-priority unsecured claims each are assigned to separate Classes under the Plan.  A Claim shall receive a distribution under the Plan only if it is an "Allowed Claim" as defined in the Plan.  The Reorganized Debtor will pay its Creditors in the amounts described in the Plan and herein, over time, using cash flow generated post-confirmation to fund the Plan payments.

2.03    Significant Legal Events During the Chapter 11 Case.

In the opinion of the Debtor, the principal legal events that have occurred during the pendency of this Chapter 11 Case may be summarized by topic as set forth below.

(1)    Filing of the Case:   On the Petition Date, May 26, 2010, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Northern District of Ohio, Eastern Division, Judge Baxter.  Since the Petition Date, the Debtor has managed its business and property as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

(2)    Filing of the Debtor's Statement of Affairs and Schedules:  The Debtor filed its Statement of Financial Affairs and Schedules on July 9, 2010, as subsequently amended from time to time.

(3) <u>Cash Collateral Orders</u>: On May 28, 2010, the Court entered its Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection. On June 16, 2010, the Court entered its Second Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection. On July 7, 2010, the Court entered its Third Interim Order Authorizing the Use of Cash Collateral and Granting Adequate Protection, as subsequently amended by the following: (i) Stipulation and Agreed Order Extending: Agreed Third Interim Order Authorizing the Use of Cash Collateral and Granting Adequate Protection, which was entered on July 22, 2010; (ii) Second Stipulation and Agreed Order Further Extending: Agreed Interim Order Authorizing the Use of Cash Collateral and Granting Adequate Protection, which was entered on August 4, 2010; (iii) Third Stipulation and Agreed Order Further Expending: Agreed Interim Order Authorizing the Use of Cash Collateral and Granting Adequate Protection, which was entered on September 2, 2010; (iv) Fourth Stipulation and Agreed Order Further Extending: Agreed Third Interim Order Authorizing the Use of Cash Collateral and Granting Adequate Protection, dated as of September 28, 2010 [docket # 258]; (v) Fifth Stipulation and Agreed Order Further Extending: Agreed Third Interim Order Authorizing the Use of Cash Collateral and Granting Adequate Protection, dated as of October 18, 2010 [docket # 285]; (vi) Sixth Stipulation and Agreed Order Further Extending: Agreed Third Interim Order Authorizing the Use of Cash Collateral and Granting Adequate Protection, dated as of October 25, 2010 [docket # 296]; and (vi) Seventh Stipulation and Agreed Order Further Extending: Agreed Third Interim Order Authorizing the Use of Cash Collateral and Granting Adequate Protection, dated as of November 2, 2010 [docket # 304].

(4) <u>Miscellaneous Events</u>:

1. On June 3, 2010, the Court entered its chapter 11 scheduling Order requiring that (i) all parties who have or assert any claim against or interest in the Debtor to file their proofs of claim or interest with the clerk of the Bankruptcy Court on or before September 3, 2010; and (ii) the Debtor file its Plan and Disclosure Statement on or before September 24, 2010.

2. On June 9, 2010, an Official Committee of Unsecured Creditors (the "Committee") was appointed by the Office of the United States Trustee.

3. On July 9, 2010, the section 341 meeting of creditors was held.

4. On July 30, 2010, the Court entered an Order establishing September 3, 2010, as the bar date for filing requests for payment of certain administrative expense claims pursuant to sections 503 and 507(a)(2) of the Bankruptcy Code.

5. On August 23, 2010, the Court entered an Order authorizing the Debtor to assume its insurance agreements.

(5) <u>Disclosure Statement</u>: The Debtor filed its Disclosure Statement on November 24, 2010.

(6) <u>Plan of Reorganization</u>: The Debtor filed its Plan of Reorganization on November 24, 2010.

(7) <u>Employment of Professionals</u>:

1.      On July 8, 2010, the Court entered an Order authorizing the Debtor to retain Thompson Hine LLP as its legal counsel for this Chapter 11 Case.

2.      On July 8, 2010, the Court entered an Order authorizing the Committee to retain Hahn Loeser & Parks, LLP as its legal counsel for this Chapter 11 Case.

3.      On August 4, 2010, the Court entered an Order authorizing the Committee to retain RSM McGladrey, Inc. as its financial advisor.

4.      On November 16, 2010, the Court entered an Order authorizing the Debtor to retain Inglewood Associates LLC as its financial advisor *nunc pro tunc* to September 24, 2010.

(8)     <u>Adversary Proceedings</u>:  No adversary proceedings have been filed to date.

## III.

## GENERAL INFORMATION ABOUT THE DEBTOR

3.01    <u>Nature of the Debtor.</u>

The Debtor is a New York limited liability company formed in November 2006 for the purpose of purchasing, developing, owning and operating Peek 'n Peak Resort & Spa in Findley Lake, New York ("Peek 'n Peak Resort" or the "Resort").  Peek 'n Peak Resort is a popular recreational and tourist complex that offers visitors the opportunity to enjoy numerous activities and services including, among other things, (i) snow skiing and other snow sports on approximately 27 slopes and trails, (ii) rounds of golf on the Resort's two golf courses, one of which is a championship caliber, par 72 golf course, on which the Resort has hosted numerous tournaments and outings including those sponsored by the PGA, (iii) signature treatments and therapies at the Resort's luxurious spa, (iv) fine dining, and (iv) a vast array of lodging accommodations ranging from traditional hotel style rooms and suites to a diverse selection of first-class condominiums.  With the foregoing amenities to offer, the Resort has become a popular destination for weddings, conferences and other special events.  In 2008, Peek 'n Peak Resort's annual gross revenues exceeded $18,350,000.00

In connection with the Debtor's acquisition and development of the Resort, it became indebted to Peak 'n Peak Recreation, Inc. (predecessor in interest to the Estates of Eugene Cross and Norbert Cross) ("PPRI").  A portion of the indebtedness owed to PPRI was later refinanced by The Huntington National Bank ("Huntington Bank").  To develop condominium units and other residences, the Debtor obtained construction financing from Sky Bank (predecessor of Huntington Bank) and PNC Bank, National Association ("PNC Bank").  More specifically, the Debtor became indebted to, and granted certain security interests to, (i) PPRI pursuant to the Peek 'N Peak Note and Peek 'N Peak Security Instruments, (ii) Huntington Bank pursuant to the Huntington Bank Notes and the Huntington Bank Security Instruments, and (iii) PNC Bank pursuant to the PNC Bank Note and PNC Bank Security Instruments.  As provided in the foregoing loan documents (collectively, the "Loan Documents"), PPRI and Huntington Bank were each granted security interests, liens and mortgages in substantially all of the Debtor's real and personal property to the extent described therein and the relevant agreements among them,

11

and PNC Bank was granted liens and mortgages on the Fairways Real Property to the extent described in the PNC Bank Security Instruments. As of the Petition Date, the Debtor was in default of its obligations under the Loan Documents. The Debtor's outstanding obligations under the respective Loan Documents as of the Petition Date were as follows: (i) $8,499,780.21 owed to PPRI, (ii) $15,681,599.00 owed to Huntington Bank, and (iii) $2,858,937.00 owed to PNC Bank.

For several months leading up to the Petition Date, the Debtor had been involved in extended discussions and negotiations with Huntington Bank concerning the possibility of refinancing and/or restructuring the loans and notes held by Huntington Bank, certain of which had matured pursuant to their original terms. In recognition of the extraordinary tightening of the capital markets and deteriorating lending conditions, Huntington Bank and the Debtor entered into agreements that allowed the Debtor to continue to operate pursuant to certain terms and conditions described therein. Following the expiration of the most recent of such agreements and without any advance notice to the Debtor, Huntington Bank initiated a foreclosure action on the Petition Date in the County Court of Chautauqua County, New York concurrently therewith filed papers seeking ex parte appointment of a receiver of the Resort. The County Court granted Huntington Bank's ex parte request to appoint a receiver, who immediately attempted to seize control of the Resort. To protect the interests of its Creditors and Equity Holders, the Debtor filed a petition under chapter 11 of the Bankruptcy Code and reasserted management and control over the Resort.

