```
-----------------------------------------------------×
                                                      :
In re                                                 :        Case No. 10-15099
                                                      :
KIEBLER RECREATION, LLC                               :        Chapter 11
                                                      :
                                    Debtor.           :        Judge Randolph Baxter
                                                      :
-----------------------------------------------------×
```

---

# DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION

---

Robert C. Folland
Andrew L. Turscak, Jr.
Curtis L. Tuggle
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, OH  44114-1291
(216) 566-5500

*Counsel to Debtor, Kiebler Recreation, LLC*

Dated:  March 14, 2011

11585568.5

**DEBTOR'S PLAN OF REORGANIZATION**

**ARTICLE I.**

**INTRODUCTION**

Kiebler Recreation, LLC (the "Debtor") proposes the following First Amended Plan of Reorganization (the "Plan") pursuant to section 1121 of title 11 of the United States Code (the "Bankruptcy Code"). All holders of Claims (defined herein) are encouraged to read this Plan and the accompanying Disclosure Statement in their entirety before voting to accept or reject this Plan.

**ARTICLE II.**

**DEFINITIONS AND RULES OF INTERPRETATION**

**1.**     **Scope of Definitions.**

Unless the context otherwise requires, the capitalized terms that follow shall have the following meanings. Any term used in the Plan that is not defined herein, but is otherwise defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules. Whenever the context requires, terms shall include the plural as well as the singular in number, and the masculine shall include the feminine and the feminine shall include the masculine in gender. The term "including" shall mean "including, without limitation."

**2.**     **Definitions.**

2.1.   **"Administrative Expense Claim"** shall mean an Allowed Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority payment pursuant to section 507(a)(2) of the Bankruptcy Code, including (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the Debtor's business, (b) compensation for legal and other services and reimbursement of expenses approved, awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code (hereafter, "Professional Fees"), and (c) Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Court.

2.2.   **"Allowed Claim" or "Allowed"** (when used with respect to a Claim) shall mean a Claim against the Debtor to the extent that such Claim (a) has been allowed by a Final Order of the Court; (b) is (i) listed in the Debtor's Schedules, other than a Claim that is Scheduled at zero, unknown, as disputed, contingent, or unliquidated, or listed as disputed under the Plan or (ii) evidenced by a proof of claim that has been filed with the Court on or before the Bar Date or deemed filed pursuant to any Final Order of the Court or under applicable law, and as to which (A) no objection to its allowance has been timely filed; (B) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (C) the Claim is allowed pursuant to the terms of this Plan. Notwithstanding any other provision of the Plan, the term "Allowed Claim" shall not include any Claim held by a creditor against which the Debtor or the

2

Reorganized Debtor has asserted a claim or objection that has the effect of precluding a Distribution with respect to such Claim.

2.3.     **"Bankruptcy Code"** shall mean 11 U.S.C. § 101 *et seq.*, as in effect with respect to the Chapter 11 Case on the date of the filing of this Plan.  All code references herein are to the Bankruptcy Code, unless otherwise stated.

2.4.     **"Bankruptcy Rules"** shall mean: (a) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, (b) the Federal Rules of Civil Procedure, and (c) the Local Rules of the Court, all as amended from time to time and as applicable to this Chapter 11 Case or proceedings therein.

2.5.     **"Bar Date"** shall mean September 3, 2010, the deadline set by the Court by which parties who have, assert, or may have or assert, any Claim against or Interest in the Debtor must file their proof of Claim or Interest with the clerk of the Court.

2.6.     **"Business Day"** shall mean any day, excluding Saturdays, Sundays and legal holidays, on which commercial banks are open for business in Cleveland, Ohio.

2.7.     **"Cash"** shall mean legal tender of the United States of America.

2.8.     **"Camelot II Real Property"** shall mean all that certain parcel of the Resort Real Property preliminarily designated for condominium developments, more particularly identified on <u>Schedule 2.8</u> to this Plan, and all rights and interests of every nature in real estate associated therewith or related thereto.

2.9.     **"Causes of Action"** shall mean any and all actions, claims, rights, demands, causes of action, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment for goods and services and otherwise, rights of setoff or recoupment, defenses, damages, suits, or proceedings of any kind or nature, whether under contract or tort, (a) held by the Debtor under applicable law, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, or (b) created or arising in favor of the Debtor, its Estate under the Bankruptcy Code, including, without limitation, all claims, rights and causes of action arising under section 510 or under any of sections 542 through 553 of the Bankruptcy Code, in each case regardless of whether such actions, causes of action, claims, demands, suits or rights are commenced prior to or after the Effective Date.

2.10.     **"Chapter 11 Case"** shall mean the above-captioned chapter 11 case, Case No. 10-15099, pending in the Court.

2.11.     **"Claim"** shall mean a claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtor.

2.12.     **"Class"** shall mean any class into which Claims or Interests are classified pursuant to this Plan.

11585568.5

2.13.  **"Committee"** shall mean the Official Committee of Unsecured Creditors appointed in the Debtor's Chapter 11 case, as it may be constituted from time to time.

2.14.  **"Confirmation Date"** shall mean the date on which the Confirmation Order is entered on the docket of the Court.

2.15.  **"Confirmation Order"** shall mean the Order entered by the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

2.16.  **"Consummation Date"** shall mean the date on which the Reorganized Debtor makes the final Distribution in accordance with the Plan.

2.17.  **"Court" or "Bankruptcy Court"** shall mean the United States Bankruptcy Court for the Northern District of Ohio, Chapter 11 Case No. 10-15099, or, in the event such Bankruptcy Court ceases to exercise jurisdiction over this Chapter 11 Case, such court or adjunct thereof that exercises jurisdiction over this Chapter 11 Case in lieu of the Bankruptcy Court.

2.18.  **"Creditor"** shall mean a holder of any Claim against the Debtor.

2.18A.  **"Creditor Trust"** shall mean that certain trust established pursuant to the Plan for the benefit of Class 8(a) Unsecured Claims.

2.18B.  **"Creditor Trust Assets"** shall mean all Causes of Action and all sums due to Class 8(a) Unsecured Creditors and all proceeds of any of them.

2.18C.  **"Creditor Trust Oversight Committee"** shall have the meaning set forth in Article VI, Section 14 of the Plan.

2.18D.  **"Creditor Trustee"** shall mean the trustee for the Creditor Trust, who initially shall be T. Steven Blake of RSM McGladrey, Inc. in Cleveland, Ohio, which firm serves as the financial advisor for the Committee in the Chapter 11 Case.

2.19.  **"Cross Estates"** shall mean the Estate of Eugene Cross and the Estate of Norbert Cross, which hold the Peek 'N Peak Note and Peek 'N Peak Security Instruments.

2.20.  **"Cross Estates Subordinated Note A"** shall mean that certain Subordinated Secured Promissory Note, dated as of the Effective Date, in the principal amount of $3,000,000.00, by the Reorganized Debtor in favor of the Cross Estates in the form of Schedule 2.20 to this Plan.

2.21.  **"Cross Estates Subordinated Note B"** shall mean that certain Subordinated Secured Promissory Note, dated as of the Effective Date, in the principal amount of $5,500,000.00, by the Reorganized Debtor in favor of the Cross Estates in the form of Schedule 2.21 to this Plan.

2.22.  **"Cross Estates Guarantee"** shall mean that certain Guarantee of Payment, dated as of the Effective Date, unconditionally guaranteeing the payment in full of the obligations

4

under the Cross Estates Subordinated Note A and the Cross Estates Subordinated Note B, by Paul Kiebler, IV in favor of the Cross Estates in the form of <u>Schedule 2.22</u> to this Plan.

2.23.    **"Designated Notice"** means notice and an opportunity for a hearing as defined in section 102(a) of the Bankruptcy Code, with notice limited to the Debtor or the Reorganized Debtor as the case may be, the Committee, the United States Trustee, the Estate of Eugene Cross, the Estate of Norbert Cross and The Huntington National Bank and their respective counsel, as well as all other parties in interest who, after entry of the Confirmation Order, file a request for such notice with the clerk of the Court and serve a copy of such notice on counsel to the Reorganized Debtor.

2.24.    **"Disallowed,"** when used with respect to a Claim, shall mean (a) a Claim, or any portion thereof, that has been Disallowed by a Final Order of the Court; (b) a Claim that has been listed in the Schedules at zero, unknown, as contingent, disputed, or unliquidated, or listed as disputed under the Plan and as to which no proof of claim has been timely filed or deemed timely filed with the Court pursuant to the Bankruptcy Code, any Final Order of the Court or other applicable law; or (c) a Claim that has not been listed in the Schedules and as to which no proof of claim has been timely filed or deemed timely filed with the Court pursuant to the Bankruptcy Code, any Final Order of the Court, or other applicable law.

2.25.    **"Disclosure Statement"** shall mean the Debtor's First Amended Disclosure Statement, initially filed with the Court on November 24, 2010, as thereafter amended on March 14, 2011, as it may be further amended or modified by the Debtor from time to time, together with all exhibits, schedules and other attachments thereto, as the same may be amended or modified by the Debtor from time to time.

2.26.    **"Disputed Claim"** means any Claim against the Debtor, including any portion thereof (a) that is neither an Allowed Claim nor a Disallowed Claim or (b) for which a written request for payment has been made, to the extent the Debtor or any party-in-interest has interposed a timely objection or request for estimation, which objection or request for estimation has not been withdrawn or determined by a Final Order.

2.27.    **"Distribution"** shall mean a distribution or payment under the Plan.

2.28.    **[Reserved]**

2.29.    **[Reserved]**

2.30.    **"Effective Date"** shall mean May 31, 2011, provided that all of the conditions set forth in the Plan have been satisfied, or such later date on which all such conditions have been satisfied.

2.31.    **"Excess Cash Flow"** shall mean _____.

2.32.    **"Petition Date"** shall mean May 26, 2010.

2.33.    **"Estate"** shall mean the bankruptcy estate of the Debtor under Section 541 of the Bankruptcy Code created by the commencement of the Chapter 11 Case.

5

2.34. **"Fairways Real Property"** shall mean all that certain real property situated in the County of Chautauqua, State of New York, more particularly described on Schedule 2.34 to this Plan, and all rights and interests of every nature in real estate associated therewith or related thereto.

2.35. **"Final Order"** shall mean an order or judgment, the operation or effect of which has not been stayed, reversed, modified, or amended and as to which the time to appeal, petition for certiorari, or seek re-argument, review or rehearing has expired and as to which no notice of appeal, petition for certiorari, or motion for re-argument, review or rehearing was timely filed or, if timely filed, has been affirmed by the highest court to which the order or judgment was appealed or from which the re-argument or rehearing was sought, or certiorari has been denied, and the time to file any further appeal or to petition for certiorari or to seek further re-argument or rehearing has expired.

2.36. **"Future Development Real Property"** shall mean that certain parcel(s) of the Resort Real Property from time to time designated by the Reorganized Debtor as real property upon which condominium units, time share units and/or single residences may be developed in accordance with Article VI of the Plan, and all rights and interests of every nature in real estate associated therewith or related thereto.

2.37. **"Greenwood Forest Real Property"** shall mean all that certain real property situated in the County of Chautauqua, State of New York, more particularly described on Schedule 2.37 to this Plan, and all rights and interests of every nature in real estate associated therewith or related thereto.

2.38. **"Huntington Bank Notes"** shall mean that certain Mortgage Note, dated as of February 14, 2006, in the principal amount of $11,000,000, by the Debtor in favor of the Huntington National Bank, Amended and Restated Promissory Note, dated as of April 6, 2006, in the principal amount of $4,190,000, by the Debtor in favor of The Huntington Bank, Amended and Restated Promissory Note, dated as of April 6, 2006, in the principal amount of $6,810,000, by the Debtor in favor of The Huntington National Bank, Promissory Note, dated as of September 7, 2006, in the principal amount of $1,000,000, by the Debtor in favor of The Huntington National Bank, Promissory Note, dated as of December 17, 2007, in the principal amount of $1,440,000, by the Debtor in favor of The Huntington National Bank and Promissory Note, dated as of October 31, 2006, in the principal amount of $5,040,000, by the Debtor in favor of Sky Bank (predecessor of The Huntington National Bank).

2.39. **"Huntington Bank Security Instruments"** shall mean that certain Mortgage, dated as of February 14, 2006, by and among the Debtor and Peek 'n Peak Recreation, Inc., in the original principal amount of $11,000,000 and recorded in the Chautauqua County Clerk's Office in Book 2873 of Mortgages at Page 781 on February 15, 2006, subsequently assigned to The Huntington National Bank, Amended and Restated Mortgage, dated as of April 6, 2006, by and among the Debtor and The Huntington National Bank, having been recorded in the Chautauqua County, New York Clerk's Office in Book 2884 of Mortgages at Page 105 on April 11, 2006, Mortgage, dated as of October 31, 2006, by and among the Debtor and Sky Bank (predecessor to The Huntington National Bank), in the original principal amount of up to $5,040,000 and recorded in the Chautauqua County, New York Clerk's Office in Book 2926 of Mortgages at

11585568.5

Page 780 on November 1, 2006, Mortgage, dated as of September 7, 2006, by and among the Debtor and The Huntington National Bank, in the original principal amount of $1,000,000 and recorded in the Chautauqua County, New York Clerk's Office in Book 3000 of Mortgages at Page 723 on November 20, 2007 and Mortgage, dated as of September 17, 2007, by and among the Debtor and The Huntington National Bank, in the original principal amount of $1,440,000 and recorded in the Chautauqua County, New York Clerk's Office in Book 3005 of Mortgages at Page 592 on December 19, 2007.