During the pendency of the Chapter 11 Case, the Debtor analyzed its historical financial performance and developed financial projections in order to properly evaluate various restructuring alternatives. In connection with the Debtor's analysis, it remained clear that despite the unprecedented economic downturn experienced in the fall of 2008 and throughout 2009, the Debtor was able to reduce expenses, improve efficiencies and achieve profitability through Resort operations. Indeed, notwithstanding the depressed economic conditions during this period, the Debtor has continued to generate substantial revenues and has realized in excess of $2,300,000.00 of net operating income in fiscal year 2010. Based upon the conservative projections prepared by the Debtor's senior management and Inglewood Associates LLC, the Debtor anticipates ongoing increases in sales and revenues at the Resort following its emergence from chapter 11 as the Reorganized Debtor. The Reorganized Debtor's obligations to Creditors under the Plan during the next five years will be satisfied with net operating income generated from the operations of the Resort, supplemented by the sale proceeds realized from the sale of condominiums and other for-sale real estate constructed on certain real property comprising the Resort. To the extent the obligations to Creditors under the Plan have not been satisfied in full at the end of the five-year period, the Reorganized Debtor shall obtain financing necessary to repay any remaining obligations.

3.02    Debtor's Management.

As of the Petition Date, the Debtor's management team was comprised of the following individuals: (i) Robert Swenson, President; (ii) Brad Gravink, General Manager; (iii) Jeff TeCulver, Treasurer; (iv) John Tau, Controller; (v) Carol Schenk, Director of Food and Beverage; (vi) Don Haringa, Director of Snow Sports; (vii) Dwayne Randall, Director of Golf; and (viii) Lori Bridges, Director of Human Resources.

3.03     Debtor's Relationships With Affiliates and Insiders.

         Pursuant to the definitions of "affiliate" and "insider" set forth in sections 101(2) and (31)(A), respectively, of the Bankruptcy Code, the only known persons or entities that could be classified as affiliates or insiders of the Debtor are the following:  Paul E. Kiebler, IV, the Debtor's Managing Member; Robert Swenson, the Debtor's President; Raymond Theiss, the Debtor's Chief Financial Officer and General Counsel; Jeff TeCulver, the Debtor's Treasurer; Apollo Property Management, LLC the Debtor's property management company; Kiebler Properties, LLC, holder of 84% of the equity interests in the Debtor; R. Gordon Matthews (Estate), the holder of 15% of the equity interests in the Debtor; Jody Kiebler, holder of 1% of the equity interests in the Debtor; Kiebler Water Services, Inc., the Debtor's wholly-owned subsidiary; Kiebler Sewage Services, Inc., the Debtor's wholly-owned subsidiary;

         For the reasons set forth elsewhere in this Disclosure Statement, including without limitation the resort management expertise and important relationships established by the Debtor's current management, the Debtor believes that the continuation of substantially all of current management personnel in their respective capacities will best serve the interests of Creditors and parties in interest.  As described in the Reorganized Debtor's financial projections discussed in Section 8.2 hereof, the aggregate annual salary expense for the Reorganized Debtor's management personnel is projected as approximately $695,000.

         As provided under the Plan, all of the existing capital Interests in the Debtor shall be cancelled and the holders of such Interests shall receive no property or distributions under the Plan on account thereof.  On the Effective Date of the Plan, Bluewater Ski Trust shall receive 100% of the membership units in the Reorganized Debtor in exchange for a cash payment to the Reorganized Debtor equal to One Million Two Hundred Thousand Dollars ($1,200,000). Bluewater Ski Trust is an Ohio statutory trust to be formed by Paul Kiebler, IV and others.

3.04     Summary of Debtor's Current Financial Condition.

         Copies of the most recent Monthly Operating Reports are appended hereto as Exhibits B and C.  Additional copies may be obtained, at reproduction cost, by directing a written request to Debtor's counsel, Curtis L. Tuggle, Esq., at Thompson Hine LLP, 3900 Key Center, 127 Public Square, Cleveland, Ohio 44114.  Copies of the respective Monthly Operating Reports may also be downloaded from the Court's ECF system.

## IV.

## SUMMARY OF THE DEBTOR'S PLAN

4.01     Classification of Claims and Distribution to Creditors.

         The following table summarizes the classification and treatment of Claims and Interests under the Plan, including whether a class is impaired or unimpaired and the Debtor's estimates of the approximate dollar amounts of the claims in each class, which estimates are based on the Debtor's records and Schedules, as well as its preliminary assessment as to the validity of the proofs of claim filed in this Chapter 11 Case.

13

Notwithstanding the treatment set forth below, a holder of any Allowed Claim may elect to receive a lesser and different treatment if so agreed with the Debtor or the Reorganized Debtor, as the case may be.

**ANY IMPAIRED CLASS OF CREDITORS IN WHICH NO MEMBER VOTES TO ACCEPT OR REJECT THE PLAN WILL BE DEEMED TO HAVE ACCEPTED THE PLAN.**

**THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF.**

| Class | Description And Amount | Treatment Under The Plan | Estimated Aggregate Recovery | Status |
|---|---|---|---|---|
| N/A | Administrative Expense Claims<br><br>To be determined | Unless a holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Reorganized Debtor will pay all Allowed Administrative Claims in Cash in full on the Effective Date or as soon thereafter as is reasonably practicable. | 100% | N/A |
| N/A | Priority Tax Claims<br><br>N/A | The Reorganized Debtor will satisfy the Priority Tax Claim in full as part of Class 5(a) of the Plan. | 100% | N/A |
| 1 | Huntington Bank Claim<br><br>Not fully liquidated | To the extent the Huntington Bank Claim is Allowed, the Allowed amount of the Huntington Bank Claim will be satisfied without bifurcation under section 506(a) of the Bankruptcy Code. After the Effective Date and to the extent the Huntington Bank Claim is Allowed, in full and final settlement, satisfaction and discharge of the Huntington Bank Claim, Huntington Bank shall receive the New Huntington Bank Senior Secured Note, in the principal amount equal to the Allowed amount of the Huntington Bank Claim. The New Huntington Bank Senior Secured Note shall accrue interest retroactively from the Effective Date on a monthly basis on the 10th day of each month, to be payable only in the event of and after the date the Huntington Bank | N/A | Impaired |

14

| | | Claim is Allowed by the Court.<br><br>The New Huntington Bank Senior Secured Note shall be paid in equal consecutive monthly installments based on a 300 month amortization at 4.5% simple interest per annum calculated from the Effective Date, with a balloon payment of any unpaid accrued interest and principal due at the end of the 60th month after the Effective Date. The New Huntington Bank Senior Secured Note shall be paid from Net Condominium Sale Proceeds in accordance with the provisions of Article VI of the Plan. The Reorganized Debtor may, in its discretion, pay or prepay all or any part of the indebtedness under the New Huntington Bank Senior Secured Note at any time after the Effective Date.<br><br>Until the Allowed amount of the Huntington Bank Claim has been fully and finally determined by the Court as provided in the Plan, subject to the Estate's avoidance rights and any other claim held by the Estate, the Liens evidenced by the Huntington Bank Security Instruments shall not be released or discharged. | | |
|---|---|---|---|---|
| 2 | PNC Bank Claim<br><br>$1,500,000 | The PNC Bank Claim will be satisfied without bifurcation under section 506(a) of the Bankruptcy Code. As of the Effective Date, the PNC Bank Claim shall be fully and finally settled, satisfied and discharged with a Cash payment in the amount of $1,500,000.00 and an Allowed Administrative Expense Claim in the amount of $50,000. | 100% | Impaired |
| 3 | Cross Estates Claim<br><br>$8,499,780.42 | As of the Effective Date or as soon as reasonably practicable thereafter, in full and final settlement, satisfaction and discharge of the Cross Estates Claim, the Cross Estates shall receive the Cross Estates Guarantee and the Cross Estates Subordinated Secured Note, in the principal amount of $8,499,780.21, which shall be secured by the Liens in favor of the Cross Estates evidenced by the Peek 'N Peak Security Instruments in accordance with the | 100% | Impaired |