2.40. **"Interest"** shall mean any equity interest in the Debtor that is of a kind specified in Section 101(16) of the Bankruptcy Code.

2.41. **"Interest" or "Interest Rate"** shall mean simple interest calculated on a per annum basis at a rate equivalent to the rate used to calculate the interest due on money judgments in civil cases in federal district courts. Any Interest due under this Plan will be calculated based on the weekly average 1-year constant maturity Treasury yield for the calendar week preceding the Effective Date.

2.42. **"Lien"** shall mean, with respect to any interest in property, any mortgage, lien, pledge, charge, security interest, easement or encumbrance of any kind whatsoever affecting such interest in property to secure payment of a debt or performance of an obligation.

2.43. **"Net Condominium Sale Proceeds"** shall mean the contract sales price for each condominium unit, time share unit or residence of the Debtor, Reorganized Debtor or any wholly-owned single purpose entity formed by the Reorganized Debtor for the purpose of developing condominiums or other for-sale real estate on certain parcels of the Resort Real Property (the "SPE") plus or minus adjustments for post-petition real estate taxes, plus any credits to the Debtor, Reorganized Debtor or SPE for prior mortgage tax payments under section 339 of the New York Real Property Law; minus the actual amounts paid by the Debtor, Reorganized Debtor or SPE with respect to such sale for: the Release Price(s) as herein defined, if any; real estate commissions to unrelated real estate broker(s); recording and filing fees; and attorney's fees for the closing of such transaction.

2.44. **"New Huntington Bank Note A"** shall mean that certain Promissory Note A, dated as of the Effective Date, in the principal amount of $13,000,000, by the Reorganized Debtor in favor of The Huntington National Bank, in the form of <u>Schedule 2.44</u> to this Plan.

2.45. **"New Huntington Bank Note B"** shall mean that certain Promissory Note B, dated as of the Effective Date, in the principal amount of $2,800,000, by the Reorganized Debtor in favor of The Huntington National Bank, in the form of <u>Schedule 2.45</u> to this Plan.

2.46. **"Order"** shall mean an order of the Court.

2.47. **"Peek 'N Peak Note"** shall mean that certain Secured Promissory Note, dated as of February 14, 2006, in the principal amount of $7,744,300, by and among the Debtor and Peek 'N Peak Recreation, Inc., which was subsequently assigned to the Estate of Norbert Cross and the Estate of Eugene Cross with each party holding an equal one-half interest therein.

11585568.5

2.48. **"Peek 'N Peak Security Instruments"** that certain Mortgage, dated as of February 14, 2006, by and among the Debtor and Peek 'N Peak Recreation, Inc. and Supplemental Mortgage, dated as of April 6, 2006, by and among the Debtor and Peek 'N Peak Recreation, Inc.

2.49. **"Person"** shall mean a "person" as defined in section 101(41) of the Bankruptcy Code.

2.50. **"Petition Date"** shall mean May 26, 2010.

2.51. **"Plan"** shall mean this Plan of Reorganization, as it may be amended or modified by the Debtor from time to time, together with all exhibits, schedules and other attachments hereto, as the same may be amended or modified by the Debtor from time to time, all of which are incorporated herein by reference.

2.52. **"Plan Documents"** shall mean the documents to be executed, delivered, assumed, and/or performed in connection with the consummation of the Plan on or about the Effective Date, each in form and substance satisfactory to the Debtor.

2.53. **"PNC Bank Note"** shall mean that certain Promissory Note, dated as of March 16, 2007, in the principal amount of $3,100,000, by the Debtor in favor of National City Bank (predecessor of PNC Bank, National Association).

2.54. **"PNC Bank Security Instruments"** shall mean that certain Mortgage, acknowledged on March 16, 2007, by and among the Debtor and National City Bank (predecessor of PNC Bank, National Association), in the original principal amount of up to $3,100,000 and recorded in the Chautauqua County, New York Clerk's Office in Book 2952 of Mortgages at Page 146 on March 26, 2007.

2.55. **"Priority Claim"** shall mean an Allowed Unsecured Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

2.56. **"Pro Rata"** shall mean with respect to any Allowed Claim in any Class, that proportion that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in such Class.

2.57. **"Reinstated or Reinstatement"** means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim so as to leave such Claim unimpaired, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim as such maturity existed before such default; (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation other than a default arising from failure to operate a

8

nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the holder of such Claim (other than the Debtor or an Insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder of such Claim. The Debtor reserves its legal, equitable and contractual rights and defenses to dispute the liability and/or amount of any Reinstated Claim in any court of competent jurisdiction after the Effective Date of the Plan.

2.58. **"Related Persons"** shall mean, with respect to any Entity, such predecessors, successors and assigns (whether by operation of law or otherwise) and their respective current and former affiliates and each of their respective current and former members, partners, equity-holders, officers, directors, employees, managers, shareholders, partners, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals, and any Entity claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, members and professionals).

2.59. **"Released Parties"** shall mean, collectively, the Debtor, the Reorganized Debtor, the members of the Committee, PNC Bank, N.A. and the Cross Estates and each of their respective Related Persons including, but not limited to, Kiebler Properties, LLC, Kiebler Water Services, Inc., Kiebler Sewage Services, Inc., Apollo Property Management, LLC, Paul Kiebler, IV, and Jody Kiebler.

2.60. **"Release Price"** shall mean the funds necessary to release a Lien including but not limited to a construction mortgage, if any, recorded against Resort Real Property at the time of the sale of such Resort Real Property as set forth in Article VI of the Plan.

2.61. **"Reorganized Debtor"** shall mean Peek 'N Peak Recreation, LLC, a limited liability company formed under the laws of the State of Ohio.

2.62. **"Resort Real Property"** shall mean all that certain real property situated in the County of Chautauqua, State of New York, more particularly described on Schedule 2.62 to this Plan, and all rights and interests of every nature in real estate associated therewith or related thereto.

2.63. **"Ridgeview Real Property"** shall mean all that certain real property situated in the County of Chautauqua, State of New York, more particularly described on Schedule 2.63 to this Plan, and all rights and interests of every nature in real estate associated therewith or related thereto.

2.64. **"Scheduled"** shall mean, with respect to any Claim or Interest, the status and amount, if any, of such Claim or Interest, as set forth in the Debtor's Schedules.

2.65. **"Schedules"** shall mean the Debtor's Schedules of Assets and Liabilities and Statements of Financial Affairs filed on July 9, 2010, in each case as amended from time to time.

2.66. **"Secured Claim"** shall mean an Allowed Claim secured by a perfected lien on property of the Estate to the extent of the value, as of the Petition Date, of such lien as

9

determined by a Final Order of the Court pursuant to section 506 of the Bankruptcy Code, as determined pursuant to the terms of this Plan or as otherwise agreed upon by the Debtor and the holder of such Allowed Claim.

2.67.  **"Stoney Creek Real Property"**  shall mean all that certain real property situated in the County of Chautauqua, State of New York, more particularly described on <u>Schedule 2.67</u> to this Plan, and all rights and interests of every nature in real estate associated therewith or related thereto.

2.68.  **"Tower Project Real Property"** shall mean all that certain real property situated in the County of Chautauqua, State of New York, more particularly described on <u>Schedule 2.68</u> to this Plan, and all rights and interests of every nature in real estate associated therewith or related thereto.

2.69.  **"Unsecured Claim"** shall mean a Claim which arose before the Petition Date and which is not secured by any interest in any asset in the Debtor's Estate.  Unsecured Claim shall include a Claim which arises from the rejection of an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code.

**3.**    **Rules of Interpretation.**

For purposes of this Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document, schedule or exhibit means such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Section, Articles and Schedules are references to Section, Articles and Schedules of or to this Plan as the same may be amended, waived or modified from time to time; (f) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection or clause contained in this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, releases, or other agreements or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (j) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

11585568.5

## ARTICLE III.

## CLASSIFICATION OF CLAIMS AND INTERESTS

1.      **Introduction.**

All Claims and Interests in the Chapter 11 Case are classified in the Classes below. A Claim in a particular Class is entitled to receive Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and only to the extent such Claim has not been previously paid, released, or otherwise satisfied.

2.      **Classification.**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are designated as unclassified under the Plan. Other Claims and Interests are classified under Classes 1 through 10 as follows:

Administrative Expense Claims (Unclassified)

Priority Tax Claim (Unclassified)

Class 1 – Secured Claim of The Huntington National Bank

Class 2 – Secured Claim of PNC Bank, National Association

Class 3 – Secured Claim of the Cross Estates

Class 4(a)-(b) – Secured Tax Claims

Class 5 – Secured Claim of On Deck Capital, Inc.

Class 6(a)-(c) – Secured Claims of Holders of Mechanics' Liens

Class 7(a)-(d) – Other Secured Claims

Class 8(a)–(c) – Unsecured Claims

Class 9 – Interests

## ARTICLE IV.

## DESCRIPTION, TREATMENT AND IMPAIRMENT OF CLAIMS AND INTERESTS

In full and complete satisfaction of the Allowed Claims and Interests herein, the holders of Allowed Claims shall receive the treatment set forth below.

11

**(a)**     **Administrative Expense Claims (Unclassified)**

(1)     <u>Description</u>: Administrative Claims are generally any Claims that arise after the Petition Date in conjunction with the administration of the Chapter 11 Case and allowed under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2) of the Bankruptcy Code. Administrative Claims include, for example, quarterly fees to the U.S. Trustee payable under section 1930 of Title 28 of the United States Code, Claims for the payment of Professional Fees, and actual and necessary costs and expenses incurred in the ordinary course of the Debtor's business or of preserving the Debtor's Estate.

(2)     <u>Treatment</u>: Unless a holder(s) of an Allowed Administrative Expense Claim(s) agrees to a different treatment, the Reorganized Debtor will pay all Allowed Administrative Claims in Cash in full on the Effective Date or as soon thereafter as is reasonably practicable. Except with respect to Professional Fees, trade debt incurred in the ordinary course of business and U.S. Trustee fees payable under section 1930 of Title 28 of the United States Code, all requests for payment of administrative costs and expenses under sections 507(a)(2) and 503(b) of the Bankruptcy Code pursuant to the Order Approving Debtor's Motion for Order Establishing Administrative Expense Claim Bar Date [Docket No. 169] were required to be filed with the Court on or before September 3, 2010 (the "Administrative Expense Claim Bar Date"). Any claim not filed on or before the Administrative Expense Claim Bar Date shall be forever barred and any holder of such a barred claim shall be forever barred from asserting such claim against the Debtor, the Estate, the Reorganized Debtor, or any of their respective property. Any professional fees or expenses incurred subsequent to the Effective Date by the Reorganized Debtor or the Committee may be paid by the Reorganized Debtor without application to the Bankruptcy Court, provided, however, that the Court retains jurisdiction to decide any dispute regarding payment of post-Effective Date professional fees or expenses.

Notwithstanding the immediately preceding paragraph, however, Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor through the Effective Date shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions, as the Claims accrue. Accrued expenses incurred in the operation of the ordinary course of the businesses of the Debtor, post-petition, shall be assumed by the Reorganized Debtor as ordinary course of business obligations, to be paid post-confirmation as these Claims come due. All post-petition real estate and sales taxes, utilities, wages and salaries that are due and payable as of the Effective Date will be paid current as of that date.

(3)     <u>Impairment</u>: Unclassified Administrative Expense Claims are unimpaired and shall not be entitled to vote on the Plan.

12

11585568.5

**(b)** <u>**Priority Tax Claim (Unclassified)**</u>

(1) <u>Description</u>: This is the Claim for taxes of County of Chautauqua, State of New York ("Chautauqua County") entitled to priority under section 507(a)(8) of the Bankruptcy Code pursuant to section 1129(a)(9)(D) of the Bankruptcy Code.

(2) <u>Treatment</u>: The Reorganized Debtor will satisfy the Priority Tax Claim in full as part of Class 5(a) of the Plan.

(3) <u>Impairment</u>: Unclassified Priority Tax Claims are unimpaired and shall not be entitled to vote on the Plan.

**(c)** <u>**Class 1 – Secured Claim of The Huntington National Bank ("Huntington Bank")**</u>

(1) <u>Description</u>: Class 1 consists of the secured claim of Huntington Bank (the "Huntington Bank Claim"). The Huntington Bank Claim is comprised of the Debtor's outstanding obligations to Huntington Bank under the Huntington Bank Notes in the Allowed amount of $15,800,000.00 excluding any post-petition fees, costs or interest subsequently Allowed and otherwise unpaid. The Huntington Bank Claim is secured by Liens on substantially all of the Debtor's real and personal property pursuant to and as provided in the Huntington Bank Security Instruments; provided, however, that the Huntington Bank Claim is not secured by any of the following property of the Debtor: any Causes of Action, any on-road motor vehicles, the Fairways Real Property, or that portion of the Debtor's real property situated in the State of Pennsylvania.