15

| | | | | |
|---|---|---|---|---|
| | | same priority against the real property of the Reorganized Debtor as applicable to the real property of the Debtor.<br><br>The Cross Estates Subordinated Secured Note shall accrue interest retroactively from the Effective Date on a monthly basis on the 10th day of each month. The Cross Estates Subordinated Secured Note shall be paid in equal consecutive monthly installments based on a 300 month amortization at five (5%) percent simple interest per annum calculated from the Effective Date with a balloon payment of any unpaid accrued interest and principal due at the end of the 60th month after the Effective Date. The Cross Estates Claim shall also be paid from Net Condominium Sale Proceeds in accordance with the provisions of Article VI of the Plan until the indebtedness under the Cross Estates Subordinated Secured Note has been paid in full. Notwithstanding the foregoing, the Reorganized Debtor may, in its discretion, pay or prepay all or any part of the indebtedness under the Cross Estates Subordinated Secured Note at any time after the Effective Date. | | |
| 4(a) | Secured Real Property Tax Claim<br><br>$1,258,680.32 | The Reorganized Debtor will satisfy the Secured Real Property Tax Claim in full by remitting deferred Cash payments bearing Interest on account of the Secured Real Property Tax Claim of a value, as of the Effective Date, equal to the Allowed amount of such Claim, over a period not exceeding five years after the Petition Date. Notwithstanding the foregoing, the Reorganized Debtor may in its discretion, pay or prepay all or any part of the amount owed to Chautauqua County at any time after the Effective Date.<br><br>The Liens of Chautauqua County shall be divested on the Effective Date of the Plan upon the Ridgeview Real Property; the Fairways Real Property; the Camelot II Real Property; the Stoney Creek Real Property; The Greenwood Forest Real Property; and the | 100% | Impaired |

16

| | | | | |
|---|---|---|---|---|
| | | Tower Project Real Property. | | |
| 4(b) | Secured Sales Tax Claim<br><br>$436,006.13 | The Reorganized Debtor will satisfy the Secured Sales Tax Claim in full by remitting to the State of New York deferred Cash payments bearing Interest on account of the Claim over a period not exceeding five years after the Effective Date. Commencing on the first month after the Effective Date, such deferred Cash payments shall be made to the State of New York on or before the last Business Day of each calendar month, until the Secured Sales Tax Claim has been paid in full, in accordance with the following payment schedule: (i) $5,000 payable each March, April, May, September, October and November; (ii) $15,000 payable each June, July and August; and (iii) $50,000 payable each December, January and February. Notwithstanding the foregoing, the Reorganized Debtor may in its discretion, pay or prepay all or any part of the amounts owed to the State of New York on account of the Secured Sales Tax Claim at any time after the Effective Date.<br><br>The Liens of the State of New York shall be divested on the Effective Date of the Plan upon the Ridgeview Real Property; the Fairways Real Property; the Camelot II Real Property; the Stoney Creek Real Property; the Greenwood Forest Real Property; and the Tower Project Real Property. | 100% | Impaired |
| 5 | On Deck Capital Claim<br><br>$26,468.91 | The On Deck Capital Claim will be satisfied without bifurcation under section 506(a) of the Bankruptcy Code. As of the Effective Date or soon as reasonably practicable thereafter, in full and final settlement, satisfaction and discharge of the On Deck Capital Claim, On Deck Capital shall receive a Cash Distribution equal to $15,000.00. | 57% | Impaired |
| 6(a) | King's Heating Claim | The Reorganized Debtor will satisfy the King's Heating Claim in full by paying Interest only payments on a monthly basis beginning on the 10th day of the month after the Effective Date | 100% | Impaired |

17

| | | | | |
|---|---|---|---|---|
| | $87,891.34 | of the Plan with Interest on the then outstanding balance of the King's Heating Claim calculated from the Effective Date, with a balloon payment of any unpaid accrued Interest and principal due at the end of the 60th month after the Effective Date. Notwithstanding the foregoing, the Reorganized Debtor may, in its discretion, pay or prepay all or any part of the King's Heating Claim at any time after the Effective Date; provided, however, that no such payment may be made to King's Heating until the claims of Huntington Bank and the Cross Estates are paid in full unless otherwise agreed to in advance in writing by Huntington Bank and the Cross Estates.<br><br>The King's Heating Lien shall be divested on the Effective Date of the Plan upon the Ridgeview Real Property; the Fairways Real Property; the Camelot II Real Property; the Stoney Creek Real Property; the Greenwood Forest Real Property and the Tower Project Real Property. | | |
| 6(b) | Builder's Support Claim<br><br>Not fully liquidated | Solely to the extent the Builder's Support Claim is Allowed by the Court pursuant to a Final Order, the Allowed amount of such Claim shall be satisfied without bifurcation under section 506(a) of the Bankruptcy Code as described in the Plan. The Reorganized Debtor will satisfy the Allowed Builder's Support Claim in full by paying Interest only payments on a monthly basis beginning on the 10th day of the month after the Effective Date of the Plan with Interest on the then outstanding balance of the Allowed Builder's Support Claim calculated from the Effective Date, with a balloon payment of any unpaid accrued Interest and principal due at the end of the 60th month after the Effective Date. Notwithstanding the foregoing, the Reorganized Debtor may, in its discretion, pay or prepay all or any part of the Allowed Builder's Support Claim at any time after the Effective Date; provided, however, that no such payment may be made to Builder's | N/A | Impaired |

18

| | | Support until the claims of Huntington Bank and the Cross Estates are paid in full unless otherwise agreed to in advance in writing by Huntington Bank and the Cross Estates.<br><br>The Builder's Support Lien shall be divested on the Effective Date of the Plan upon the Ridgeview Real Property; the Fairways Real Property; the Camelot II Real Property; the Stoney Creek Real Property; the Greenwood Forest Real Property; and the Tower Project Real Property. | | |
|---|---|---|---|---|
| 6(c) | R.W. Larson Claim<br><br>Not fully liquidated | Solely to the extent the R.W. Larson Claim is Allowed by the Court pursuant to a Final Order, the Allowed amount of such Claim will be satisfied without bifurcation under section 506(a) of the Bankruptcy Code as described in the Plan. The Reorganized Debtor will satisfy the Allowed amount of the R.W. Larson Claim in full by paying Interest only payments on a monthly basis beginning on the 10th day of the month after the entry of a Final Order determining the Allowed amount of such Claim with Interest on the then outstanding balance of the R.W. Larson Claim calculated from the Effective Date, with a balloon payment of any unpaid accrued Interest and principal due at the end of the 60th month after the Effective Date. Notwithstanding the foregoing, the Reorganized Debtor may, in its discretion, pay or prepay all or any part of the Allowed R.W. Larson Claim at any time after the Effective Date; provided, however, that no such payment may be made to R.W. Larson until the claims of Huntington Bank and the Cross Estates are paid in full unless otherwise agreed to in advance in writing by Huntington Bank and the Cross Estates.<br><br>The R.W. Larson Lien shall be divested on the Effective Date of the Plan upon the Ridgeview Real Property; the Fairways Real Property; the Camelot II Real Property; the Stoney Creek Real Property; the Greenwood Forest Real Property; and the Tower Project Real Property. | N/A | Impaired |

| 7(a) | Textron Lease Claim $793,025.46 | On the Effective Date or as soon as reasonably practicable thereafter, in full and final settlement, satisfaction and discharge of the Textron Secured Claim, Textron shall receive (i) free and clear of all liens, claims and encumbrances, all right, title and interest of the Debtor in those certain Prolink GPS units described in Schedule 1030366, which secure the Debtor's obligations to Textron evidenced by such Schedule and shall constitute full and final settlement, satisfaction and discharge of all obligations evidenced by Schedule 1030366, and (ii) the Reinstatement of Schedules 1029810, 1029840, 1029857 and 1030365 of the Textron Agreement. | 100% | Impaired |
|------|------|------|------|------|
| 7(b) | Leasenet Lease Claim $145,737.00 | Unless Leasenet agrees to a different treatment, the Leasenet Lease Claim shall be Reinstated on the Effective Date to the extent that it is not paid in the ordinary course of business prior thereto. | 100% | Unimpaired |
| 7(c) | Huntington Bank Lease Claim $1,500.00 | Unless Huntington Bank agrees to a different treatment, the Huntington Bank Lease Claim shall be satisfied in full through the Reinstatement of the Huntington Bank Lease on the Effective Date to the extent that it is not paid in the ordinary course of business prior thereto. Notwithstanding the foregoing, the Reorganized Debtor may in its discretion, pay or prepay all or any part of the amount owed to Huntington Bank on account of the Huntington Bank Lease Claim at any time after the Effective Date. | 100% | Unimpaired |
| 7(d) | GMAC Claim $64,575.00 | Unless GMAC agrees to a different treatment, the GMAC Claim shall be satisfied in full through the Reinstatement of the GMAC Agreement on the Effective Date to the extent that it is not paid in the ordinary course of business prior thereto. Notwithstanding the foregoing, the Reorganized Debtor may in its discretion, pay or prepay all or any part of the amount owed to GMAC on account of the GMAC Claim at any time after the Effective Date. | 100% | Unimpaired |