(2) <u>Treatment</u>: The Huntington Bank Claim will be satisfied without bifurcation under section 506(a) of the Bankruptcy Code. On the Effective Date, in full and final settlement, satisfaction and discharge of the Huntington Bank Claim, Huntington Bank shall receive the New Huntington Bank Note A and the New Huntington Bank Note B (collectively, the "New Huntington Bank Notes"). The exchange of the Huntington Bank Notes with the New Huntington Bank Notes will be evidenced by a notice exchange agreement prepared by Huntington Bank and in form and substance reasonably satisfactory to the Reorganized Debtor. The New Huntington Bank Notes shall accrue interest from the Effective Date on a monthly basis on the 10th day of each month based on a 300 month amortization at the rate of 30 Day LIBOR plus 4.25% interest (the "Huntington Note Rate"). The New Huntington Bank Note A shall be paid in equal consecutive monthly installments at the Note Rate, with a balloon payment of all unpaid principal and accrued interest due on May 31, 2014 (the "Huntington Maturity Date"). The New Huntington Bank Note B shall accrue interest at the Huntington Note Rate, but no interest is payable until after the earlier of (i) the Huntington Maturity Date and (ii) an event of default as defined in the Huntington Bank Notes. If the New Huntington Bank Note A is paid in full on or before the Huntington Maturity Date, the indebtedness under the New Huntington Bank Note B shall be deemed discharged and paid in full. In the event, however, that the Reorganized Debtor

13

11585568.5

files a bankruptcy petition prior to the Huntington Maturity Date, the Debtor and its assigns acknowledge that the Huntington National Bank shall have an allowed claim equal to the amounts then owing under the New Huntington Bank Notes, and that Huntington Bank shall be entitled to monthly mortgage payments under the New Huntington Bank Notes as adequate protection in such subsequent bankruptcy proceeding. The Debtor and its assigns further acknowledge that in the event that the Reorganized Debtor files a bankruptcy petition prior to the Huntington Maturity Date, the Reorganized Debtor will not oppose Huntington Bank's motion to modify the automatic stay to seek to exercise its state law foreclosure rights, or to conduct a sale of assets pursuant to section 363 of the Bankruptcy Code. Notwithstanding the foregoing, the Reorganized Debtor may, in its discretion, pay or prepay all or any part of the indebtedness under the New Huntington Bank Note A at any time after the Effective Date.

The New Huntington Bank Notes shall be secured by the Liens in favor of Huntington Bank as set forth herein, and the Huntington Bank Security Instruments will be amended to secure the New Huntington Bank Notes. On the Effective Date, the Reorganized Debtor shall execute and deliver the New Huntington Bank Notes to Huntington Bank.

Huntington Bank shall also be paid from Net Condominium Sale Proceeds in accordance with the provisions of Article VI of the Plan until the indebtedness under the New Huntington Bank Note A has been paid in full.

On or before the Effective Date, the Debtor will dismiss with prejudice the adversary proceeding brought against Huntington Bank in the Court on November 24, 2010, Adv. Proc. No. 10-01385.

(3)    <u>Impairment</u>: Class 1 is impaired by the Plan.

**(d)    <u>Class 2</u> – Secured Claim of PNC Bank, National Association ("PNC Bank")**

(1)    <u>Description</u>: Class 2 consists of the secured claim of PNC Bank (the "PNC Bank Claim"). The PNC Bank Claim is comprised of the Debtor's outstanding obligations to PNC Bank under the PNC Bank Note in the Scheduled amount of $2,858,937.00. The PNC Bank Claim is secured by Liens on the Fairways Real Property pursuant to and as provided in the PNC Bank Security Instruments; provided, however, that the PNC Bank Claim is not secured by any of the Causes of Action. The Allowed amount of the PNC Bank Claim shall be $1,500,000.00.

(2)    <u>Treatment</u>: The PNC Bank Claim will be satisfied without bifurcation under section 506(a) of the Bankruptcy Code. On or before 30-days after the Effective Date the PNC Bank Claim shall be fully and finally settled, satisfied and discharged with a Cash payment in the amount of $1,500,000.00 and an Allowed Administrative Expense Claim in the amount of $50,000, which administrative claim shall be paid on the Effective Date. Moreover, notwithstanding the release provisions of Article XII of this Plan, such releases shall specifically exclude

14

obligations due and owing pursuant to the following notes and their respective guaranties: (1) that certain Promissory Note, dated January 5, 2006, in the original principal amount of $3,900,000.00, executed and delivered by R. Gordon Mathews, Paul E. Kiebler, IV, James N. Kratsa, William P. Kratsa, Jr. and Joseph T. Svete to PNC Bank, National Association; (2) that certain Promissory Note, dated October 11, 2005, in the original principal amount of $1,000,000.00, executed and delivered by Kiebler Properties, LLC to PNC Bank, National Association; and (3) that certain Promissory Note, dated October 12, 2006, in the original principal amount of $6,000,000.00, executed and delivered by Paul E. Kiebler, IV and R. Gordon Matthews to PNC Bank, National Association. The obligations evidenced by the foregoing promissory notes and all guaranties executed in conjunction with such notes are not affected by the Plan and remain in full force and effect.

(3)     Impairment: Class 2 is impaired by the Plan.

**(e)     Class 3 – Secured Claim of the Cross Estates**

(1)     Description: Class 3 consists of the secured claims of the Estate of Eugene Cross and the Estate of Norbert Cross (the "Cross Estates Claim"). The Cross Estates Claim is comprised of the Debtor's outstanding obligations under the Peek 'N Peak Note in the Scheduled amount of $8,499,780.42. The Cross Estates Claim is secured by Liens on substantially all of the Debtor's real property; provided, however, that the Cross Estates Claim is not secured by any of the following property of the Debtor: any Causes of Action, any on-road motor vehicles, or that portion of the Debtor's real property situated in the State of Pennsylvania. The Allowed amount of the Cross Estates Claim shall be $8,499,780.42 ($4,249,890.21 for the Estate of Eugene Cross and $4,249,890.21 for the Estate of Norbert Cross).

(2)     Treatment: The Cross Estates Claim will be satisfied without bifurcation under section 506(a) of the Bankruptcy Code. As of the Effective Date or as soon as reasonably practicable thereafter, in full and final settlement, satisfaction and discharge of the Cross Estates Claim, the Cross Estates shall receive the Cross Estates Guarantee, as well as the Cross Estates Subordinated Note A and the Cross Estates Subordinated Note B (collectively, the "Cross Estates Subordinated Secured Notes"), which shall be secured by the Liens in favor of the Cross Estates evidenced by the Peek 'N Peak Security Instruments in accordance with the same priority against the real property of the Reorganized Debtor as applicable to the real property of the Debtor; provided, however, that the Cross Estates Claim shall not be secured by any of the following property of the Debtor: any Causes of Action, any on-road motor vehicles, or that portion of the Debtor's real property situated in the State of Pennsylvania. The exchange of the Peek 'N Peak Note with the Cross Estates Subordinated Secured Notes will be evidenced by a note exchange agreement prepared by the Reorganized Debtor and in form and substance reasonably satisfactory to the Cross Estates. The Peek 'N Peak Security

15

Instruments will be amended to secure the Cross Estates Subordinated Secured Notes.

The Cross Estates Subordinated Note A shall accrue interest from the Effective Date on a monthly basis on the 10th day of each month based on a 300 month amortization at the rate of 30 Day LIBOR plus 4.25% interest (the "Cross Note Rate") calculated from the Effective Date. The Cross Estates Subordinated Note A shall be paid in equal consecutive monthly installments at the Cross Note Rate, with a balloon payment of any unpaid accrued interest and principal due on May 31, 2014 (the "Cross Maturity Date"). The Cross Estates Subordinated Note B shall accrue interest at the rate of 5% simple interest per annum calculated from the Effective Date, but no interest is payable until after the earlier of (i) the Cross Maturity Date and (ii) an event of default as defined in the Cross Estates Subordinated Secured Notes. If the Cross Estates Subordinated Note A is paid in full on or before the Cross Maturity Date, the indebtedness under the Cross Estates Subordinated Note B shall be deemed discharged and paid in full. The Cross Estates Claim shall also be paid from Net Condominium Sale Proceeds in accordance with the provisions of Article VI of the Plan until the indebtedness under the Cross Estates Subordinated Secured Note has been paid in full. Notwithstanding the foregoing, the Cross Estates Subordinated Secured Notes and the Peek 'N Peak Security Instruments shall be deemed discharged and paid in full upon the payment of (i) $1,500,000.00 on the Effective Date, or (ii) $2,500,000 plus accrued interest (but minus any credits for Effective Date or post-Effective Date payments) on the Cross Estates Subordinated Note A on or before December 31, 2011.

All Liens on the Debtor's or Reorganized Debtor's real or personal property in favor of the Cross Estates shall be subject to the subordination and mandatory release provisions set forth in Article VI of the Plan.

(3)     Impairment: Class 3 is impaired by the Plan.

**(f)     Class 4(a) – Secured Real Property Tax Claim**

(1)     Description: Class 4(a) consists of the secured real property tax claim of Chautauqua County on account of unpaid taxes for the 2008, 2009 and 2010 tax years Scheduled in the amount of $1,258,680.32 (the "Secured Real Property Tax Claim"). The Allowed amount of the Secured Real Property Tax Claim shall be $1,258,680.32.

(2)     Treatment: The Reorganized Debtor will satisfy the Secured Real Property Tax Claim in full by remitting deferred Cash payments bearing Interest on account of the Secured Real Property Tax Claim of a value, as of the Effective Date, equal to the Allowed amount of such Claim, over a period not exceeding five years after the Petition Date. Notwithstanding the foregoing, the Reorganized Debtor may in its discretion, pay or prepay all or any part of the amount owed to Chautauqua County at any time after the Effective Date. The Liens of Chautauqua County

16

shall be divested on the Effective Date of the Plan upon the Ridgeview Real Property; the Fairways Real Property; the Camelot II Real Property; the Stoney Creek Real Property; The Greenwood Forest Real Property; and the Tower Project Real Property.

(3)     Impairment:  Class 4(a) is impaired by the Plan.

**(g)     Class 4(b) – Secured Sales Tax Claim**

(1)     Description:  Class 4(b) consists of the secured sales tax claim of the State of New York (the "Secured Sales Tax Claim").  The Allowed amount of the Secured Sales Tax Claim shall be $436,006.13 less all payments made by the Debtor after the Petition Date during the pendency of the Chapter 11 Case.

(2)     Treatment:  The Secured Sales Tax Claim will be satisfied without bifurcation under Section 506(a) of the Bankruptcy Code.  As of the Effective Date or as reasonably practicable thereafter, in full and final settlement, satisfaction and discharge of the Secured Sales Tax Claim, the State of New York shall receive a Cash Distribution equal to $314,139.52 plus accrued interest at the rate of 14.5% from and after March 10, 2011 less any payments made thereafter.

(3)     Impairment:  Class 4(b) is impaired by the Plan.

**(h)     Class 5 – Secured Claim of On Deck Capital, Inc. ("On Deck Capital")**

(1)     Description:  Class 5 consists of the secured claim of On Deck Capital (the "On Deck Capital Claim").  The On Deck Capital Claim is Scheduled in the amount of $23,468.91.   The Allowed amount of the On Deck Capital Claim shall be $15,000.00.

(2)     Treatment:  The On Deck Capital Claim will be satisfied without bifurcation under section 506(a) of the Bankruptcy Code.  As of the Effective Date or soon as reasonably practicable thereafter, in full and final settlement, satisfaction and discharge of the On Deck Capital Claim, On Deck Capital shall receive a Cash Distribution equal to $15,000.00.

(3)     Impairment:  Class 5 is impaired by the Plan.

**(i)     Class 6(a) – Mechanics' Lien Claim of King's Heating and Sheet Metal, Inc. ("King's Heating")**

(1)     Description:  Class 6(a) consists of the mechanics' lien claim of King's Heating (the "King's Heating Claim"). The King's Heating Claim is Scheduled in the amount of $87,891.34.  The Allowed amount of the King's Heating Claim shall be $87,891.34.

11585568.5

(2)    Treatment:  The Reorganized Debtor will satisfy the King's Heating Claim in full by granting it an Allowed Unsecured Claim to be satisfied as part of a Class 8(a) of the Plan

(3)    Impairment:  Class 6(a) is impaired by the Plan.

**(j)    Class 6(b) – Mechanics' Lien Claim of Builder's Support and Supply, Inc. ("Builder's Support")**

(1)    Description:  Class 6(b) consists of the mechanics' lien claim of Builder's Support (the "Builder's Support Claim") The Builder's Support Claim is Scheduled in the amount of $44,874.84.  The Builder's Support Claim is disputed by the Debtor.

(2)    Treatment:  Solely to the extent the Builder's Support Claim is Allowed by the Court pursuant to a Final Order, the Allowed amount of such Claim shall be satisfied as an Allowed Unsecured Claim as part of Class 8(a) of the Plan.

(3)    Impairment:  Class 6(b) is impaired by the Plan.

**(k)    Class 6(c) – Mechanics' Lien Claim of R.W. Larson Associates, P.C. ("R.W. Larson")**

(1)    Description:  Class 6(c) consists of the disputed mechanics' lien claim of R.W. Larson (the "R.W. Larson Claim") The R.W. Larson Claim is Scheduled as disputed in the aggregate amount of $76,775.17.

(2)    Treatment:  Solely to the extent the R.W. Larson Claim is Allowed by the Court pursuant to a Final Order, the Allowed amount of such Claim will be satisfied as an Allowed Unsecured Claim as part of Class 8(a) of the Plan.

(3)    Impairment:  Class 6(c) is impaired by the Plan.