| 8(a) | Convenience Class of Unsecured Claims $55,000.00 | Unless a holder(s) of an Allowed Unsecured Claim(s) in Class 8(a) agrees to a different treatment, on the Effective Date or as soon as reasonably practicable thereafter, holders of such Allowed Unsecured Claims shall receive Cash Distributions equal to 100% of their Allowed Unsecured Claims in full and final satisfaction thereof. | 100% | Unimpaired |
|------|------|------|------|------|
| 8(b) | Unsecured Claims $3,848,446.14 | Unless a holder(s) of an Allowed Unsecured Claim(s) agrees to a different treatment, on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor will remit to the Distribution Agent of the holders of Allowed Unsecured Claims in Class 8(b) the following "Deferred Cash Distributions": (i) monthly Interest payments in Cash over a period of 60 months after the Effective Date of a value, as of the Effective Date, equal to the outstanding Allowed amount of such Claims; (ii) Pro-Rata Distributions in deferred Cash payments equal to such share of Net Condominium Sale Proceeds, to which the holders of Allowed Unsecured Claims in Class 8(b) are entitled pursuant to Article VI of the Plan, which shall be remitted to the Distribution Agent for the benefit of the holders of such Claims within 30 days of receipt thereof by the Reorganized Debtor, over a period of five years after the Effective Date or until such Claims have been paid in full; and (iii) deferred Cash payments equal to the outstanding amount of such Claims, after application of the payments of interest and Net Condominium Sale Proceeds received by the holders of such Claims, on the five year anniversary date of the Effective Date. Each Holder of an Allowed Unsecured Claim in Class 8(b) shall be entitled to return a Ballot marked to indicate an irrevocable election to reduce such Allowed Claim to $1,000 and forego receipt of Deferred Cash distributions in exchange for a Cash Distribution equal to $1,000 on the Effective Date or as soon as reasonably practicable thereafter in full and | 100% | Impaired |

| | | | | |
|---|---|---|---|---|
| | | final satisfaction thereof. | | |
| 8(c) | Insider Unsecured Claims<br><br>$600,000 | Class 8(c) Insider Unsecured Claims shall receive no property or distribution(s) under the Plan. | 0% | Impaired |
| 9 | Interests | As of the Effective Date, all capital Interests in the Debtor shall be cancelled, and the holders of such Interests shall receive no property or distribution(s) under the Plan on account thereof. | N/A | Unimpaired |

## V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

5.01    Vesting of the Debtor's Assets.

All property of the Estate, other than that specifically addressed in this Subsection, shall vest automatically in the Reorganized Debtor on the Effective Date free and clear of all Liens, Claims and Interests, except as otherwise specifically provided for in this Plan or the Confirmation Order.

Ridgeview Real Property:

The five condominium units situated on the Ridgeview Real Property (the "Ridgeview Condominiums") will vest in the Reorganized Debtor free and clear of all Liens, Claims and Interests, except as otherwise specifically provided in this Plan or the Confirmation Order, subject to the condition that Net Condominium Sale Proceeds from the sale of each of the Ridgeview Condominium Units shall be distributed as follows: (i) 80% will be paid to (a) Huntington Bank (subject to Article IV(c)(2) of the Plan) to be applied to the principal balance of the New Huntington Bank Senior Secured Note until such indebtedness has been paid in full and, thereafter, (b) the Cross Estates, equally, to be applied to the principal balance of the Cross Estates Subordinated Secured Note until such indebtedness has been in paid in full and, thereafter, (c) the Distribution Agent for the benefit of the holders of Allowed Unsecured Claims in Class 8(b) until such indebtedness has been paid in full, and (ii) remainder will be paid to the Reorganized Debtor.  Upon the Reorganized Debtor's entry into a written contract with a third party for the sale of any Ridgeview Condominium and within three (3) Business Days of the Reorganized Debtor's written notice thereof, Huntington Bank and the Cross Estates shall deliver to counsel for the Reorganized Debtor, to hold in escrow pending the closing of such sale, fully executed release instruments prepared by the Reorganized Debtor and in form and substance satisfactory to Huntington and the Cross Estates.  Upon the closing of the sale of such Ridgeview Condominium, the release instrument shall be duly recorded and any fees and expenses therewith shall be satisfied by the Reorganized Debtor and included in the calculation

22

of Net Condominium Sale Proceeds.  In the event the sale of such Ridgeview Condominium fails to close within a reasonable time period, the release instrument shall be destroyed by counsel for the Reorganized Debtor.

Greenwood Forest Real Property:

The time shares comprising the Greenwood Forest Real Property (the "Greenwood Forest Time Shares") will vest in the Reorganized Debtor free and clear of all Liens, Claims and Interests, except as otherwise specifically provided in this Plan or the Confirmation Order subject to the condition that Net Condominium Sale Proceeds from the sale of each of the Greenwood Forest Time Shares shall be distributed as follows: (i) 100% of the direct costs and expenses resulting from the improvement of the Greenwood Forest Real Property will be paid to the Reorganized Debtor or other party that satisfied such costs and expenses and, thereafter; (ii) 80% will be paid to (a) Huntington Bank (subject to Article IV(c)(2) of the Plan) to be applied to the principal balance of the New Huntington Bank Senior Secured Note until such indebtedness has been paid in full and, thereafter, (b) the Cross Estates, equally, to be applied to the principal balance of the Cross Estates Subordinated Secured Note until such indebtedness has been in paid in full and, thereafter, (c) the Distribution Agent for the benefit of the holders of Allowed Unsecured Claims in Class 8(b) until such indebtedness has been paid in full and, therafter; (iii) remainder will be paid to the Reorganized Debtor.  Upon the Reorganized Debtor's entry into a written contract with a third party for the sale of any Greenwood Forest Time Share and within three (3) Business Days of the Reorganized Debtor's written notice thereof, Huntington Bank and the Cross Estates shall deliver to counsel for the Reorganized Debtor, to hold in escrow pending the closing of such sale, fully executed release instruments prepared by the Reorganized Debtor and in form and substance satisfactory to Huntington and the Cross Estates.  Upon the closing of the sale of such Greenwood Forest Time Share, the release instrument shall be duly recorded and any fees and expenses therewith shall be satisfied by the Reorganized Debtor and included in the calculation of Net Condominium Sale Proceeds.  In the event the sale of such Greenwood Forest Time Share fails to close within a reasonable time period, the release instrument shall be destroyed by counsel for the Reorganized Debtor.

Fairways Real Property:

The twelve condominium units situated on the Fairways Real Property (the "Fairways Condominiums") will vest in the Reorganized Debtor free and clear of all Liens, Claims and Interests, except as otherwise specifically provided in this Plan or the Confirmation Order, and subject to the following conditions:

(a)     On or prior to the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor will secure financing in an amount not to exceed $1,850.000 from a financial institution or other party selected by the Reorganized Debtor in its sole discretion (the "Fairways Real Property Lender") pursuant to terms and conditions agreed to by the Reorganized Debtor in its reasonable business judgment, which terms and conditions may include, among other things, the Reorganized Debtor granting the Fairways Real Property Lender a first priority mortgage and lien upon the Fairways Real Property to secure the Reorganized Debtor's repayment of such indebtedness;

23

(b)     Upon request of the Reorganized Debtor, the Cross Estates shall promptly execute and deliver a subordination agreement in favor of the Fairways Real Property Lender, in form and substance reasonably satisfactory to the Cross Estates and the Fairways Real Property Lender, that shall subordinate the Liens on the Fairways Real Property in favor of the Cross Estates to the mortgage and liens granted by the Reorganized Debtor to the Fairways Real Property Lender;  and

(c)     Net Condominium Sale Proceeds realized from the sale of each of the Fairways Condominiums shall be distributed as follows:

> (i)     100% of the Net Condominium Sale Proceeds will be paid to the Fairways Real Property Lender until the Fairways Real Property Lender has been paid in full;

> (ii)    upon payment in full of the indebtedness owed to the Fairways Real Property Lender, the Net Condominium Sale Proceeds will be paid, equally, to the Cross Estates to be applied to the principal balance of the Cross Estates Subordinated Secured Note until the Cross Estates have been paid in full;

> (iii)   upon payment in full of the indebtedness under the Cross Estates Subordinated Secured Note, the Net Condominium Sale Proceeds will be paid to the Distribution Agent for the benefit of the holders of Allowed Unsecured Claims in Class 8(b) until such holders have been paid in full; and

> (iv)    the remainder of the Net Condominium Proceeds, if any, shall be retained by the Reorganized Debtor.