**(l)    Class 7(a) – Secured Claim of Textron Financial Corporation ("Textron")**

(1)    Description:  Class 7(a) consists of the secured claim of Textron arising under that Master Loan and Security Agreement, dated as of March 7, 2006, and related Schedules 1029810, 1029840, 1029857, 1030365 and 1030366 (the "Textron Agreement"), between Textron and the Debtor (the "Textron Secured Claim"). The Textron Secured Claim is Scheduled in the amount of $793,025.46.

(2)    Treatment:  On the Effective Date or as soon as reasonably practicable thereafter, in full and final settlement, satisfaction and discharge of the Textron Secured Claim, Textron shall receive (i) free and clear of all liens, claims and encumbrances, all right, title and interest of the Debtor in those certain Prolink GPS units described in Schedule 1030366, which secure the Debtor's obligations to Textron evidenced by such Schedule and shall constitute full and final settlement, satisfaction and discharge of all obligations evidenced by Schedule 1030366, (ii) an Allowed Unsecured Claim as part of Class 8(a) of the Plan to

18

satisfy the deficiency claim on account of Schedule 1030366 and (iii) the Reinstatement of Schedules 1029810, 1029840, 1029857 and 1030365 of the Textron Agreement.

(3)     <u>Impairment</u>:  Class 7(a) is impaired by the Plan.

**(m)     Class 7(b) – Secured Claim of Leasenet, Inc. ("Leasenet")**

(1)     <u>Description</u>:  Class 7(b) consists of the secured claim of Leasenet under that certain equipment lease (the "Leasenet Lease") between Leasenet and the Debtor identified as lease number 25010 (the "Leasenet Lease Claim").  The Leasenet Lease Claim is Scheduled in the amount of $145,737.00.

(2)     <u>Treatment</u>:  Unless Leasenet agrees to a different treatment, the Leasenet Lease Claim shall be satisfied in full through the Reinstatement of the Leasenet Lease on the Effective Date to the extent that it is not paid in the ordinary course of business prior thereto.  Notwithstanding the foregoing, the Reorganized Debtor may in its discretion, pay or prepay all or any part of the amount owed to Leasenet on account of the Leasenet Lease Claim at any time after the Effective Date.

(3)     <u>Impairment</u>:  Class 7(b) is unimpaired by the Plan.  Leasenet is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**(n)     Class 7(c) – Other Secured Claim of Huntington Bank**

(1)     <u>Description</u>:  Class 7(c) consists of the secured claim of Huntington Bank under that certain Lease Agreement (the "Huntington Bank Lease"), dated as of June 23, 2006, between Huntington Bank and the Debtor and identified as lease number 4801.01 (the "Huntington Bank Lease Claim").  The Huntington Bank Lease Claim is approximately $1,500.00.

(2)     <u>Treatment</u>:  Unless Huntington Bank agrees to a different treatment, the Huntington Bank Lease Claim shall be satisfied in full through the Reinstatement of the Huntington Bank Lease on the Effective Date to the extent that it is not paid in the ordinary course of business prior thereto.  Notwithstanding the foregoing, the Reorganized Debtor may in its discretion, pay or prepay all or any part of the amount owed to Huntington Bank on account of the Huntington Bank Lease Claim at any time after the Effective Date.

(3)     <u>Impairment</u>:  Class 7(c) is unimpaired by the Plan.  Huntington Bank is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**(o)     Class 7(d) – GMAC**

(1)     <u>Description</u>:  Class 7(d) consists of the secured claim of GMAC under that certain installment sales contract (the "GMAC Agreement") between GMAC and the

19

11585568.5

Debtor (the "GMAC Claim"). The GMAC Claim is Scheduled in the amount of $64,575.00.

(2)    Treatment: Unless GMAC agrees to a different treatment, the GMAC Claim shall be satisfied in full through the Reinstatement of the GMAC Agreement on the Effective Date to the extent that it is not paid in the ordinary course of business prior thereto. Notwithstanding the foregoing, the Reorganized Debtor may in its discretion, pay or prepay all or any part of the amount owed to GMAC on account of the GMAC Claim at any time after the Effective Date.

(3)    Impairment: Class 7(d) is unimpaired by the Plan. GMAC is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**(p)    Class 8(a) – Unsecured Claims**

(1)    Description: Class 8(a) consists of all Unsecured Claims that have been Allowed, excluding Unsecured Claims classified elsewhere in this Plan. The Debtor believes the total amount of allowable Unsecured Claims in Class 8(a) equals approximately $3,898,446.14.

(2)    Treatment: Unless a holder(s) of an Allowed Unsecured Claim(s) agrees to a different treatment, on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor will remit to the Creditor Trustee for distribution to the holders of Allowed Unsecured Claims in Class 8(a) the following "Deferred Cash Distributions": (i) quarterly interest payments in Cash over a period of 36 months after the Effective Date of a value, as of the Effective Date, equal to the outstanding Allowed amount of such Claims at the rate of 6% simple interest per annum; (ii) Pro-Rata Distributions in deferred Cash payments equal to such share of Net Condominium Sale Proceeds, to which the holders of Allowed Unsecured Claims in Class 8(a) are entitled pursuant to Article VI of the Plan, which shall be remitted to the Creditor Trustee for the benefit of the holders of such Claims within 30 days of receipt thereof by the Reorganized Debtor, over a period of three years after the Effective Date or until such Claims have been paid in full; (iii) a minimum of 25% of Excess Cash Flow annually on each anniversary date of the Effective Date; and (iv) deferred Cash payments equal to the outstanding amount of such Claims, after application of the payments of interest and Net Condominium Sale Proceeds received by the holders of such Claims, on the third year anniversary date of the Effective Date.

(3)    Impairment: Class 8(a) is impaired by the Plan.

**(q)    Class 8(b) – Insider Unsecured Claims**

(1)    Description: Class 8(b) consists of all Unsecured Claims held by "Insiders" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. The Debtor believes the total of allowable Insider Unsecured Claims equals approximately $600,000.00.

11585568.5

(2)    <u>Treatment</u>:  Class 8(b) Insider Unsecured Claims shall receive no property or distribution(s) under the Plan.

(3)    <u>Impairment</u>:  Class 8(b) is impaired by the Plan.

**(r)    <u>Class 8(c)</u> – Convenience Class of Unsecured Claims**

(1)    <u>Description</u>:  Class 8(c) consists of all Unsecured Claims that have been Allowed in respective amounts equal to or less than $1,000, excluding Unsecured Claims classified elsewhere in this Plan.  The Debtor believes the total amount of allowable Unsecured Claims in Class 8(c) equals approximately $55,000.00.

(2)    <u>Treatment</u>:    Unless a holder(s) of an Allowed Unsecured Claim(s) in Class 8(c) agrees to a different treatment, not later than 45 days after the balance of cash on deposit with the Creditors Trust is $55,000 or more, the Creditors Trustee shall cause the Creditors Trust to distribute to holders of such Allowed Unsecured Claims Cash Distributions equal to 100% of their Allowed Unsecured Claims in full and final satisfaction thereof.

(3)    <u>Impairment</u>:  Class 8(c) is unimpaired by the Plan.  Each holder of an Allowed Unsecured Claim in Class 8(c) is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**(s)    <u>Class 9</u> – Interests**

(1)    <u>Description</u> and Treatment:  Class 9 consists of all capital Interests in the Debtor, namely, the following:  the 84% capital interest of Kiebler Properties, LLC; the 15% capital interest of R. Gordon Matthews (Estate); and the 1% capital interest of Jody R. Kiebler.

(2)    <u>Treatment</u>:  As of the Effective Date, all capital Interests in the Debtor shall be cancelled, and the holders of such Interests shall receive no property or distribution(s) under the Plan on account thereof.

(3)    <u>Impairment</u>:  Class 9 is impaired by the Plan.

**2.    <u>Special Provision Regarding Unimpaired and Reinstated Claims</u>**

Except as otherwise specifically provided in this Plan, nothing herein shall be deemed to affect, diminish or impair the Debtor's or the Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including, but not limited to, legal and equitable defenses to setoffs or recoupment against Reinstatement Claims or Unimpaired Claims; and, except as otherwise specifically provided in this Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtor had immediately prior to the Petition Date, against or with respect to any Claim left Unimpaired by the Plan.  The Reorganized Debtor shall have, retain, reserve, and be entitled to assert all such Claims, Causes

11585568.5

of Action, rights of setoff, and other legal or equitable defenses which the Debtor had immediately prior to the Petition Date full as if the Chapter 11 Case had not been commenced, and all of the Reorganized Debtor's legal and equitable rights respecting any Reinstated Claim or Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

## ARTICLE V.

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE

## OR MORE CLASSES OF CLAIMS OR INTERESTS

**1.** **Classes Entitled to Vote.**

Each impaired Class shall be entitled to vote to accept or reject the Plan. Any unimpaired Class shall be deemed to have accepted the Plan, and shall not be entitled to vote to accept or reject the Plan.

**2.** **Class Acceptance Requirement.**

Under section 1126(c) of the Bankruptcy Code, an impaired Class of Claims has accepted the Plan if the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class who have voted on the Plan have voted to accept the Plan. **ANY IMPAIRED CLASS OF CLAIMS IN WHICH NO HOLDER VOTES TO ACCEPT OR REJECT THE PLAN WILL BE DEEMED TO HAVE ACCEPTED THE PLAN.**

**3.** **Non-Consensual Confirmation.**

If any Impaired Class fails to accept this Plan by the requisite statutory majorities, the Debtor reserves the right (i) to confirm this Plan by a "cram-down" of such non-accepting Class pursuant to section 1129(b) of the Bankruptcy Code and (ii) to propose any modifications to this Plan and to confirm this Plan as modified, without re-solicitation, to the extent permitted by the Bankruptcy Code.

## ARTICLE VI.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**1.** **Vesting of the Debtor's Assets.**

All property of the Estate, other than that specifically addressed in this Subsection, shall vest automatically in the Reorganized Debtor on the Effective Date free and clear of all Liens, Claims and Interests, except as otherwise specifically provided for in this Plan or the Confirmation Order.

11585568.5

**Ridgeview Real Property:**

The five condominium units situated on the Ridgeview Real Property (the "Ridgeview Condominiums") will vest in the Reorganized Debtor free and clear of all Liens, Claims and Interests, except as otherwise specifically provided in this Plan or the Confirmation Order, subject to the conditions set forth in this section. The Ridgeview Condominiums shall be marketed and sold pursuant to agreement with Howard Hanna Holt. The first sale of a Ridgeview Condominium Unit shall be for a minimum net Release Price of $700,000, with confirmation of the Plan conditioned upon (A) an executed contract delivered to the Debtor by _____, 2011 (with a copy promptly provided to counsel for Huntington Bank, the Cross Estates and the Committee), and (B) a closing of such purchase on or prior to the Effective Date. The Net Condominium Sale proceeds from the sale of the first Ridgeview Condominium Unit shall be distributed as follows: (i) first $250,000 to the Reorganized Debtor's general fund for the purposes described in section 3 below; (ii) remaining net proceeds from the sale of the first unit to be paid over to Huntington Bank to be applied to the principal balance of the New Huntington Bank Note A until such indebtedness has been paid in full.

The second sale of a Ridgeview Condominium Unit shall be for a minimum net Release Price of $650,000, unless otherwise agreed upon by Huntington Bank and the Creditor Trustee, with the closing of such sale to occur on or before _____. The Net Condominium Sale proceeds from the sale of the second Ridgeview Condominium Unit shall be distributed as follows: (i) first $200,000 to the Reorganized Debtor's general fund to be allocated for the purpose of finishing construction on the fifth Ridgeview Condominium Unit; (ii) remaining net proceeds from the sale of the second unit to be distributed as follows: (a) 70% to Huntington Bank to be applied to the principal balance of the New Huntington Bank Note A until such indebtedness has been paid in full; (b) 10% to Cross Estates, equally, to be applied to the principal balance of the Cross Estates Subordinated Note A until such indebtedness has been in paid in full; (c) 10% to Creditor Trustee for the benefit of the holders of Allowed Unsecured Claims in Class 8(a) until such indebtedness has been paid in full; and (d) 10% to Reorganized Debtor's general fund.

The remaining sales of the Ridgeview Condominium Units shall each be for a minimum net Release Price of $650,000, unless otherwise agreed upon by Huntington Bank and the Creditor Trustee. The Net Condominium Sale proceeds from the sale of each remaining Ridgeview Condominium Unit shall be distributed as follows: (i) 70% to Huntington Bank to be applied to the principal balance of the New Huntington Bank Note A until such indebtedness has been paid in full; (ii) 10% to the Cross Estates, equally, to be applied to the principal balance of the Cross Estates Subordinated Note A until such indebtedness has been in paid in full; (iii) 10% to Creditor Trustee for the benefit of the holders of Allowed Unsecured Claims in Class 8(a) until such indebtedness has been paid in full; and (iv) 10% to Reorganized Debtor's general fund.

Upon the Reorganized Debtor's entry into a written contract with a third party for the sale of any Ridgeview Condominium and within three (3) Business Days of the Reorganized Debtor's written notice thereof, Huntington Bank and the Cross Estates shall deliver to counsel for the Reorganized Debtor, to hold in escrow pending the closing of such sale, fully executed release instruments prepared by the Reorganized Debtor and in form and substance satisfactory to Huntington Bank and the Cross Estates. Upon the closing of the sale of such Ridgeview Condominium, the release instrument shall be duly recorded and any fees and expenses therewith

23

11585568.5

shall be satisfied by the Reorganized Debtor and included in the calculation of Net Condominium Sale Proceeds. In the event the sale of such Ridgeview Condominium fails to close within a reasonable time period, the release instrument shall be destroyed by counsel for the Reorganized Debtor.