Upon the Reorganized Debtor's entry into a written contract with a third party for the sale of any Fairways Condominium and within three (3) Business Days of the Reorganized Debtor's written notice thereof, the Fairways Real Property Lender and the Cross Estates shall deliver to counsel for the Reorganized Debtor, to hold in escrow pending the closing of such sale, fully executed release instruments prepared by the Reorganized Debtor and in form and substance satisfactory to the Fairways Real Property Lender and the Cross Estates.  Upon the closing of the sale of such Fairways Condominium, the release instrument shall be duly recorded and any fees and expenses therewith shall be satisfied by the Reorganized Debtor.  In the event the sale of such Fairways Condominium fails to close within a reasonable time period, the release instrument shall be destroyed by counsel for the Reorganized Debtor.

<u>Development Property</u>:

The condominium units to be developed on the Camelot II Real Property (the "Camelot II Condominiums"), the proposed condominium units to be developed on the Stoney Creek Real Property (the "Stoney Creek Condominiums"), the proposed condominium units to be developed on the Tower Project Real Property (the "Tower Project Condominiums") and the proposed condominium units or single family residences to be developed on the Future Development Real Property (the "Future Development Property Units", and together with the Camelot II

24

Condominiums, Stoney Creek Condominiums, and Tower Project Condominiums, collectively, the "Development Property Units") will vest in the Reorganized Debtor subject to the Liens of Huntington Bank (subject to a determination by the Court that such Liens are valid and enforceable) and the Cross Estates and free and clear of all other Liens, Claims and Interests, except as otherwise specifically provided in this Plan or the Confirmation Order, and subject to the following conditions:

(a)     Subject to the limitations provided in Article IV(c) of the Plan, until the indebtedness under the New Huntington Bank Senior Secured Note has been satisfied in full the Release Price specified in subparagraph (b) below for the applicable parcel of real property on which the Development Property Units will be constructed shall be paid to Huntington Bank and, thereafter, to the Cross Estates until the amount of indebtedness under the Cross Estates Subordinated Secured Note has been paid in full.  Upon receipt of the Release Price by Huntington Bank or the Cross Estates, as applicable, Huntington Bank, the Cross Estates and any other holder of a Lien on such parcel shall fully release and discharge all of their respective Liens on such parcel by promptly executing and recording release instruments prepared by and in form and substance satisfactory to Huntington Bank and the Cross Estates.  Such release instruments shall be duly executed and recorded concurrently with the closing and Huntington Bank's or the Cross Estates receipt of the Release Price, as applicable.  Any fees and expenses associated with the recording of such release instruments shall be satisfied by the Reorganized Debtor.  To the extent the Release Price is paid to Huntington Bank, the Reorganized Debtor shall concurrently with the remittance of such Release Price payment deliver written notice thereof to the Cross Estates and other holder, if any;

(b)     The Release Price for each parcel of real property on which the Development Property Units will be constructed, which is assumed to be taken down in multiple phases as the complexes are developed such that each phase and corresponding parcel may be less than one acre, shall be calculated as follows:

(i)      Camelot II Real Property shall be calculated based upon a Release Price equal to $120,000 per acre (estimated as equivalent to $10,000 per unit);

(ii)     Stoney Creek Real Property shall be calculated based upon a Release Price equal to $120,000 per acre (estimated as equivalent to $13,043 per unit);

(iii)    Tower Project Real Property shall be calculated based upon a Release Price equal to $120,000 per acre (estimated as equivalent to $4,000 per unit); and

(iv)     Future Development Real Property shall be calculated based upon a Release Price equal to $120,000 per acre.

(c)     The Net Condominium Sale Proceeds from the sale of each of the Development Property Units will be distributed in accordance with the respective percentages and order of priority set forth below, such that upon payment in full of the indebtedness owed to any holder of senior indebtedness, the holder of indebtedness immediately junior in priority shall be entitled to receive the distributions to which such senior holder would otherwise have been entitled:

25

(i)     35% to Huntington Bank (subject to Article IV(c)(2) of the Plan) to be applied to the principal balance of the New Huntington Bank Senior Secured Note;

(ii)    25%, equally, to the Cross Estates to be applied to the principal balance of the Cross Estates Subordinated Secured Note;

(ii)    20% to the Distribution Agent for the benefit of the holders of Allowed Unsecured Claims in Class 8(b); and

(iii)   remainder to the Reorganized Debtor.

5.02    Equity Interests in Reorganized Debtor.

On the Effective Date, the Bluewater Ski Trust shall remit to the Reorganized Debtor in immediately available funds a payment equal to One Million Two Hundred Thousand Dollars ($1,200,000) as consideration for 100% of the membership units to be issued by the Reorganized Debtor upon the Effective Date. On the Effective Date, all of the membership units issued by the Reorganized Debtor shall vest in and be distributed to the Bluewater Ski Trust with all accompanying rights, remedies and interests customarily associated with ownership of equity interests in a limited liability company formed under the laws of the State of Ohio.

5.03    Dissolution of Creditors' Committee.

On the Effective Date, the Committee shall be dissolved, employment of the Committee's counsel shall terminate, and the members of the Committee shall be released of all duties, responsibilities, and obligations related to or arising from or in connection with this Chapter 11 Case.

5.04    Distribution Agent.

On the Effective Date, the Distribution Agent will be appointed pursuant to the terms of the Confirmation Order. Confirmation of the Plan shall constitute the appointment of the Distribution Agent. The Distribution Agent will serve until such time as all Distributions to the holders of Allowed Class 8(b) Unsecured Claims, through the Distribution Agent, are made under this Plan.

On and after the Effective Date, the Reorganized Debtor will remit to the Distribution Agent all amounts due and owing to the Distribution Agent for the benefit of holders of Allowed Unsecured Claims in Class 8(b) as provided under and in accordance with this Plan.

The Bankruptcy Court will retain jurisdiction to hear disputes concerning the Distributions to the Distribution Agent, required for the benefit of holders of Allowed Class 8(b) Unsecured Claims. The Distribution Agent and the Reorganized Debtor will each have the right to bring any such dispute before the Bankruptcy Court. Notwithstanding the foregoing, the rights of the Distribution Agent and the Reorganized Debtor to bring such dispute before the Bankruptcy Court will be limited to the extent necessary to ensure payments required under the Plan.

The Distribution Agent will prepare and maintain an adequate set of financial books, records or data bases that will allow the Distribution Agent to track the amount of Class 8(b) Unsecured Claims asserted against the Estate and the amounts paid to each holder of Allowed Class 8(b) Unsecured Claims pursuant to the terms of this Plan; *provided, however*, that the Distribution Agent also shall be entitled to request the use of the Reorganized Debtor's books and records. The Reorganized Debtor shall provide reasonable access to its financial books and records to the Distribution Agent during normal business hours. The Distribution Agent shall continue to make Distributions to holders of Allowed Class 8(b) Unsecured Claims in accordance with this Plan until all such Distributions have been made in accordance with this Plan.