**Greenwood Forest Real Property:**

The time shares comprising the Greenwood Forest Real Property (the "Greenwood Forest Time Shares") will vest in the Reorganized Debtor free and clear of all Liens, Claims and Interests, except as otherwise specifically provided in this Plan or the Confirmation Order subject to the condition that Net Condominium Sale Proceeds from the sale of each of the Greenwood Forest Time Shares shall be distributed as follows: (i) an amount equal to 100% of the direct costs and expenses resulting from the improvement of the Greenwood Forest Real Property will be paid to the Reorganized Debtor or other party that satisfied such costs and expenses and, thereafter; (ii) 80% will be paid to (a) Huntington Bank to be applied to the principal balance of the New Huntington Bank Senior Secured Note until such indebtedness has been paid in full and, thereafter, (b) the Cross Estates, equally, to be applied to the principal balance of the Cross Estates Subordinated Secured Note until such indebtedness has been in paid in full and, thereafter, (c) the Creditor Trustee for the benefit of the holders of Allowed Unsecured Claims in Class 8(a) until such indebtedness has been paid in full and, theraffer; (iii) remainder will be paid to the Reorganized Debtor. Upon the Reorganized Debtor's entry into a written contract with a third party for the sale of any Greenwood Forest Time Share and within three (3) Business Days of the Reorganized Debtor's written notice thereof, Huntington Bank and the Cross Estates shall deliver to counsel for the Reorganized Debtor, to hold in escrow pending the closing of such sale, fully executed release instruments prepared by the Reorganized Debtor and in form and substance satisfactory to Huntington Bank and the Cross Estates. Upon the closing of the sale of such Greenwood Forest Time Share, the release instrument shall be duly recorded and any fees and expenses therewith shall be satisfied by the Reorganized Debtor and included in the calculation of Net Condominium Sale Proceeds. In the event the sale of such Greenwood Forest Time Share fails to close within a reasonable time period, the release instrument shall be destroyed by counsel for the Reorganized Debtor.

**Fairways Real Property:**

On or prior to the Effective Date or as soon as reasonably practicable thereafter, the Debtor or the Reorganized Debtor as the case may be, shall convey the twelve condominium units situated on the Fairways Real Property (the "Fairways Condominiums") to a limited liability company to be formed under the laws of the State of Ohio ("Newco"), owned and operated by Paul E. Kiebler, IV. The conveyance of the Fairways Condominiums to Newco shall be in exchange for cash consideration of $1,500,000 and assumption by Newco of the Cross Estates Subordinated Secured Notes and related obligations, and it shall be free and clear of all Liens, Claims and Interests, except as otherwise specifically provided in this Plan or the Confirmation Order, and subject to the following conditions:

(a) Financing to secure the conveyance of the Fairways Condominiums in an amount not to exceed $1,850.000 from a financial institution or other party (the "Fairways Real Property Lender") may include, among other things, the granting to the Fairways Real Property Lender of

24

a first priority mortgage and lien upon the Fairways Real Property to secure the repayment of such indebtedness;

(b)     Upon request of Newco, the Cross Estates shall promptly execute and deliver a subordination agreement in favor of the Fairways Real Property Lender, in form and substance reasonably satisfactory to the Cross Estates and Fairways Real Property Lender, that shall subordinate the Liens on the Fairways Real Property in favor of the Cross Estates to the mortgage and liens granted to the Fairways Real Property Lender;

(c)     The cash consideration of $1,500,000 shall be used to satisfy in full the Allowed amount of the PNC Bank Claim; and

(d)     Net Condominium Sale Proceeds realized from the sale of each of the Fairways Condominiums shall be distributed as follows:

> (i)     100% of the Net Condominium Sale Proceeds will be paid to the Fairways Real Property Lender until the Fairways Real Property Lender has been paid in full;

> (ii)     upon payment in full of the indebtedness owed to the Fairways Real Property Lender, the Net Condominium Sale Proceeds from the sale of each Fairways Condominium unit shall be distributed as follows:  (a) 80% to the Cross Estates, equally, to be applied to the principal balance of the Cross Estates Subordinated Note A until such indebtedness has been in paid in full; (b) 20% to Newco; and

> (iii)     upon payment in full of the indebtedness owed to the Cross Estates, 100% of the Net Condominium Sale Proceeds will be paid to Newco.

Upon Newco's entry into a written contract with a third party for the sale of any Fairways Condominium and within three (3) Business Days of Newco's written notice thereof, the Fairways Real Property Lender and the Cross Estates shall deliver to Newco, to hold in escrow pending the closing of such sale, fully executed release instruments prepared by Newco and in form and substance satisfactory to the Fairways Real Property Lender and the Cross Estates. Upon the closing of the sale of such Fairways Condominium, the release instrument shall be duly recorded and any fees and expenses therewith shall be satisfied by Newco.  In the event the sale of such Fairways Condominium fails to close within a reasonable time period, the release instrument shall be destroyed by Newco.

Within five (5) Business Days of the entry of an Order approving the Disclosure Statement, the Debtor will seek third party financing to implement the refinancing of the Fairways Real Property, as provided in this section.

**Development Property:**

On or prior to _____, the condominium units to be developed on the Camelot II Real Property (the "Camelot II Condominiums"), the proposed condominium units to be developed on the Stoney Creek Real Property (the "Stoney Creek Condominiums"), the proposed

11585568.5

condominium units to be developed on the Tower Project Real Property (the "Tower Project Condominiums") and the proposed condominium units or single family residences to be developed on the Future Development Real Property (the "Future Development Property Units", and together with the Camelot II Condominiums, Stoney Creek Condominiums, and Tower Project Condominiums, collectively, the "Development Property Units") shall be conveyed by the Debtor, or the Reorganized Debtor as the case may be, to a limited liability company to be formed under the laws of the State of Ohio (Newco$^2$) and operated by Paul E. Kiebler, IV. The conveyance of the Development Property Units to Newco$^2$ shall be in exchange for cash consideration of $600,000, and it shall be free and clear of all Liens, except those held by the Cross Estates, Claims and Interests, except as otherwise specifically provided in this Plan or the Confirmation Order, and subject to the following conditions:

(a) Financing to secure the conveyance of the Development Property Units from a financial institution or other party (the "Development Real Property Lender") may include, among other things, the granting to the Development Real Property Lender of a first priority mortgage and lien upon the Development Property Units to secure the repayment of such indebtedness;

(b) Newco$^2$ shall provide Huntington Bank and the Creditor Trustee (or its predecessor, the Committee) with letters of intent disclosing the source of the financing to secure the conveyance of the Development Property Units;

(c) The cash consideration of $600,000 shall be paid to Huntington Bank (subject to Article IV(c)(2) of the Plan) to be applied to the principal balance of the New Huntington Bank Note A until such indebtedness has been paid in full.;

(d) Upon request of (Newco$^2$), the Cross Estates shall promptly execute and deliver a Subordination Agreement in favor of the Development Real Property Lender, in form and substance reasonably satisfactory to the Cross Estates and the Development Real Property Lender, that shall subordinate the Liens on the Development Property Units in favor of the Cross Estates to the Mortgage and Liens granted to the Development Real Property Lender. Said Liens shall be released by the Cross Estates upon the final sale of any Development Property Units to a third party purchaser.

(e) The Net Condominium Sale Proceeds from the sale of each of the Development Property Units will be distributed in accordance with the respective percentages and order of priority set forth below, such that upon payment in full of the indebtedness owed to any holder of senior indebtedness, the holder of indebtedness immediately junior in priority shall be entitled to receive the distributions to which such senior holder would otherwise have been entitled:

(i) 100% of the Net Condominium Sale Proceeds will be paid to the Development Real Property Lender until the Development Real Property Lender has been paid in full; and

(ii) Upon payment in full of the indebtedness owed to the Development Real Property Lender, the Net Condominium Sale Proceeds from the sale of each Development Property Unit shall be distributed as follows: (a)

26

[30]% to the Cross Estates, equally, to be applied to the principal balance of the Cross Estates Subordinated Note A until such indebtedness has been in paid in full; (b) [30]% to the Creditor Trustee for the benefit of the holders of Allowed Unsecured Claims in Class 8(a) until such time as that class is paid in full; (c) 40% to (Newco$^2$); and (d) upon payment in full of the indebtedness owed to the Cross Estates and the Creditor Trustee, any remainder to Newco$^2$.

## 2.    Equity Interests in Reorganized Debtor

On the Effective Date, Drakkar Ventures, LLC shall remit to the Reorganized Debtor in immediately available funds a payment equal to Two Million Two Hundred Thousand Dollars ($2,200,000) as consideration for certain membership units to be issued by the Reorganized Debtor upon the Effective Date. On the Effective Date, all of the membership units issued by the Reorganized Debtor shall vest in and be distributed to Drakkar Ventures, LLC or another entity designated by J. Hunter Banbary and Blue Water Ski Trust, LLC or another entity designated by Paul E. Kiebler, IV and with all accompanying rights, remedies and interests customarily associated with ownership of equity interests in a limited liability company formed under the laws of the State of Ohio.

## 3.    Operation of the Reorganized Debtor.

In addition to the equity contribution described in the preceding section, on or before the Effective Date, the Reorganized Debtor will be capitalized with $250,000 from the first sale of a unit of the Ridgeview Real Property to be contributed to the Reorganized Debtor's general fund, with the remaining net proceeds of the unit sale to be paid to Huntington Bank. As of the Effective Date, a Chief Restructuring Officer (the "CRO") selected by the Reorganized Debtor and the Committee to be J. Hunter Banbarry but subject to the approval of Huntington Bank whose consent shall not unreasonably be withheld will be appointed to run the Reorganized Debtor's operations. Following the Effective Date, Paul E. Kiebler, IV, together with any family members or insiders (collectively, the "Kiebler Parties"), may own or hold equity interests in the Reorganized Debtor, but they shall establish a trust in favor of the CRO (the "CRO Trust"), contributing all voting rights associated with their equity interests into the CRO Trust, pursuant to which the CRO shall exercise all such voting rights. Until such time as Huntington Bank is paid in full under this Plan, the Kiebler Parties shall exercise no control over the Reorganized Debtor. In the event the CRO is unwilling or unable to continue to fulfill his or her duties to the Reorganized Debtor, a replacement CRO reasonably acceptable to the Reorganized Debtor, the Creditor Trustee, and Huntington Bank shall be appointed as CRO. Notwithstanding anything contained herein, the Kiebler Parties shall be granted reasonable access to the CRO and to the Reorganized Debtor's books and records and premises.

Following the Effective Date, subject to a budget reasonably acceptable to the CRO and Huntington Bank, the Reorganized Debtor shall utilize the first $500,000 of its $2,200,000 capital infusion for the following purposes: (i) remodeling of the B wing of the Resort Real Property, and (ii) the purchase of new flat screen televisions and sleeper sofas for the C and D wings of the Resort Real Property.

11585568.5

On the Effective Date, the Debtor and Reorganized Debtor shall enter into an agreement pursuant to which the Debtor, through Kiebler Water Services, Inc. and Kiebler Sewage Services, Inc. (collectively, the "Utility Properties") with Newco and Newco[2], shall ensure that the Utility Properties will provide services to the Newco and Newco[2] on mutually agreeable terms. Such services shall include service by the Utility Properties to the Undeveloped Property, and in exchange for such services, the Reorganized Debtor shall provide any necessary capital improvements to or expansions of the Utility Properties.

On the Effective Date, the Debtor and Reorganized Debtor shall enter into an agreement pursuant to which the Debtor, through Kiebler Properties, LLC, shall ensure that the lease with The Huntington National Bank, Equipment Finance Division, Lease # 101-0004801-0002, pursuant to which certain snowmaking equipment is leased, is assigned or otherwise transferred to the Reorganized Debtor, along with all rights and obligations attendant thereto.

On the Effective Date, the Debtor or the Reorganized Debtor as the case may be, will establish a fully funded escrow for the purpose of reserving accrued real estate taxes in order to ensure that all future real estate taxes will be paid in full as and when they become due and payable. Following the Effective Date, the real estate tax escrow and the monthly payments to Huntington Bank are to be paid into an account that will be able to be swept into the relevant obligee accounts, with the excess transferred to the Reorganized Debtor's operating account by the 10th of every month. The Reorganized Debtor has the option to prepay a given year's interest and principal due to Huntington Bank for the full calendar year, first on the Effective Date, and thereafter on or before May 31 of each subsequent year, and in the event of such a lump sum payment, the interest rate will be the applicable rate on the date of the payment.

On and after the Effective Date, the Reorganized Debtor shall deposit 4% of its gross revenues on a monthly basis into a reserve account which shall be used by the Reorganized Debtor at its discretion for property maintenance, repairs and improvements.

After the Effective Date, the Reorganized Debtor will provide financial statements to Huntington Bank and its designated financial advisor, and the Creditor Trustee. Huntington Bank's financial advisor shall allowed reasonable access, on a monthly basis, to the Reorganized Debtor's books and records for the purpose of auditing the Reorganized Debtor's records, with reasonable costs of such audits to be reimbursed by the Reorganized Debtor.

Other than as set forth in this section, the Reorganized Debtor may use, sell, acquire, lease or otherwise dispose of its property only in accordance with the Plan and the Confirmation Order, but shall otherwise be free of any restrictions imposed by the Court, the Bankruptcy Code, or the Bankruptcy Rules. The Reorganized Debtor will use net available income derived from the operation of its business in the ordinary course for the purpose of carrying out the terms of this Plan and funding the payments contemplated by the Plan.