5.05    Oversight of the Distribution Agent.

All activities of the Distribution Agent shall be subject to oversight by the Distribution Agent Oversight Committee. Up to four members of the Committee willing to serve shall become the Distribution Agent Oversight Committee, effective as of the Effective Date. Any member of the Distribution Agent Oversight Committee who transfers its Claims shall be deemed to have resigned from the Distribution Agent Oversight Committee effective as of the date of such transfer, and such member shall not be permitted to serve on Distribution Agent Oversight Committee. No successor of a member of the Distribution Agent Oversight Committee, and no transferee of a Claim held by a member of the Distribution Agent Oversight Committee, shall be permitted to serve as a member of the Distribution Agent Oversight Committee. The Distribution Agent Oversight Committee shall not receive compensation from the Reorganized Debtor.

The Distribution Agent shall provide the Distribution Agent Oversight Committee a monthly invoice of fees and expenses incurred. The Distribution Agent's fees and expenses shall be paid from the Deferred Cash Distributions within 30 days of the receipt of such invoice. In the event of a dispute over the Distribution Agent's requested fees and expenses, the portion of the Distribution Agent's fees and expenses that is not in dispute shall be paid. The Bankruptcy Court shall retain jurisdiction to hear and decide any unresolved dispute over the Distribution Agent's requested fees and expenses. Only the Distribution Agent Oversight Committee will have standing to object to the payment of the Distribution Agent's fees and expenses.

5.06    Operation of the Reorganized Debtor.

(1)    The Reorganized Debtor. The Debtor shall continue to operate as a debtor-in-possession from the Confirmation Date through and until the Effective Date. Upon the Effective Date, all matters provided under the Plan shall be deemed authorized and approved without further approval from the Bankruptcy Court, and the Reorganized Debtor will be authorized to conduct its business activities in the ordinary course of business. The Reorganized Debtor will execute the Plan through a continuation of its operations as contemplated under the Plan, and it may use, sell, acquire, lease or otherwise dispose of its property in accordance with the Plan and the Confirmation Order, but shall otherwise be free of any restrictions imposed by the Court, the Bankruptcy Code, or the Bankruptcy Rules. The Reorganized Debtor will use net available income derived from the operation of its business in the ordinary course for the purpose of carrying out the terms of the Plan and funding the payments contemplated by the Plan.

27

(2)    No Recourse.  Neither the Debtor, the Reorganized Debtor nor the Committee or any of their respective members, employees, officers, directors, managers, agents, attorneys, or advisors, shall have or incur any liability to any holder of a Claim or Interest or any other party in interest, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, the negotiation, formulation and preparation of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration or distribution of property under the Plan, except for their gross negligence or willful misconduct, and in all respects they shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. The entry of the Confirmation Order shall constitute the determination by the Court that the Debtor, the Committee, and each of their respective current and former members, employees, officers, directors, managers, agents, attorneys, and advisors shall have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code pursuant to, among others, sections 1125(e) and 1129(a)(3) of the Bankruptcy Code, with respect to the foregoing.  Nothing herein shall be construed, however, to relieve the Debtor or the Reorganized Debtor, or any other party, from performing their respective obligations under the Plan.

5.07    Distributions to Insiders of Reorganized Debtor.

Except as specifically set forth in the Plan, until such time as the Allowed Claims have been paid in full the Reorganized Debtor shall not (i) make any payment, incur any liability or provide other consideration to any person or entity, for the purchase, acquisition, redemption, repurchase, payment or retirement of any capital stock, membership units or other equity interest of the Reorganized Debtor or as a dividend, return of capital or other distribution in respect of the Reorganized Debtor's capital stock, membership units or other equity interest; (ii) guaranty any debt or the performance or payment of any obligation, or incur any indebtedness, borrow any funds or obtain any loans or letters of credit for the benefit of any Insider of the Reorganized Debtor, (iii) make any loan to any member, shareholder, investor, employee, officer, director, agent or Insider of the Reorganized Debtor or any party affiliated with or related to any of the foregoing, (iv) provide bonuses, distributions, management fees or other non-salary compensation to any Insider of the Reorganized Debtor, except for management fees equal to 2% of gross operating revenues of the Reorganized Debtor payable monthly so long as the Reorganized Debtor, in its reasonable business judgment, has sufficient cash flow and liquidity to remit such payments, otherwise such management fees shall accrue and be due and owing when the Reorganized Debtor has sufficient cash flow and liquidity to satisfy such obligations, or (v) provide any salaries, wages or other compensation to Paul Kiebler, IV, unless otherwise agreed to in advance in writing by Huntington Bank, the Cross Estates and the Distribution Agent.

5.08    Injunction and Settlement.

Except as otherwise expressly provided in the Plan or the Confirmation Order, the rights afforded in the Plan and the treatment of all Liens, Claims and Interests therein shall be in exchange for, and in complete satisfaction, discharge and release of, all Claims and Interests of an kind, including without limitation any interest accrued on such Claims from and after the Petition Date, except as otherwise set forth in the Plan, against the Released Parties.  Except as otherwise provided in the Plan or the Confirmation Order, confirmation of the Plan acts as a

28

discharge effective as of the Effective Date, of any and all debts of the Debtor that arose at any time before the entry of the Confirmation Order, including, but not limited to, all principal or interest, whether accrued before or after the Petition Date. The Debtor's discharge shall be effective as to each Claim, regardless of whether a proof of claim therefor was filed, whether the Claim is an Allowed Claim, or whether the holder thereof votes to accept the Plan. All persons who have held, hold, or may hold Claims against or Interests in the Debtor (including without limitation claims for indemnity and/or contribution) shall be permanently enjoined, on and after the Effective Date, subject to the occurrence of the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such claim or equity interest against the Released Parties, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order against the Released Parties on account of any such claim or equity interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Released Parties or against the property or interests in property of the Released Parties on account of any such claim or equity interest, and (iv) asserting any rights of setoff, subordination, or recoupment of any kind against any obligation due from or against the Released Parties or against the property or interest in property of or against the Debtor or the Reorganized Debtor on account of any such claim or equity interest. The foregoing injunction will extend to successors of the Released Parties and their respective properties and interests in property. Any act taken in violation of this Article shall be null and void, and any party injured by any violation of such injunction shall be entitled to recover actual damages, including costs and attorneys' fees, from the violator and, if appropriate, punitive damages from the willful violator. On and after the Confirmation Date, the provisions of the Plan shall be binding upon the Debtor, the Estate, the Reorganized Debtor, all holders of Claims, all holders of Interests, and all other parties in interest in the Chapter 11 Case, and their respective successors and assigns, in each case whether or not such persons or entities have filed a claim or are impaired and whether or not such persons or entities have accepted the Plan.

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, the Debtor on its own behalf and as representative of its estate, and on behalf of its Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts owing, causes of action, rights, liabilities of any nature whatsoever and remedies of the Debtor's estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against the Released Parties arising from or relating to the period prior to the Effective Date are released by this Plan, including any act, omission or transaction in connection with the Chapter 11 Case, the Plan and the Disclosure Statement that may be asserted by or on behalf of the Debtor or its estate.

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Equity Interest, or other right of a holder of an equity security or other ownership interest that is terminated, and each of its respective Related Persons, shall, and shall

be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally each and all of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to the Debtor, the Debtor's estate, the Reorganized Debtor or any of their respective assets and property, the Chapter 11 Case, the Plan or the Disclosure Statement.