4. **Distributions to Insiders of Reorganized Debtor.**

Except as specifically set forth in this Plan, until such time as the Allowed Claims have been paid in full the Reorganized Debtor shall not (i) make any payment, incur any liability or provide other consideration to any person or entity, for the purchase, acquisition, redemption,

28

11585568.5

repurchase, payment or retirement of any capital stock, membership units or other equity interest of the Reorganized Debtor or as a dividend, return of capital or other distribution in respect of the Reorganized Debtor's capital stock, membership units or other equity interest; (ii) guaranty any debt or the performance or payment of any obligation, or incur any indebtedness, borrow any funds or obtain any loans or letters of credit for the benefit of any Insider of the Reorganized Debtor, (iii) make any loan to any member, shareholder, investor, employee, officer, director, agent or Insider of the Reorganized Debtor or any party affiliated with or related to any of the foregoing, (iv) provide bonuses, distributions, management fees or other non-salary compensation to any Insider of the Reorganized Debtor, or (v) provide any salaries, wages or other compensation to Paul Kiebler, IV, unless otherwise agreed to in advance in writing by Huntington Bank, the Cross Estates and the Creditor Trustee.

**5.** **Administration of Claims.**

Within 120 days after the Effective Date, or such later date as may be fixed by the Court, both the Reorganized Debtor and the Creditor Trustee shall complete their respective reviews of the Claims and shall initiate and file any and all actions as either deems necessary or appropriate to dispute, disallow, object to, estimate or otherwise quantify the Claims against the Estate, whether scheduled by the Debtor and/or submitted by creditors. The Reorganized Debtor and the Creditor Trustee shall take actions regarding the administration, reconciliation and settlement of Claims, and shall object to Claims and prosecute Claims actions with the Court, until such time as the Court determines whether a Claim is an Allowed Claim, or until the Reorganized Debtor or the Creditor Trustee determines that further pursuit of litigation or actions objecting to Claims is no longer cost efficient, or will be of no further benefit. **THE FAILURE TO OBJECT TO ANY CLAIM, OR TO SEEK THE ESTIMATION OF ANY CLAIM, PRIOR TO THE COMMENCEMENT OF THE HEARING ON CONFIRMATION OF THE PLAN SHALL NOT BE DEEMED TO BE A WAIVER OF THE RIGHT TO OBJECT THEREAFTER TO SUCH CLAIM IN WHOLE OR IN PART AND WHETHER THE CLAIM HAS BEEN SCHEDULED OR NOT, OR TO THEREAFTER SEEK ESTIMATION OF SUCH CLAIM FOR THE PURPOSE OF DISTRIBUTION.**

**6.** **No Distribution Pending Allowance.**

Notwithstanding any other provision in this Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

**7.** **Distribution After Allowance.**

As soon as practicable after a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim shall receive a distribution in an amount equal to the distribution that such holder would have received had such Disputed Claim been an Allowed Claim on the Effective Date. Distributions to each holder of a Disputed Claim, to the extent that such Claim becomes an Allowed Claim, shall be made in accordance with the Class of Claims to which such Claim belongs.

11585568.5

**8.     Subordinated Claims.**

Under this Plan, the Claim of any Creditor may be subordinated pursuant to section 510 of the Bankruptcy Code to Claims of other Creditors. The Reorganized Debtor and the Creditor Trustee shall have the exclusive right to seek subordination of Claims after the Effective Date. The Court shall have the authority to enter any Order consistent with the Plan establishing the extent, priority and validity of such Subordinated Claims.

**9.     Pursuit and Preservation of Causes of Action.**

The Debtor has filed, or it intends to file, adversary complaints to pursue causes of actions against Creditors and other third parties.  On the Effective Date, both the Reorganized Debtor and the Creditor Trustee shall automatically succeed to all of the Debtor's right, title and interest in and to such claims, with standing to pursue any such claim, and the Causes of Action shall automatically and fully vest in, and they shall be retained and enforced by, the Reorganized Debtor and the Creditor Trustee pursuant to Bankruptcy Code section 1123(b)(3)(B).  Under this Plan, the Reorganized Debtor and the Creditor Trustee are intended to retain and enforce, and they shall be authorized to retain and enforce, any and all such claims and Causes of Action as contemplated by Bankruptcy Code sections 1123(b)(3)(A) and (3)(B). The Reorganized Debtor and the Creditor Trustee shall have full, exclusive and complete authority to pursue and prosecute any or all such Causes of Action, or to refrain from pursuing any or all Causes of Action, including, without limitation, those Causes of Action listed on <u>Schedule 6.9</u> hereto.  The Reorganized Debtor and the Creditor Trustee shall have the authority to compromise, settle and resolve any Cause of Action upon such terms and conditions as the Reorganized Debtor and the Creditor Trustee deem appropriate.  **ALL CAUSES OF ACTION SHALL SURVIVE CONFIRMATION, AND THE ASSERTION OF CAUSES OF ACTION SHALL NOT BE BARRED OR LIMITED BY ANY ESTOPPEL, WHETHER JUDICIAL, EQUITABLE OR OTHERWISE**.

In addition, claims for avoidance of preferences and fraudulent transfers are hereby preserved for the benefit of the Debtor, the Estate, the Reorganized Debtor, and the Creditor Trust, but the Debtor, the Reorganized Debtor, and the Creditor Trust retain the right, in their respective discretion, to abandon any or all such claims.

All proceedings relating to the allowance, disallowance, subordination or estimation of Claims will be investigated, filed, enforced, exercised, abandoned, adjusted, settled or compromised by the Reorganized Debtor at its sole cost and expense, and/or the Creditor Trustee at the sole cost and expense of the Creditor Trust.

**10.     Injunctions and Stays.**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the Consummation Date.

11585568.5

## 11. __Appointment of the Creditor Trustee__

The Creditor Trustee will be appointed pursuant to the terms of the Confirmation Order. Confirmation of the Plan shall constitute the appointment of the Creditor Trustee. The Creditor Trustee will serve until such time as all Distributions to the holders of Allowed Class 8(a) Unsecured Claims, through the Creditor Trustee, are made under this Plan.

The Creditor Trustee may resign at any time in [his/her] sole discretion, and such resignation shall be effective upon the earlier of (i) 30 days after the Creditor Trustee has given written notice of resignation to the members of the Creditor Trust Oversight Committee, and (ii) the date the Creditor Trust Oversight Committee appoints a successor to the resigning Creditor Trustee. The Creditor Trustee may be removed at any time by an affirmative vote of a majority of the members of the Creditor Trust Oversight Committee. In the event of the resignation or removal of the Creditor Trustee, a successor shall thereupon be appointed by the Creditor Trust Oversight Committee and serve as Creditor Trustee under the terms of this Plan.

The Creditor Trustee may independently retain, without the necessity of obtaining any approval from the Court or providing notice to any party in interest, the services of legal counsel, including without limitation Hahn Loeser & Parks LLP, currently counsel for the Committee, and may retain other professionals and professional persons, including without limitation RSM McGladrey, Inc., currently financial advisor for the Committee, for specific purposes and tasks, without the necessity of obtaining any approval from the Court or providing notice to any party in interest, that are necessary to assist the Creditor Trustee in the performance of [his/her] duties or to defend any claim bought against the Creditor Trustee arising out of [his/her] acts or omissions. The reasonable fees and expenses of such professional persons shall be paid from the Creditor Trust Assets, without necessity of providing any notice or seeking or obtaining any approval of the Court. The Creditor Trustee shall pay such professional persons' fees and expenses upon the passage of 30 days from the presentation of any monthly invoice by such professional to the Creditor Trustee and to the Creditor Trust Oversight Committee. In the event of a dispute over such professional's requested fees and expenses, the Creditor Trustee shall pay the portion of the professional's fees and expenses that is not in dispute. The Bankruptcy Court shall retain jurisdiction to hear and decide any unresolved dispute over such professional's requested fees and expenses.

## 12. __Distributions to the Creditor Trustee.__

On and after the Effective Date, the Reorganized Debtor will remit to the Creditor Trustee all amounts due and owing to the Creditor Trustee for the benefit of holders of Allowed Unsecured Claims in Class 8(a) as provided under and in accordance with this Plan.

The Bankruptcy Court will retain jurisdiction to hear disputes concerning the Distributions to the Creditor Trustee, required for the benefit of holders of Allowed Class 8(a) Unsecured Claims. The Creditor Trustee and the Reorganized Debtor will each have the right to bring any such dispute before the Bankruptcy Court. Notwithstanding the foregoing, the rights of the Creditor Trustee and the Reorganized Debtor to bring such dispute before the Bankruptcy Court will be limited to the extent necessary to ensure payments required under the Plan.

11585568.5

The Creditor Trustee will prepare and maintain an adequate set of financial books, records or data bases that will allow the Creditor Trustee to track the amount of Class 8(a) Unsecured Claims asserted against the Estate and the amounts paid to each holder of Allowed Class 8(a) Unsecured Claims pursuant to the terms of this Plan; *provided, however*, that the Creditor Trustee also shall be entitled to request the use of the Reorganized Debtor's books and records. The Reorganized Debtor shall provide reasonable access to its financial books and records to the Creditor Trustee during normal business hours. The Creditor Trustee shall continue to make Distributions to holders of Allowed Class 8(a) Unsecured Claims in accordance with this Plan until all such Distributions have been made in accordance with this Plan.

## 13. Compensation of the Creditor Trustee.

The Creditor Trustee and any professionals the Creditor Trustee may employ from time to time shall provide the Creditor Trust Oversight Committee a monthly invoice of fees and expenses incurred. The Creditor Trustee's fees and expenses and those of any professional employed by the Creditor Trustee shall be paid from the Creditor Trust Assets within 30 days of the receipt of such invoice. In the event of a dispute over the Creditor Trustee's requested fees and expenses or those of any professional employed by the Creditor Trustee, the portion of such fees and expenses that is not in dispute shall be paid. The Bankruptcy Court shall retain jurisdiction to hear and decide any unresolved dispute over such requested fees and expenses. Only the Creditor Trust Oversight Committee will have standing to object to the payment of the Creditor Trustee's fees and expenses and those of any professional employed by the Creditor Trustee.

## 14. Oversight of the Creditor Trustee.

All activities of the Creditor Trustee shall be subject to oversight by the Creditor Trust Oversight Committee. Up to four members of the Committee willing to serve shall become the Creditor Trust Oversight Committee, effective as of the Effective Date. Any member of the Creditor Trust Oversight Committee who transfers his, her or its Claims shall be deemed to have resigned from the Creditor Trust Oversight Committee effective as of the date of such transfer, and such member shall not be permitted to serve on the Creditor Trust Oversight Committee. No successor of a member of the Creditor Trust Oversight Committee, and no transferee of a Claim held by a member of the Creditor Trust Oversight Committee, shall be permitted to serve as a member of the Creditor Trust Oversight Committee. The Creditor Trust Oversight Committee shall not receive compensation from the Reorganized Debtor or the Creditor Trust, but shall be reimbursed for any reasonable out-of-pocket expenses.

## 15. Dissolution of Creditors' Committee.

Upon the Effective Date or as soon as reasonably practicable thereafter, the Committee shall be dissolved, employment of the Committee's counsel shall terminate, and the members of the Committee shall be released of all duties, responsibilities, and obligations related to or arising from or in connection with this Chapter 11 Case.

11585568.5

16.  **Effectuating Documents; Further Transactions.**

The Debtor and the Reorganized Debtor shall be authorized to execute, deliver, file, and/or record such contracts, instruments, releases, and other agreements or documents, and to take such other actions, as may be necessary, desirable or appropriate to effectuate and further evidence the terms and conditions of the Plan.

17.  **U.S. Trustee Fees and Reports.**

Notwithstanding any other provisions of this Plan, the Reorganized Debtor shall pay any and all fees of the Office of the United States Trustee as and when such fees become due, and shall file with the Office of the United States Trustee all reports which are required pursuant to the relevant guidelines of the Office of the United States Trustee.

18.  **Discharge of Duties**

After making the final Distribution under the Plan, the Reorganized Debtor shall be discharged from its duties under the Plan.

**ARTICLE VII.**

**PROVISIONS REGARDING DISTRIBUTIONS**

1.  **Distributions.**

On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make Distributions with respect to Allowed Administrative Expense Claims. Subsequent to the Effective Date, the Reorganized Debtor shall make Distributions with respect to all other Allowed Claims as contemplated by and to the extent set forth in the Plan.

2.  **Interest/Fees on Claims.**

Except as set forth in a Final Order of the Court entered in the Chapter 11 Case or as otherwise set forth herein, no holder of any Claim shall be entitled to interest or fees of any nature whatsoever accruing on or after the Petition Date on such Claim.

3.  **Means of Payment.**

All payments made pursuant to this Plan shall be in Cash and by any means reasonably selected by the Reorganized Debtor, including check or wire transfer, and may include any endorsement or limitation as may be approved by the Reorganized Debtor.