5.09    Administration of Claims.

The Bankruptcy Court established September 3, 2010 as the Bar Date by which all proofs of claim were required to be filed in the Chapter 11 Case. Within 120 days after the Effective Date, or such later date as may be fixed by the Court, the Reorganized Debtor shall complete its review of the Claims and shall initiate and file any and all actions as it deems necessary or appropriate to dispute, disallow, object to, estimate or otherwise quantify the Claims against the Estate, whether scheduled by the Debtor and/or submitted by creditors. The Reorganized Debtor shall take actions regarding the administration, reconciliation and settlement of Claims, and shall object to Claims and prosecute Claims actions with the Court, until such time as the Court determines whether a Claim is an Allowed Claim, or until the Debtor determines that further pursuit of litigation or actions objecting to Claims is no longer cost efficient, or will be of no further benefit. **THE FAILURE TO OBJECT TO ANY CLAIM, OR TO SEEK THE ESTIMATION OF ANY CLAIM, PRIOR TO THE COMMENCEMENT OF THE HEARING ON CONFIRMATION OF THE PLAN SHALL NOT BE DEEMED TO BE A WAIVER OF THE RIGHT TO OBJECT THEREAFTER TO SUCH CLAIM IN WHOLE OR IN PART AND WHETHER THE CLAIM HAS BEEN SCHEDULED OR NOT, OR TO THEREAFTER SEEK ESTIMATION OF SUCH CLAIM FOR THE PURPOSE OF DISTRIBUTION.**

5.10    Pursuit of Causes of Action.

As of the Effective Date, the Causes of Action shall vest in, and they shall be retained and enforced by, the Reorganized Debtor pursuant to Bankruptcy Code section 1123(b)(3)(B). The Reorganized Debtor shall have full, exclusive and complete authority to pursue and prosecute such Causes of Action, or to refrain from pursuing any Cause of Action, including, without limitation, those Causes of Action listed on Exhibit C hereto. The Reorganized Debtor shall have the authority to compromise, settle and resolve any Cause of Action upon such terms and conditions as the Debtor deems appropriate. **ALL CAUSES OF ACTION SHALL SURVIVE CONFIRMATION, AND THE ASSERTION OF CAUSES OF ACTION SHALL NOT BE BARRED OR LIMITED BY ANY ESTOPPEL, WHETHER JUDICIAL, EQUITABLE OR OTHERWISE.** In addition, claims for avoidance of preferences and fraudulent transfers are hereby preserved for the benefit of the Estate and the Reorganized Debtor, but the Debtor and the Reorganized Debtor retain the right, in their respective sole discretion, to abandon any or all such claims.

All proceedings relating to the allowance, disallowance, subordination or estimation of Claims will be investigated, filed, enforced, exercised, abandoned, adjusted, settled or compromised by the Reorganized Debtor at its sole cost and expense.

Each and every holder of an Allowed Claim that elects to participate in the distributions provided for under the Plan represents and warrants to the Debtor that such holder is authorized to accept in consideration of such Allowed Claims the distributions provided for under the Plan and that there are no outstanding commitments, agreements or understandings, express or implied, that may in any way defeat or modify the rights conveyed or released or the obligations undertaken under the Plan.

5.11   Effectuating Documents; Further Transactions.

The Debtor and the Reorganized Debtor shall be authorized to execute, deliver, file, and/or record such contracts, instruments, releases, and other agreements or documents, and to take such other actions, as may be necessary, desirable or appropriate to effectuate and further evidence the terms and conditions of the Plan.

5.12   U. S. Trustee Fees and Reports.

The Reorganized Debtor shall pay any and all fees of the Office of the United States Trustee as and when such fees become due, and it shall file with the Office of the United States Trustee all reports which are required pursuant to the relevant guidelines of the Office of the United States Trustee.

**VI.**

**PROVISIONS REGARDING DISTRIBUTIONS**

6.01   Distributions by the Reorganized Debtor.

On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make Distributions with respect to Allowed Administrative Expense Claims. Subsequent to the Effective Date, the Reorganized Debtor shall make Distributions with respect to all other Allowed Claims as set forth in the Plan. The Reorganized Debtor will continue to make Distributions up to and including the Consummation Date.

6.02   Interest and Fees.

Except as set forth in a Final Order of the Court entered in the Chapter 11 Case or as otherwise set forth in the Plan, no holder of any Claim shall be entitled to interest or fees of any nature whatsoever accruing on or after the Petition Date on such Claim.

6.03   Means of Payment.

All payments made pursuant to the Plan shall be in Cash and by any means reasonably selected by the Reorganized Debtor, including check or wire transfer, and may include any endorsement or limitation as may be approved by the Reorganized Debtor.

6.04    Duties of Reorganized Debtor.

The Reorganized Debtor will have responsibility for determining Distributions as necessary and for sending such Distributions to the appropriate holders of Claims. The duties of the Reorganized Debtor are limited to the functions set forth specifically in the Plan.  The Reorganized Debtor and its managers, members, officers, directors, attorneys and other agents shall incur no liability for their respective actions (or failures to act) or conduct pursuant to the Plan except to the extent attributable to their willful misconduct or gross negligence. Notwithstanding any other provision of the Plan to the contrary, Distributions may be deferred or delayed in the discretion of the Reorganized Debtor for a reasonable time in the event that additional time is needed to make a proper Distribution, or in the event that the receipt of additional funds is necessary to make meaningful payments.

6.05    Unclaimed Property.

Any property to be distributed on account of a Claim against or Interest in the Debtor shall be distributed by mail to the latest mailing address filed of record for the party entitled thereto, or if no such mailing address has been so filed, the mailing address reflected in the Debtor's Schedules.  Any property so distributed that is unclaimed for longer than ninety days after the distribution thereof by mail shall become property of the Reorganized Debtor and such persons to whom such unclaimed assets are distributed shall be eliminated from all future mailings of the Reorganized Debtor, no subsequent Distributions shall be made on account of such Claim, and such Claim shall be treated as being Disallowed, waived, and satisfied.  These provisions shall apply without regard to any applicable nonbankruptcy laws with respect to unclaimed property.

**VII.**

**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

7.01    Alternatives.

This Disclosure Statement is designed to provide information to the Creditors to assist them in forming a judgment as to whether to vote to accept or reject the Plan.  A brief discussion of alternatives to the Plan may be useful in making this decision.  The Debtor believes that the Plan is the best alternative for one simple reason:  **Only the Plan allows for a realistic likelihood of full payments to all holders of Allowed Claims**.  Under any alternative scenario, operations at the Resort will be suspended, disrupted, hindered, and/or terminated, with only Chautauqua County, New York, The Huntington National Bank, PNC Bank, N.A. and the Cross Estates, and perhaps one or more other secured creditors, likely to realize any recoveries on their Claims.  In arriving at the conclusion that the Plan provides the best hope of recovery for all Creditors, the Debtor has evaluated the various alternatives as follows:

(1)    Continuation of the Chapter 11 Case by a Chapter 11 Trustee.  The Debtor believes that such action would not be in the best interest of the Creditors due, in part, to the delay and costs associated with such an appointment.  More importantly, a trustee would lack both the resort management expertise that the Debtor has accumulated and the important relationships that the Debtor has developed.  Despite the recent deep recession, the Debtor has

32

achieved improved profitability and strong cash flow. The Debtor is not in need of exit financing in order to fund the payments contemplated by the Plan, and it is in the best position to ensure that the recent successes are continued, having devoted its efforts toward reducing expenses and improving profitability in previous and current fiscal year and beyond. With its recent successes, its important relationships relative to the Resort, and its expertise in the management of a four-season recreation complex, the Debtor is best suited to ensure future profitability. For these reasons, the Debtor believes holders of Allowed Claims would receive substantially less upon appointment of a chapter 11 trustee than they will under the Plan.

(2)     Dismissal of the Chapter 11 Case. Dismissal of the Chapter 11 Case would allow The Huntington National Bank and any other parties to initiate or resume non-bankruptcy litigation and collection remedies against the Debtor. Because secured lenders, whose rights are superior to all other creditors, would be entitled to exercise their state law foreclosure rights upon a dismissal of the Chapter 11 Case, the likely result of a dismissal would be satisfaction of the claims of the Debtor's secured lenders only, with no payments to any other Classes of Claims, with the possible exception of one or more secured Creditors.

(3)     Conversion of the Chapter 11 Case to a Chapter 7 Case. The Debtor believes that conversion to chapter 7 and appointment of a chapter 7 trustee would have a detrimental impact on the Estate. As an initial matter, there are attendant costs and delay associated with such an appointment. More significantly, a chapter 7 trustee would be hampered by the same disadvantages that would afflict a chapter 11 trustee, namely, lack of requisite resort management expertise, and none of the important relationships that the Debtor has developed. As mentioned above, despite the recession, the Debtor has achieved improved profitability and strong cash flow. It is not in need of exit financing to fund the payments contemplated by the Plan, and it is in the best position to ensure that the recent successes are continued and that operations at the Resort remain profitable going forward. For the same reasons that the appointment of a chapter 11 trustee would not be in the best interest of the Estate or Creditors, the Debtor believes holders of Allowed Claims would receive substantially less upon appointment of a chapter 7 trustee than they will under the Plan.