4.  **Duties of Reorganized Debtor.**

The Reorganized Debtor will have responsibility for determining Distributions as necessary and for sending such Distributions to the Creditor Trustee and the appropriate holders of Claims. The duties of the Reorganized Debtor are limited to the functions set forth specifically in this Plan.  The Reorganized Debtor and its managers, members, officers, directors,

33

11585568.5

shareholders, representatives, employees, attorneys and other agents shall incur no liability for their respective actions (or failures to act) or conduct pursuant to this Plan except to the extent attributable to their willful misconduct or gross negligence. Notwithstanding any other provision of this Plan to the contrary, and subject to the right of the Creditor Trustee to be heard by the Bankruptcy Court, Distributions may be deferred or delayed in the discretion of the Reorganized Debtor for a reasonable time in the event that additional time is needed to make a proper Distribution, or in the event that the receipt of additional funds is necessary to make meaningful payments.

5.    **Rounding.**

Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole dollar.

6.    **Unclaimed Property.**

Any property to be distributed on account of a Claim against or Interest in the Debtor shall be distributed by mail to the latest mailing address filed of record for the party entitled thereto, or if no such mailing address has been so filed, the mailing address reflected in the Debtor's Schedules. Any property so distributed that is unclaimed for longer than 90 days after the distribution thereof by mail shall become property of the Reorganized Debtor and such persons to whom such unclaimed assets are distributed shall be eliminated from all future mailings of the Reorganized Debtor and Creditor Trustee, no subsequent Distributions shall be made on account of such Claim, and such Claim shall be treated as being Disallowed, waived, and satisfied. These provisions shall apply without regard to any applicable nonbankruptcy laws with respect to unclaimed property.

7.    **Taxes.**

The Reorganized Debtor shall be entitled to deduct any federal or state withholding taxes from any Distributions made with respect to Allowed Claims, as appropriate, and shall otherwise comply with section 346 of the Bankruptcy Code. The Debtor, the Reorganized Debtor, and the Creditor Trustee, as the case may be, shall be authorized, to the extent necessary or appropriate, to seek a determination of the Estate's or the Creditor Trust's tax liabilities, as contemplated by section 505 of the Bankruptcy Code. Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes or equity securities under this Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument or transfer under this Plan, including, without limitation, merger agreements, agreements or consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any stamp tax or other similar tax or governmental assessment.

11585568.5

# ARTICLE VIII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.  Assumption of Executory Contracts and Leases.

On the Effective Date, all executory contracts or unexpired leases of the Debtor will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtor pursuant to an order entered by the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms, or (iii) is an executory contract to be rejected by the Debtor pursuant to the Plan and set forth on Schedule 8.1.  Entry of the Confirmation Order by the Bankruptcy court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to this Section 1 shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan, or any Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.

### 2.  Cure Defaults of Assumed Executory Contracts and Unexpired Leases

Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree.  In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.  Pending the Bankruptcy Court's ruling on such dispute, the executory contract or unexpired lease at issue shall be deemed assumed by the Debtor unless otherwise ordered by the Bankruptcy Court.

### 3.  Insurance Policies

All insurance policies pursuant to which the Debtor has rights and obligations as of the date of the entry of the Confirmation Order and that qualify as executory contracts shall be assumed by the Debtor and Reorganized Debtor and shall continue in full force and effect.  All insurance policies shall revest in the Reorganized Debtor.

### 4.  Post-Petition Contracts and Leases

All contracts, agreements and leases that were entered into by the Debtor or assumed by the Debtor after the Petition Date shall be deemed assigned by the Debtor to the Reorganized Debtor on the Effective Date.

35

5. **Bar Date for Rejection Damages.**

With respect to any executory contract or unexpired lease that has been rejected pursuant to section 365 of the Bankruptcy Code, which rejection results in a Claim that has not theretofore been evidenced by a timely filed proof of claim or a proof of claim that is deemed to be timely filed under applicable law, then any person seeking to assert such a Claim shall file with the Court, and serve upon the Reorganized Debtor, a proof of claim within 20 days from the Effective Date. Any person seeking to assert such a Claim who fails to file a proof of claim within this 20 day period shall be deemed to have waived said Claim, and it shall be forever barred.

ARTICLE IX.

CONDITIONS PRECEDENT

Each of the following conditions must occur and be satisfied on or before the Effective Date for the Plan to be effective on the Effective Date (provided that the Debtor may agree to waive any one or more of the following conditions):

(a) The Confirmation Order shall have been signed by the Court and duly entered by the Clerk of the Court in a form and substance reasonably acceptable to the Debtor, and

(b) Either the Confirmation Order shall have become a Final Order or there shall not be any stay in effect with respect to the Confirmation Order and the Confirmation Order shall not have been vacated, reversed, modified or amended in any material respects without the prior written consent of the Debtor.

ARTICLE X.

MODIFICATIONS AND AMENDMENTS

The Debtor—and, as of the Effective Date, the Reorganized Debtor—reserves the sole and exclusive right to alter, amend, or modify the Plan as contemplated by section 1127 of the Bankruptcy Code. The Plan may be modified, before or after confirmation, without notice or hearing, or on such notice and hearing as the Court deems appropriate, if the Court finds that the proposed modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard to the proposed modification. Without limiting the foregoing, the Plan otherwise may be modified after notice and hearing. In the event of any modification at or before confirmation, any votes in favor of the Plan shall be deemed to be votes in favor of the Plan as modified, unless the Court finds that the proposed modification materially and adversely affects the rights of the parties in interest that cast said votes.

36

11585568.5

# ARTICLE XI.

## RETENTION OF JURISDICTION

After the Confirmation Date, and until the Chapter 11 Case is closed, the Court shall retain jurisdiction for the following purposes:

A.      To classify, allow or disallow Claims and direct distribution of funds under the Plan and to hear and determine any controversies pertaining thereto.

B.      To hear and determine any and all motions, applications, adversary proceedings and other matters arising out of or related to the Plan, to construe and take any action to enforce the execution of this Plan, the Confirmation Order, or any other Order, or to issue such Orders as may be necessary for the implementation, execution, performance or consummation of the Plan and all matters referred to herein or in the Confirmation Order or to resolve any disputes concerning any of the foregoing.

C.      To hear and decide avoidance actions under chapter 5 of the Bankruptcy Code and turnover actions under sections 543 and 543.

D.      To decide matters arising under section 1112 of the Bankruptcy Code.

E.      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked or vacated.

F.      To adjudicate any disputes concerning payment of pre- or post-Effective Date Professional Fees or expenses or any request for payment of administrative expenses.

G.      To modify the Plan or remedy any defect, omission or inconsistency in the Plan and to enter such orders as are necessary or appropriate to carry out the Plan under section 1127(b) of the Bankruptcy Code.

H.      To issue injunctions or orders as may be necessary or appropriate to restrain interference with this Plan or its execution and to enforce the permanent injunction under section 524 of the Bankruptcy Code.

I.      To hear and determine matters concerning state, local and federal taxes pursuant to sections 346, 505, 525 and 1146 of the Bankruptcy Code.

J.      To hear and determine any other dispute or matter relating to the Chapter 11 Case, including without limitation, the Causes of Action, the Creditor Trust and any other matter subject to the Court's jurisdiction pursuant to applicable law.

37

## ARTICLE XII.

## INJUNCTION AND SETTLEMENT

The rights afforded in this Plan and the treatment of all Liens, Claims and Interests herein shall be in exchange for, and in complete satisfaction, discharge and release of, all Claims and Interests of an kind, including without limitation any interest accrued on such Claims from and after the Petition Date, except as otherwise set forth in this Plan, against the Debtor, the Estate, or the Reorganized Debtor. Except as otherwise provided in the Plan or the Confirmation Order, confirmation of the Plan acts as a discharge satisfaction, effective as of the Effective Date, of any and all debts of the Debtor that arose at any time before the entry of the Confirmation Order, including, but not limited to, all principal or interest, whether accrued before or after the Petition Date. The Debtor's discharge shall be effective as to each Claim, regardless of whether a proof of claim therefor was filed, whether the Claim is an Allowed Claim, or whether the holder thereof votes to accept the Plan. All persons who have held, hold, or may hold Claims against or Interests in the Debtor (including without limitation claims for indemnity and/or contribution) shall be permanently enjoined, on and after the Effective Date, subject to the occurrence of the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such claim or equity interest against the Released Parties, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order against the Released Parties on account of any such claim or equity interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Released Parties or against the property or interests in property of the Released Parties on account of any such claim or equity interest, and (iv) asserting any rights of setoff, subordination, or recoupment of any kind against any obligation due from or against the Released Parties or against the property or interest in property of or against the Debtor or the Reorganized Debtor on account of any such claim or equity interest. The foregoing injunction will extend to successors of the Released Parties and their respective properties and interests in property. Any act taken in violation of this Article shall be null and void, and any party injured by any violation of such injunction shall be entitled to recover actual damages, including costs and attorneys' fees, from the violator and, if appropriate, punitive damages from the willful violator. On and after the Confirmation Date, the provisions of the Plan shall be binding upon the Debtor, the Estate, the Reorganized Debtor, all holders of Claims, all holders of Interests, and all other parties in interest in the Chapter 11 Case, and their respective successors and assigns, in each case whether or not such persons or entities have filed a claim or are impaired and whether or not such persons or entities have accepted the Plan.

Each of the discharge, injunction and release provisions provided in this Article XII is an integral part of the Plan and is essential to its implementation. The Debtor, the Reorganized Debtor and each of the Released Parties shall have the right to independently seek the enforcement of the discharge, injunction and release provisions set forth in this Article XII.

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, the Debtor on its own behalf and as representative of its estate, and on behalf of its Related Persons, shall, and shall be deemed to, completely and forever release, waive, void,

38

extinguish and discharge unconditionally, each and all Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts owing, causes of action, rights, liabilities of any nature whatsoever and remedies of the Debtor's estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against the Released Parties arising from or relating to the period prior to the Effective Date are released by this Plan, including any act, omission or transaction in connection with the Chapter 11 Case, the Plan and the Disclosure Statement that may be asserted by or on behalf of the Debtor or its estate.

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Equity Interest, or other right of a holder of an equity security or other ownership interest that is terminated, and each of its respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally each and all of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to the Debtor, the Debtor's estate, the Reorganized Debtor or any of their respective assets and property, the Chapter 11 Case, the Plan or the Disclosure Statement.

**NOTWITHSTANDING ANY OTHER PROVISION OF THE PLAN, NO HOLDER OF A CLAIM OR AN INTEREST, OR OTHER PARTY IN INTEREST, AND NO SUCCESSORS OR ASSIGNS OF THE FOREGOING, SHALL HAVE ANY CLAIM, CAUSE OF ACTION, OR OTHER LEGAL OR EQUITABLE RIGHT AGAINST THE RELEASED PARTIES FOR ANY ACT OR OMISSION FROM THE PETITION DATE THROUGH THE EFFECTIVE DATE IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, EXCEPT FOR THEIR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. PROVIDED THAT THEY ACT IN GOOD FAITH, IN ALL SUCH INSTANCES, THE ABOVE-REFERENCED PARTIES SHALL BE AND HAVE BEEN ENTITLED TO REASONABLY RELY ON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES IN CONNECTION WITH THE CASE AND UNDER THE PLAN.**

11585568.5

# ARTICLE XIII.

## LIMITATION OF LIABILITY

Neither the Debtor, the Reorganized Debtor nor the Committee or any of their respective members, employees, officers, directors, managers, agents, attorneys, or advisors, shall have or incur any liability to any holder of a Claim or Interest or any other party in interest, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, the negotiation, formulation and preparation of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration or distribution of property under the Plan, except for their gross negligence or willful misconduct, and in all respects they shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. The entry of the Confirmation Order shall constitute the determination by the Court that the Debtor, the Reorganized Debtor, the Committee, and each of their respective current and former members, employees, officers, directors, managers, agents, attorneys, and advisors shall have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code pursuant to, among others, sections 1125(e) and 1129(a)(3) of the Bankruptcy Code, with respect to the foregoing. Nothing herein shall be construed, however, to relieve the Debtor or the Reorganized Debtor, or any other party, from performing their respective obligations under the Plan.

## ARTICLE XIV.

## MISCELLANEOUS

1.   **Binding Effect.**

The Plan shall be legally binding upon and inure to the benefit of the Debtor, the Estate, the Committee, the Reorganized Debtor, the holders of Claims, the holders of Interests and all other parties in interest in the Chapter 11 Case, and their respective successors and assigns.

2.   **Post-Confirmation Date Retention of Professionals**

Upon the Effective Date, any requirement that professionals employed by the Reorganized Debtor comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtor will be authorized to employ an compensate professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

3.   **Notices.**

Any notice required or permitted to be provided to the Debtor or the Reorganized Debtor under the Plan shall be in writing, and served by overnight courier service or by certified mail, return receipt requested, addressed as follows:

40

11585568.5

**The Debtor
or the Reorganized Debtor:**

Robert C. Folland, Esq.
Andrew L. Turscak, Jr., Esq.
Curtis L. Tuggle, Esq.
Thompson Hine LLP
3900 Key Tower
127 Public Square
Cleveland, OH 44114

**4.      Revocation.**

The Debtor reserves the right to revoke and withdraw the Plan prior to confirmation.  If the Debtor revokes or withdraws the Plan, then the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor, or any other person or entity or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtor.

**5.      Plan Controls.**

In the event, and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, or any other agreement or instrument required or contemplated to be executed by the Debtor, the Committee, the Reorganized Debtor, or any other entity pursuant to the Plan, the provisions of the Plan shall control and take precedence.  In the event of any inconsistency between any provision of any of the foregoing documents and any provision of the Confirmation Order, the Confirmation Order shall control and take precedence.

**6.      Time.**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Court, the provisions of Bankruptcy Rule 9006 shall apply.