While the ultimate distributions under the Plan cannot be guaranteed, for the reasons set forth above, the Debtor believes the Plan is clearly superior to any other alternative in that it is the only available means by which to provide a complete recovery for holders of Allowed Claims.

## VIII.

## VALUATION OF DEBTOR'S ASSETS AND LIABILITIES

8.01     Valuation of the Resort.

On September 17, 2010, the Debtor received an appraisal of the Resort (the "Resort Appraisal") that was prepared at its request by Hotel & Leisure Advisors, a hospitality consulting firm located in Cleveland, Ohio that specializes in, among other things, appraisals, feasiblity studies, asset management and property condition assessments for hotels, waterparks, resorts, golf courses, ski resorts, restaurants, conference and convention centers and other leisure real

33

estate. In order to prepare the appraisal report, Hotel & Leisure Advisors diligently examined and evaluated the Resort, which is comprised of 107 hotel rooms, the 12 Fairways Condominiums, the 5 Ridgeview Condominiums, 105 acres of downhill skiing, two 18-hole golf courses, water and sewage treatment facilities, a miniature golf course, convenience store/gas station, numerous support facilities and undeveloped land, and various financial information related to the Resort's historical and projected performance that was provided by the Debtor. As detailed in the Resort Appraisal, Hotel & Leisure Advisors concluded that the as is market value of the Resort real estate as of June 23, 2010 is $31,600,000.

8.01    Liquidation Analysis.

A liquidation analysis of all assets in the Debtor's Estate is set forth on the attached Exhibit D. The purpose of the liquidation analysis is to provide the holders of Claims with a means to compare the results under the Plan to the results for such parties if the Chapter 11 Case was converted to a case under chapter 7 of the Bankruptcy Code, and the Debtor was then liquidated. Under section 1129(a)(7) of the Bankruptcy Code, to confirm the Plan, each holder of a Claim whose rights are impaired and who does not accept the Plan must receive or retain property of a value or under the Plan as of the Effective Date that is not less than the amount that such holder would retain or receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code as of such date. *See* INTRODUCTION, § 1.06 Requirements for Confirmation of Plan. This is sometimes referred to as the "best interests" test. The liquidation analysis is based upon the Debtor's good faith estimate of what it believes is the realizable value of its assets, and projections of the likely costs of liquidation and administration of the Debtor's Estate. For the reasons already explained, the Debtor believes only the Plan provides for a reasonable probability of full recovery for Creditors other than the Secured Lenders.

8.02    Feasibility.

As a condition to confirmation, the Bankruptcy Code requires the Court to determine that confirmation is not likely to be followed by liquidation of the Reorganized Debtor or the need for further financial reorganization. For purposes of determining whether the Plan meets this "feasibility" standard, the Debtor's financial advisor, Inglewood Associates LLC, has projected the ability of the Reorganized Debtor to continue operations and meet its obligations under the Plan. Pursuant to the Court's Administrative Order No. 94-3, the Debtor's five- year financial projections, which were prepared by Inglewood Associated LLC, and the Debtor's historical financial statements for the three years preceding the Petition Date are attached hereto as Exhibit E.

The Debtor and Inglewood Associates LLC believe the results set forth in the financial projections are reasonable and attainable and that the Reorganized Debtor will have sufficient funds to operate and meet its obligations under the Plan. Although much effort has been made to ensure that the financial projections and their underlying assumptions are reasonable, it is impossible to guarantee the Debtor's ability to achieve the projected results, which are inevitably subject to unanticipated events and uncertainties, which may affect actual financial results. Therefore, actual results achieved throughout the projection period may be greater or less than projected results.

34

Holders of Claims should carefully read and consider these factors and others set forth in this Disclosure Statement before voting to accept or reject the Plan. As provided in the financial projections, the Debtor believes the Plan is feasible and that the Reorganized Debtor will be able to meet its obligations under the Plan.

## IX.

## FEDERAL INCOME TAX CONSEQUENCES

9.01    General.

The Debtor has not obtained a tax opinion and it expresses no view as to the tax consequences to the holder of any Claim or Interest caused by the terms of the Plan. Creditors are advised and encouraged to obtain their own tax counsel to determine the tax consequences of

BECAUSE THE DEBTOR EXPRESSES NO TAX ADVICE, IN NO EVENT WILL THE DEBTOR OR ITS PROFESSIONAL ADVISORS BE LIABLE FOR THE TAX CONSEQUENCES TO ANY CLAIMANT UNDER THE PLAN. CREDITORS MUST LOOK SOLELY TO AND RELY SOLELY UPON THEIR OWN ADVISORS AS TO THE TAX CONSEQUENCES OF THE PLAN TO ANY CLAIMANT.

## X.

## REORGANIZED DEBTOR

10.01    Consummation Date.

On the Consummation Date, after making the final Distribution under the Plan, the Reorganized Debtor shall be discharged from its duties under the Plan.

## XI.

## GENERAL PROVISIONS

11.01    Retention of Jurisdiction by Bankruptcy Court.

In accordance with title 28 of the United States Code, the Bankruptcy Code, and other applicable law, the Plan provides that the Bankruptcy Court shall retain exclusive jurisdiction of the Chapter 11 Case after the Confirmation Date for the following purposes.

(a)    To classify, allow or disallow Claims and direct distribution of funds under the Plan and to hear and determine any controversies pertaining thereto.

(b)    To hear and determine any and all motions, applications, adversary proceedings and other matters arising out of or related to the Plan, to construe and take any action to enforce the execution of the Plan, the Confirmation Order, or any other Order, or to issue such Orders as may be necessary for the implementation, execution, performance or consummation of the Plan

and all matters referred to herein or in the Confirmation Order or to resolve any disputes concerning any of the foregoing.

        (c)      To hear and decide avoidance actions under chapter 5 of the Bankruptcy Code and turnover actions under sections 543 and 543.

        (d)      To decide matters arising under section 1112 of the Bankruptcy Code.

        (e)      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked or vacated.

        (f)      To adjudicate any disputes concerning payment of pre- or post-Effective Date Professional Fees or expenses or any request for payment of administrative expenses.

        (g)      To modify the Plan or remedy any defect, omission or inconsistency in the Plan and to enter such orders as are necessary or appropriate to carry out the Plan under section 1127(b) of the Bankruptcy Code.

        (h)      To issue injunctions or orders as may be necessary or appropriate to restrain interference with the Plan or its execution and to enforce the permanent injunction under section 524 of the Bankruptcy Code.

        (i)      To hear and determine matters concerning state, local and federal taxes pursuant to sections 346, 505, 525 and 1146 of the Bankruptcy Code.

        (j)      To hear and determine any other dispute or matter relating to the Chapter 11 Case, including without limitation, the Causes of Action, and any other matter subject to the Court's jurisdiction pursuant to applicable law.

## XII.

## SOLICITATION IN CONNECTION WITH THE PLAN

        Although this Disclosure Statement has attempted to provide information regarding the Debtor, the Estate, and the potential benefits that might accrue to Creditors, this Disclosure Statement cannot guarantee the percentages of each Allowed Claim to be realized upon immediate liquidation or that will be received from the Plan if implemented because of the various factors described herein. Despite these uncertainties and risks described herein, the Debtor believes that the Plan is feasible and can provide each holder of a Claim against the Debtor with an opportunity to receive substantially more than the benefits that would be received from liquidation of the Debtor under Chapter 7 of the Bankruptcy Code. **THE DEBTOR RESPECTFULLY SOLICITS YOUR VOTE IN FAVOR OF THE PLAN.**

36

November 24, 2010                        Respectfully Submitted,

                                         /s/ Andrew Turscak
                                         Robert C. Folland (0065728)
                                         Andrew L. Turscak, Jr. (0073851)
                                         Curtis L. Tuggle
                                         THOMPSON HINE LLP
                                         3900 Key Center
                                         127 Public Square
                                         Cleveland, Ohio 44114
                                         (216) 566-5500 (phone)
                                         (216) 566-5800 (fax)
                                         Robert.Folland@Thompsonhine.com
                                         Andrew.Turscak@Thompsonhine.com
                                         Curtis.Tuggle@Thompsonhine.com

                                         *Counsel for Debtor, Kiebler Recreation, LLC*

11546398.6