**7.      Section 1125(e) of the Bankruptcy Code.**

As of the Confirmation Date, the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. As of the Confirmation Date, the Debtor, the Committee and their respective members, officers, directors, agents, managers, financial advisors, attorneys, employees, and representatives shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the new securities hereunder, and therefore are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections hereof or other offer and issuance of new securities under the Plan.

41

11585568.5

8.      **Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

9.      **Savings Clause.**

Any minor defect or inconsistency in the Plan may be corrected or amended by the Confirmation Order.

10.     **Remedy of Defects.**

After the Effective Date, the Reorganized Debtor may, with approval of the Court, and so long as it does not materially and adversely affect the interests of Creditors or of Interest holders, remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and effect of the Plan and in form and substance satisfactory to the Reorganized Debtor.

11.     **Bar Date for Certain Administrative Expense Claims.**

All applications for final allowance of fees and expenses of professional persons employed by the Debtor or any statutory committee appointed in this Chapter 11 Case, pursuant to orders entered by the Bankruptcy Court and on account of services rendered prior to the Effective Date, shall be Filed with the Bankruptcy Court and served upon the Reorganized Debtor's counsel at the address set forth in Section 3 of Article XIV of this Plan, and upon counsel to the Committee, Hahn Loeser & Parks LLP, 200 Public Square, Suite 2800, Cleveland, Ohio 44114, Attn. Daniel A. DeMarco, no later than thirty (30) days after the Effective Date. Any such claim that is not Filed within this time period shall be discharged and forever barred. Objections to any application for allowance of Administrative Expense Claims described in this Section 11 must be Filed within 20 days after the filing thereof.

12.     **Effectuating Documents and Further Transactions.**

On and after the Effective Date, the Debtor and the Reorganized Debtor are authorized to execute, deliver, file or record the Plan Documents and such other contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan and any notes or securities issued pursuant to this Plan.

11585568.5

13. **Corporate Action.**

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Plan that would otherwise require approval of the members or managers of the Debtor or the Reorganized Debtor shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable general corporation law of the state(s) in which the Debtor or the Reorganized Debtor is organized without any requirement of further action by the members or managers of the Debtor or the Reorganized Debtor.

14. **Payment of Statutory Fees.**

All fees payable pursuant to section 1930, chapter 123, of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date or as soon as practicable thereafter.

15. **Governing Law.**

Unless a rule of law or procedure is supplied by federal law, including the Bankruptcy Code and the Bankruptcy Rules, and except as set forth elsewhere herein, the laws of the State of Ohio shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan.

16. **Reliance on Documents.**

The Debtor and the Reorganized Debtor may rely upon, and shall be protected in acting, or refraining from acting upon, any certificates, opinions, statements, instruments or reports believed by them to be genuine and to have been signed or presented by the proper person or persons.

17. **Designated Notice.**

Notwithstanding any other provision of this Plan, when notice and a hearing is required with regard to any action to be taken by the Debtor or the Reorganized Debtor, Designated Notice shall be adequate.

18. **Reservation of Rights.**

Except as expressly set forth herein, this Plan shall have no force and effect unless the Bankruptcy Court has entered the Confirmation Order. The filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by the Debtor with respect to this Plan shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Interests.

43

11585568.5

## ARTICLE XV.

## RECOMMENDATION.

The Debtor believes that confirmation and consummation to the Plan is preferable to all other alternatives.

## ARTICLE XVI.

## CONCLUSION

The Debtor urges Creditors to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received by the deadline established by the Court.

March 14, 2011                                    Respectfully Submitted,


                                                  /s/ Robert C. Folland
                                                  Robert C. Folland (0065728)
                                                  Andrew L. Turscak, Jr. (0073851)
                                                  Curtis L. Tuggle (0078263)
                                                  THOMPSON HINE LLP
                                                  3900 Key Center
                                                  127 Public Square
                                                  Cleveland, Ohio 44114
                                                  (216) 566-5500 (phone)
                                                  (216) 566-5800 (fax)
                                                  Robert.Folland@thompsonhine.com
                                                  Andrew.Turscak@Thompsonhine.com
                                                  Curtis.Tuggle@thompsonhine.com
                                                  *Counsel for Debtor, Kiebler Recreation, LLC*

44

## <u>Schedule 2.8</u>

**Camelot II Real Property**



11585568.5



Proposed Camelot II

Approximately 6.3 Acres

11585568.5

**Schedule 2.20**

**Cross Estates Subordinated Note A**

11585568.5

## Schedule 2.21

## Cross Estates Subordinated Note B

11585568.5

## Schedule 2.22

### Cross Estates Guarantee

11585568.5

## Schedule 2.34

## Fairways Real Property

11585568.5

## Schedule 2.37

**Greenwood Forest Real Property**

11585568.5

## Schedule 2.44

**New Huntington Bank Secured Note A**

11585568.5

## Schedule 2.45

### New Huntington Bank Secured Note B

11585568.5

**Schedule 2.62**

**Resort Real Property**

11585568.5

## Schedule 2.63

## Ridgeview Real Property

11585568.5

**Stoney Creek Real Property**

ALL THAT TRACT OR PARCEL OF LAND situate in the Town of French Creek, County of Chautauqua and State of New York, being part of Lot 55, Town 1 and Range 15 of the Holland Land Company's survey and further bounded and described as follows:  BEGINNING at a point on the westerly line of said Lot 55, said point located southerly, as measured along the westerly line of Lot 55, a distance of 343.43 feet from an existing iron stake at the southwesterly corner of lands of Ernest W. Caflisch et al, as described in a deed recorded in the Chautauqua County Clerk's office in Liber 1885 of Deeds at page 240; thence S 88°-32'-42" E, 190.51 feet to a set rebar with cap at the northwesterly corner of Stoney Creek Villas Lot 1; thence S 01°-27'-18" W, along the westerly line of Stoney Creek Villas Lot 1, a distance of 118.95 feet to a set rebar with cap at the southwesterly corner of Stoney Creek Villas Lot 1 and the north line of Abby Lane (50 feet wide private road); thence S 66°-38'-49" W, along the north line Abby Lane, 48.51 feet to a point; thence southwesterly on a curve to the left, and still along the north line of Abby Lane, 66.92 feet to a point, said curve having a radius 145.52 feet and a chord S 53°-28'-19" W, 66.34 feet; thence N 42°-54'-07" W, 137.08 feet to a point on the said westerly line of Lot 55; thence N 02°-36'-27" E, along the westerly line of Lot 55, a distance of 82.14 feet to the point of beginning containing 0.605 acre of land to be the same more or less.

and

ALL THAT TRACT OR PARCEL OF LAND situate in the Town of French Creek, County of Chautauqua and State of New York, being part of Lot 55, Town 1 Range 15 of the Holland Land Company's survey and further bounded and described as follows:  BEGINNING at an existing iron stake in the westerly line of said Lot 55, said iron stake being also the southwesterly corner of lands of Ernest W. Caflisch et al. as described in a deed recorded in the Chautauqua County Clerk's office in Liber 1885 of Deeds at page 240; thence S 87°-33'-30" E, along the southerly line of said lands of Caflisch, 636.33 feet to a point; thence S 31°-58'-29" E, 583.84 feet to a point; thence S 20°-21'-31" E, 37.22 feet to a point; thence southwesterly on a curve to the left, 182.46 feet to a point, said curve having a radius 125.00 feet and a chord S 21°-27'-26" W, 166.68 feet; thence S 63°-16'-23" W, 117.34 feet to a point; thence N 83°-00'-14" W, 390.83 feet to a point on the easterly line of lands of Northgate II Condominiums; thence N 03°-01'-15" W, along the said easterly line of lands of Northgate II Condominiums, 230.04 feet to a point; thence N 85°-36'-15" W, along the northerly line of said lands of Northgate II Condominiums, 66.68 feet to a set rebar with cap at the southeasterly corner of Stoney Creek Villas Lot 1; thence N 18°-37'-39" E, along the easterly line of Stoney Creek Villas Lot 1, a distance of 71.55 feet to a set rebar with cap; thence N 49°-12'-40" W, along the northeasterly line of Stoney Creek Villas Lot 1, a distance of 98.77 feet to a set rebar with cap; thence N 88°-32'-42" W, along the northerly line of Stoney Creek Villas Lot 1, a distance of 98.85 feet to a set rebar with cap at the northeasterly corner of Stoney Creek Villas Lot 2; thence continuing along the same course N 88°-32'-42" W, along the northerly line of Stoney Creek Villas Lot 2, a distance of 190.51 feet to a point in the westerly line of Lot 55; thence N 02°-36'-27" E, along the westerly line of Lot 55, a distance of 343.43 feet to the point of beginning containing 10.615 acres of land to be the same more or less.

ALONG WITH the right of ingress and egress over any existing or proposed roadways which traverse through the lands of Northgate II Condominiums to Abby Lane.

and

ALL THAT TRACT OR PARCEL OF LAND situate in the Town of French Creek, County of Chautauqua and State of New York, being part of Lot 55, Town 1 and Range 15 of the Holland Land Company's survey and further bounded and described as follows:  COMMENCING at an iron stake on the westerly line of said Lot 55, said iron stake located southerly, as measured along the westerly line of Lot 55, a distance of 1320 feet from the northwest corner of Lot 55; thence S 20°-12'-17" E, 497.44 feet to the POINT OF BEGINNING of the parcel hereinafter described; thence N 01°-27'-18" E, 118.95 feet to a point; thence S 88°-32'-42" E, 98.85 feet to a point; thence S 49°-12'-40" E, 98.77 feet to a point; thence S 18°-37'-39" W, 71.55 feet to a point on the north line of the Northgate II Condominiums; thence N 85°-36'-15" W, along the north line of the Northgate II Condominiums, 68.67 feet to a point; thence N 82°-53'-00" W, 85.96 feet to the point of beginning containing 0.437 acre of land to be the same more or less.

57

11585568.5

<h2 style="text-align:center"><u>Schedule 2.68</u></h2>

<h3 style="text-align:center">Tower Project Real Property</h3>

All That Tract or Parcel of Land, situate in the Town of French Creek, County of Chautauqua and State of New York, being part of Lot 54, Township 1 and Range 15 of the Holland Land Company's survey and further bounded and described as follows:  Beginning at a point located South 42 degrees 05 minutes 50 seconds East, a distance of 1,837.34 feet to the northwest corner of Lot 54; thence North 22 degrees 55 minutes 10 seconds East, 120.00 feet to a point; thence South 68 degrees 01 minute 46 seconds East, 125.00 feet to a point; thence South 24 degrees 22 minutes 12 seconds East, 130.00 feet to a point; thence south 67 degrees 31 minutes 11 seconds West, 110.00 feet to a point; thence North 49 degrees 51 minutes 02 seconds West, 150.00 feet to the point of beginning, containing 0.6007 acres of land to be the same more or less.

Being the same premises conveyed by Peek'n Peak Recreation, Inc. to Canterbury Woods Association, Inc. by deed dated January 5, 2001 which was recorded in the Chautauqua County Clerk's Office in Liber 2459 of Deeds at Page 155 on January 11, 2001.

In addition thereto that property shown on the attached sketch.

11585568.5

## Schedule 6.9

### Preserved Potential Causes of Action

As set forth in, but not limited by, the Plan and section 1123(b)(3)(B) of the Bankruptcy Code, the Debtor expressly reserves and retains for itself and for the Reorganized Debtor and the Creditor Trust, and the Reorganized Debtor and the Creditor Trustee shall be authorized to prepare, file, pursue, prosecute and settle the following Causes of Action without further approval of the Court, whether or not such Causes of Action have been asserted or commenced as of the Effective Date. Final determinations have not yet been made as to which causes of action and recovery actions may or should be pursued. The following list of Causes of Action are provided for disclosure and informational purposes:

1) Claims and Causes of Action related to transfers or payments made to third parties within the preference period set forth in Bankruptcy Code section 547.

2) Claims and Causes of Action against or with respect to any tax refunds including without limitation all appeal or other recovery rights with any taxing authority for any overpayment or any type of taxes, including claims for recalculation of real estate taxes in cases where the assessed value exceeds the market value of the real property.

3) Claims and Causes of Action arising out of any current or former contracts to which the Debtor was or is a party.

4) All claims and Causes of Action, including those arising under Bankruptcy Code sections 105, 502, 510, and 542 through 553, as well as applicable state law, for avoidance and/or recovery of any transfers or payments made to third parties, including without limitation the transfers and payments detailed in the Schedules, and such parties' successors, assigns and subsequent transferees.

5) Claims and Causes of Action for avoidance, subordination, recharacterization or recovery against creditors, service providers, professionals or other third parties who have filed a proof of Claim and/or whose claims have been listed on the Schedules.

Although the Debtor has attempted to be thorough in naming potential causes of action, it cannot be certain that it has discovered or is yet aware of all existing potential Causes of Action. It is possible that additional claims or causes of action exist that are not presently known or discovered. It is the intent of the Debtor to preserve any such as yet unknown or undiscovered causes of action or claims for itself and the Reorganized Debtor and the Creditor Trust and, possibly, to pursue all such causes of action or claims after the Effective Date.

## Schedule 8.1

### Executory Contracts Rejected Pursuant to Plan

Schedule No. 1030366, dated as of July 16, 2009, to Master Loan and Security Agreement, dated as of March 7, 2006, by and among Kiebler Recreation, LLC and Textron Financial Corporation

11585568.5