ASSET PURCHASE AND SALE AGREEMENT

Between

[_____]

And

Kiebler Recreation, LLC

Dated as of _____ __, 2011

Fairways Condominiums

# TABLE OF CONTENTS

ARTICLE I       DEFINITIONS ............................................................................... 2

ARTICLE II       SALE AND PURCHASE OF PURCHASED ASSETS; ASSUMPTION OF
ASSUMED OBLIGATIONS ............................................................ 7

2.1     Purchased Assets ................................................................. 7
2.2     Assignment of Contracts ..................................................... 8
2.3     Excluded Assets .................................................................. 8
2.4     Assumed Obligations .......................................................... 8
2.5     Schedule Updates ............................................................... 9

ARTICLE III       PURCHASE PRICE AND PAYMENT ............................................. 9

3.1     Purchase Price; Deposit ...................................................... 9
3.2     Contract Assignments ....................................................... 10
3.3     Allocation of Purchase Price ............................................. 10

ARTICLE IV       REPRESENTATIONS AND WARRANTIES OF SELLER ........................ 10

4.1     Existence and Good Standing ........................................... 10
4.2     Due Authorization ............................................................ 10
4.3     Title ................................................................................. 11
4.4     Litigation ......................................................................... 11
4.5     Brokers ............................................................................ 11
4.6     Exclusivity and Survival of Representations ..................... 11

ARTICLE V       REPRESENTATIONS AND WARRANTIES OF THE BUYER ................ 11

5.1     Existence and Good Standing ........................................... 11
5.2     Due Authorization ............................................................ 12
5.3     Consents .......................................................................... 12
5.4     Litigation ......................................................................... 12
5.5     Brokers ............................................................................ 12
5.6     Financial Capability ......................................................... 12

ARTICLE VI       COVENANTS OF THE SELLER ..................................................... 13

6.1     Debtor's Chapter 11 Bankruptcy Case ............................. 13
6.2     Conduct of Business ......................................................... 13

ARTICLE VII       COVENANTS OF THE BUYER AND SELLER ................................. 13

7.1     Post-Closing Confidentiality ............................................ 13
7.2     Access to Information, Inspections ................................... 14
7.3     Title Evidence, Closing Fees and Proration of Utilities ..... 14
7.4     Tax Matters ...................................................................... 15

10-15099-pmc     Doc 766-1     FILED 08/11/11     ENTERED 08/11/11 15:31:34     Page 2 of 30

7.5      Bulk Sales Compliance ............................................................................16

ARTICLE VIII     CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER ........16

8.1      Accuracy of Representations and Warranties ...........................................16
8.2      Compliance with Agreements and Covenants ..........................................17
8.3      No Injunctions ...........................................................................................17
8.4      Purchased Contracts ..................................................................................17
8.5      Deliveries ..................................................................................................17
8.6      Bankruptcy Court Approval ......................................................................17

ARTICLE IX      CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER .................17

9.1      Accuracy of Representations and Warranties ...........................................17
9.2      Compliance with Agreements and Covenants ..........................................17
9.3      No Injunctions ...........................................................................................18
9.4      Bankruptcy Court Approval ......................................................................18
9.5      Deliveries ..................................................................................................18

ARTICLE X      CLOSING ......................................................................................................18

10.1     Closing .......................................................................................................18
10.2     Deliveries by Seller ...................................................................................18
10.3     Deliveries by the Buyer ............................................................................19

ARTICLE XI      TERMINATION ............................................................................................19

11.1     Termination Events; Opportunity to Cure ................................................19
11.2     Effect of Termination ................................................................................20

ARTICLE XII      INDEMNIFICATION ....................................................................................21

12.1     Indemnification by Seller ..........................................................................21
12.2     Indemnification by Buyer ..........................................................................21

ARTICLE XIII     MISCELLANEOUS ......................................................................................21

13.1     Entire Agreement ......................................................................................21
13.2     Headings ....................................................................................................21
13.3     Notices ......................................................................................................21
13.4     Exhibits and Schedules .............................................................................22
13.5     Severability ...............................................................................................22
13.6     Waiver .......................................................................................................22
13.7     Assignment ................................................................................................22
13.8     Successors and Assigns .............................................................................23
13.9     Governing Law ..........................................................................................23
13.10    Binding Effect ...........................................................................................23
13.11    Agreement Regarding Post-Petition Venue ..............................................23

13.12    Amendments ..................................................................................................23
13.13    Counterparts ................................................................................................23
13.14    No Third Party Beneficiaries .....................................................................23
13.15    Passage of Title and Risk of Loss ............................................................23

## SCHEDULES

Schedule 2.1(b)        Owned Real Property

Schedule 5.3           Consents

# ASSET PURCHASE AND SALE AGREEMENT

This ASSET PURCHASE AND SALE AGREEMENT is made as of the _____ day of _____, 2011 by and between David O. Simon, Chapter 11 Trustee ("Seller") of Kiebler Recreation, LLC, a New York limited liability company ("Debtor"), and _____, with offices located at _____ ("Buyer").

## BACKGROUND

A.      Debtor owns approximately 2.97 acres next to the Peek'n Peak Resort located in French Creek, New York, with twelve (12) three bedroom condominium units and an adjacent parking lot constructed on such real property (the "Fairways Condominiums"). The Fairways Condominiums are not currently classified as condominiums under New York law as the offering plan related to such units was approved but never declared effective, nor recorded with the local county clerk's office.

B.      On May 26, 2010 (the "Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court, Northern District of Ohio, Cleveland Division (the "Bankruptcy Court"). Pursuant to Bankruptcy Code sections 1107(a) and 1108, Debtor operated its business and managed its affairs as a debtor in possession from the Petition Date to June 7, 2011. On June 20, 2011, the Bankruptcy Court approved the United States Trustee's appointment of David O. Simon as trustee pursuant to section 1104 of the Bankruptcy Code.

C.       Buyer is submitting this Agreement at the request of Seller. Buyer wishes to purchase Debtor's assets related to the Fairways Condominiums, as further described below, on the terms set forth in this Agreement.

## TERMS

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, covenants and agreements herein contained, the parties hereby agree as follows:

{K0273141.1}

# ARTICLE I

## DEFINITIONS

Certain capitalized terms used herein have the meanings set forth below.

"Accounts Receivable" shall mean all trade and non-trade receivables of Debtor which are payable as a result of goods sold or services provided by Debtor with respect to the rental of units in the Fairways Condominiums.

"Affiliate" shall mean, with respect to any specified Person, any other Person who, directly or indirectly, owns or controls, is under common ownership or control with, or is owned or controlled by, such specified Person. Without limiting the generality of the foregoing, a Person shall be deemed to "own" another Person if it owns, directly or indirectly, 50% or more of the capital stock, membership interest, or other equity interest of such other Person generally entitled to vote, without regard to specified contingencies, for the election of directors or equivalent governing body of such other Person.

"Agreement" shall mean this Asset Purchase and Sale Agreement, including all exhibits and schedules hereto.

"Assumed Obligations" has the meaning set forth in Section 2.4.

"Auction" shall mean any auction conducted by Seller for the sale of the Purchased Assets.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, as amended and in effect from time to time.

"Books and Records" has the meaning set forth in Section 2.1(c).

"Breach" shall mean any material misstatement or inaccuracy in, or any material failure to perform or comply with, any representation, warranty, covenant, obligation or other provision of this Agreement and such breach has a Material Adverse Effect on the Purchased Assets.

"Business Day" shall mean any day of the year other than (a) any Saturday or Sunday or (b) any other day on which banks located in New York, New York are closed for business.

"Cash" shall mean all cash, certificates of deposit, bank accounts and other cash equivalents, together with all accrued but unpaid interest thereon.

"Closing" shall mean the consummation of the transactions contemplated herein in accordance with Article XI.

"Closing Date" shall mean the date on which the Closing actually takes place.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the temporary and final regulations promulgated thereunder.

"Contract" shall mean any contract, lease, easement, license, sales order, purchase order, supply agreement, or any other agreement, commitment or understanding whether oral or written, other than Permits.

"Credit Bid" shall mean a bid by PNC pursuant to Section 363(k) of the Bankruptcy Code and the terms and conditions of the Terms of § 363 Sale Proposal (Fairways), executed by PNC and the Seller, up to the amount of the allowed secured claim in the amount of $2,845,788.13.

"Customer Deposits" shall mean deposits paid in advance by guests for Customer Rentals.

"Customer Rentals" shall mean guest rental of units at the Fairways Condominiums

"Deposit" shall mean the initial deposit of $25,000 along with the additional deposit which together shall total an amount equal to ten percent (10%) of the Purchase Price if the Buyer is determined to be the Successful Bidder.

"Dollars" or numbers preceded by the symbol "$" shall mean amounts in United States Dollars.

"Effective Time" shall mean 12:01 a.m., Eastern Time, on the Closing Date.

"Encumbrance" shall mean any charge, claim, condition, equitable interest, lien (including without limitation any lien held or asserted by any Governmental Authority, including the PBGC and the Environmental Protection Agency), option, pledge, security interest, mortgage, right of way, easement, encroachment, servitudes, right of first option, right of first refusal, or similar restriction, including restrictions of use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any attribute of ownership, or other encumbrance, option or defect in title of every type and description, whether imposed by law, agreement, understanding or otherwise, including, without limitation, all liens, encumbrances, and interests in property as set forth in Section 363 of the Bankruptcy Code.

"Fairways Condominiums" has the meaning set forth in the Recitals.

"Final Order" shall mean an order as to which there is no appeal, motion for reconsideration, stay or similar request for relief pending, and as to which the time period to seek or file any such appeal, motion for reconsideration, stay or similar request for relief has expired.

"GAAP" shall mean generally accepted accounting principles in the United Stated applied in a consistent manner throughout the periods specified.

10-15099-pmc    Doc 766-1    FILED 08/11/11    ENTERED 08/11/11 15:31:34    Page 7 of 30

"Governmental Authority" shall mean the government of the United States, or any other foreign country or any state, provincial or political subdivision thereof and any entity, body or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Knowledge," when used with respect to Seller, shall mean the actual knowledge, without any duty of inquiry, of Seller and Robert R. Swenson, President of the Debtor.

"Law" shall mean any law, statute, code, regulation, ordinance, or rule enacted or promulgated by any Governmental Authority.

"Loss" or "Losses" shall mean any and all damages (but excluding consequential, punitive and treble damages), losses, actions, proceedings, causes of action, obligations, liabilities, responsibilities, claims, encumbrances, penalties, demands, assessments, judgments, costs and expenses including, without limitation, removal, remediation, attainment or monitoring costs, sales credits, court costs and reasonable attorneys', experts' and consultants' fees, disbursements, and costs of investigation, feasibility studies, and litigation.

"Material Adverse Effect" shall mean any event, circumstance, change or effect that has a material and adverse effect on the Purchased Assets taking into account Debtor's bankruptcy proceeding and the appointment of Seller as Chapter 11 Trustee ; provided that none of the following shall be deemed to constitute a Material Adverse Effect: (i) changes in Law or general business or economic conditions that do not have a materially disproportionate effect on the Purchased Assets, (ii) financial, banking or securities markets, (iii) changes in GAAP that do not have a materially disproportionate effect on the Purchased Assets, or (iv) national or international political or social conditions.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Owned Real Property" shall mean the real property owned in fee by the Debtor listed on Schedule 2.1(b).

"Permits" shall mean permits, tariffs, authorizations, licenses, certificates, variances, interim permits, approvals, franchises and rights under any Law or otherwise issued or required by any Governmental Authority and any applications for the foregoing which are currently used or otherwise necessary for the Debtor to engage in the operations of the Fairways Condominiums as currently conducted.

"Permitted Encumbrance" shall mean: (i) any Encumbrance related to the Owned Real Property that (A) is disclosed or otherwise reflected in the Title Commitment and any surveys of the Owned Real Property, and (B) does not interfere materially with the ownership, use, operation or value of the Owned Real Property or the Purchased Assets, provided that any and all mortgages, judgments, liens, security interests, and mechanic's liens that encumber any such Owned Real Property shall (x) be discharged on the Closing Date by the Sale Approval Order and further shall attach solely to the proceeds of the sale of the Purchased Assets after the payment of PNC on its allowed claim, (y) be deemed released from such Owned Real Property as of the Closing Date, and (z) not in any way be or become the responsibility or liability of Buyer at any time; (ii) liens for real property and personal property Taxes and assessments that are not yet due and payable as of the Closing, except to the extent such liens do not attach to the Purchased Assets by virtue of an exemption from taxation afforded by Section 1146(c) of the Bankruptcy Code, provided that any and all liens for real property and personal property Taxes and assessments that have accrued through the Closing Date (A) shall be paid out of the sale proceeds prior to the payment of any other lien and shall not encumber the Purchased Assets after the Closing and (B) shall not in any way be or become the liability of the Buyer at any time; and (iii) easements, restrictive covenants, defects in title and irregularities and other matters that (A) are of record and (B) do not interfere materially with the ownership, use, operation, or value of the Owned Real Property in question.

"Person" shall mean any individual, corporation, business trust, proprietorship, firm, partnership, limited partnership, limited liability partnership, limited liability company, trust, association, joint venture, Governmental Authority or other entity.

"Personal Property Leases" has the meaning set forth in Section 2.2(b).

"PNC" shall mean PNC Bank, National Association.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Sale Approval Order" shall mean an Order of the Bankruptcy Court that, among other things: (i) approves, pursuant to Sections 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Seller of this Agreement, and the other instruments and agreements contemplated hereby; (B) the sale of the Purchased Assets to Buyer on the terms set forth herein; and (C) the performance by Seller of his obligations under this Agreement, including, without limitation, the assignment and assumption of the Personal Property Leases and the Purchased Contracts; and (ii) finds and concludes that (A) due and proper notice has been afforded in accordance with the

Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court and the orders of the Bankruptcy Court; (B) the Purchase Price constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code for the Purchased Assets; (C) Buyer is a good faith purchaser as that term is used in Section 365(m) of the Bankruptcy Code, (D) Buyer has not engaged in collusive bidding or otherwise violated the provisions of Section 365(n) of the Bankruptcy Code; (E) title to the Purchased Assets shall vest in Buyer free and clear of all liens, mortgages, security interests and other Encumbrances of any type or nature (including free and clear of any real estate taxes owed by Debtor) except for Permitted Encumbrances; and (F) Buyer does not constitute a successor to Debtor and is not subject to successor liability under federal or state law for any tax, products liability, environmental, pension or ERISA liability of Debtor.

"Successful Bidder" shall mean at the conclusion of the Auction, the buyer whose bid for the Purchased Assets is selected by the Seller.

"Tax" (and, with correlative meaning, "Taxes" and "Taxable") shall mean any federal, state, provincial, county, local or foreign taxes, charges, fees, duties (including customs duties), levies or other assessments, including income, gross receipts, net proceeds, ad valorem, turnover, real and personal property (tangible and intangible), sales, use, franchise, excise, value added, alternative, add-on minimum, stamp, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, license, payroll, environmental, capital stock, disability, severance, employee's income withholding, other withholding, unemployment and Social Security taxes, which are imposed by any Governmental Authority, and such term shall include any interest, penalties, fines or additions to tax attributable thereto or associated therewith, and shall include any transferee or successor liability in respect of Taxes (whether by contract or otherwise).

"Tax Return" shall mean any report, return, statement, notice, form, declaration, claim for refund or other document or information filed, submitted to, or required to be supplied to a Governmental Authority in connection with the determination, assessment, collection or payment of any Tax, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party" shall mean a Person other than Buyer, Seller, or their respective Affiliates.

"Third Party Claim" shall mean any claim, action, suit or proceeding made or brought by a Third Party.

# ARTICLE II

## SALE AND PURCHASE OF PURCHASED ASSETS;
## ASSUMPTION OF ASSUMED OBLIGATIONS

2.1    Purchased Assets.  Subject to and upon the terms and conditions set forth in this Agreement, on the Closing Date, but effective as of the Effective Time, Seller shall sell, assign, convey, transfer and deliver to the Buyer, and the Buyer shall purchase, acquire and take assignment and delivery of all of the right, title and interest of the Debtor in and to the following assets, properties and rights, free and clear of all Encumbrances other than Permitted Encumbrances:

(a)    Fixed Assets.  All tangible personal property of every kind and description owned by Debtor and located in and at the Fairways Condominiums and any replacements thereof acquired prior to the Effective Time (collectively, the "Fixed Assets");

(b)    Owned Real Property.  The Owned Real Property set forth on Schedule 2.1(b) together with all appurtenant easements thereunto and all buildings, structures, improvements, plants, facilities, and fixtures located thereon;

(c)    Information and Records.  To the extent legally transferable, all books and records used in the operation of the Fairways Condominiums (but excluding any credit files that are in the Debtor's care, custody or control), including, without limitation, specifications, accounting records, rental records, service records, correspondence files, Permits (if any), product research and development records, and monitoring and test records (collectively, the "Books and Records");

(d)    Permits.  To the extent transferable, all Permits and applications for Permits that are legally capable of being transferred and are necessary to the operation of the Fairways Condominiums as presently operated and conducted.  To the extent transferable, Buyer shall pay any fees required to transfer such Permits.

(e)    Intellectual Property.  All rights and interest of Debtor in the trade name and service name "Fairways Condominiums", whether or not such mark is registered, and all goodwill, if any, relating to the operation of the Fairways Condominiums ("Debtor Intellectual Property").

(f)    Accounts Receivable.  Debtor's Accounts Receivable, if any, related to Customer Rentals.

(g)    Customer Deposits.  Customer Deposits, if any, paid to Debtor, for Customer Rentals scheduled to occur after the Closing Date.

(h)    <u>Other Assets</u>.  All documents of title, commodity contracts, rights against suppliers under warranties covering any of the Fixed Assets and other similar items, in each case, to the extent related to the Purchased Assets.

All of the foregoing assets described in this Section 2.1, together with the Purchased Contracts described in Section 2.2 are referred to herein collectively as the "Purchased Assets."

2.2    <u>Assignment of Contracts</u>.  Subject to the terms and conditions of this Agreement and the need to obtain any required consent from any Third Party, on the Closing Date and as of the Effective Time, Seller shall assign and transfer to Buyer, all of its right, title and interest in and to, and Buyer shall assume all of the obligations of Debtor with respect to Customer Rentals scheduled for dates after the Closing Date (collectively, the "Purchased Contracts").

Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Purchased Contract or any claim or right or any benefit or obligation thereunder unless the Bankruptcy Court approves Debtor's assumption of such Purchased Contract and its assignment to Buyer.  Buyer shall have the right and the opportunity to object to or otherwise respond to any motion seeking such approval.

2.3    <u>Excluded Assets</u>.  Notwithstanding anything contained in this Agreement to the contrary, the Purchased Assets shall not include any of Debtor's property, real or personal, not expressly identified in Sections 2.1 and 2.2, all Cash, or any claims or causes of action which Debtor may commence including, without limitation, those claims under Chapter 5 of the Bankruptcy Code (the "Excluded Assets").

2.4    <u>Assumed Obligations</u>.  On the Closing Date, Buyer shall assume, and agree to discharge, the following obligations of Debtor (the "Assumed Obligations"):

(a)    <u>Contract Obligations</u>.  Buyer shall assume all of the obligations of Debtor under the Purchased Contracts; provided, however, Buyer shall not assume any obligations under Purchased Contracts that are not assigned or transferred to Buyer pursuant to the Sale Approval Order.  Debtor shall be solely responsible for the payment of all costs and penalties attributable or associated with rejection of any Contracts which are not assigned to Buyer.  Buyer shall pay the transfer fees, if any, that are required to transfer any Permit or Purchased Contract to Buyer, except to the extent any such transfer fees are exempt under Section 1146(c) of the Bankruptcy Code and the Sale Approval Order.

      (b)    <u>Other Obligations</u>.  Buyer hereby assumes those obligations and liabilities of Debtor which Buyer agrees to pay, assume, and/or discharge as set forth in this Agreement, as well as all other obligations to which Buyer has agreed under this Agreement.

      2.5    <u>Schedule Updates</u>.  To the extent the Purchased Assets (other than Purchased Contracts) referred to in this Article II are sold, transferred, or otherwise disposed of in the ordinary course of business prior to the Closing Date and in accordance with Section 6.2, such Purchased Assets shall be deemed to be deleted from such schedules and any replacement asset shall be deemed to be added to such schedules without any action on the part of Seller or Debtor and without any diminution of the Purchase Price.

**ARTICLE III**

**PURCHASE PRICE AND PAYMENT**

      3.1    <u>Purchase Price; Deposit</u>.

      (a)    Buyer shall pay to Seller a purchase price of _____ Dollars ($_____) (the "Purchase Price").

      (b)    The Purchase Price shall be paid by wire transfer to Seller in immediately available funds, as follows: (i) $25,000 upon the execution of this Agreement, (ii) upon selection as the Successful Bidder, an amount that, when combined with the $25,000 due upon execution of this Agreement, will equal ten percent (10%) of the Purchase Price (the deposits amounts identified in (i) and (ii) together, the "Deposit"), and (iii) the balance of the Purchase Price on the Closing Date, subject to a credit for any Customer Deposits relating to Customer Rentals assumed by Buyer hereunder; provided, however, that PNC shall not be obligated to pay a Deposit in connection with any Credit Bid, rather PNC's payment obligations shall comply with the terms and conditions of the Terms of § 363 Sale Proposal (Fairways), entered into by PNC and the Seller.  The Purchase Price shall be wire transferred to the following account:

      Bank of America
      901 Main Street
      Dallas, TX 75202
      ABA #026009593
      Credit: Kiebler Recreation, LLC, David O. Simon, Chapter 11 Trustee
      Account No.: 4438105913

10-15099-pmc    Doc 766-1    FILED 08/11/11    ENTERED 08/11/11 15:31:34    Page 13 of 30

(c)     At the Closing, the Deposit shall be credited against the Purchase Price. However, if this Agreement is terminated because of a party's default, the Deposit shall be delivered to, or retained by, the non-defaulting party, which delivery or retention shall not limit the non-defaulting party's pursuit of any other remedies available to such party as expressly provided under this Agreement.

3.2     <u>Contract Assignments</u>.  Pursuant to the Sale Approval Order, Seller shall assign to Buyer the Purchased Contracts.

3.3     <u>Allocation of Purchase Price</u>.  The aggregate consideration (the "Consideration") to be paid by the Buyer to Seller in respect of the Purchased Assets pursuant to this Agreement shall equal the Purchase Price plus the Assumed Obligations.  Seller and Buyer mutually agree to make their respective allocations of the Consideration in accordance with Section 1060 of the Code.  Seller and Buyer will endeavor in good faith to agree, as soon as practical following the Closing Date, on such allocation (as determined for federal income tax purposes, in accordance with the provisions of the Code) ("Purchase Price Allocation").  The Purchase Price Allocation shall be evidenced by a written statement signed and dated by Seller and Buyer.  Seller and Buyer shall each file IRS Form 8594 at the time and in the manner as required by Treasury Regulation Section 1.1060-1 consistent with the Purchase Price Allocation. The Purchase Price Allocation agreed upon herein for federal income tax purposes shall not be controlling with respect to any allocation of sale proceeds determined by the Bankruptcy Court.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants as of the date hereof and as of the Closing Date as follows:

4.1     <u>Existence and Good Standing</u>.  Debtor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York.

4.2     <u>Due Authorization</u>.  Pursuant to Sections 1104 and 1108 of the Bankruptcy Code, Seller has all requisite power and authority to lease, operate and sell the Purchased Assets.  Subject to the entry of the Sale Approval Order, Seller has all requisite power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.  The execution, delivery and performance by Seller of this Agreement and the consummation of the

transactions contemplated herein have been duly and validly authorized upon entry of the Sale Approval Order.

    4.3    <u>Title</u>.

    (a)    Except as set forth in any title commitment provided by Seller to Buyer with respect to the Owned Real Property, the Debtor has good, valid and marketable title to the Purchased Assets free and clear of all Encumbrances, subject only to the Permitted Encumbrances.

    (b)    Debtor is not aware of any pending or threatened condemnation or eminent domain proceeding in respect to the Owned Real Property.

    4.4    <u>Litigation</u>.  To Seller's Knowledge, other than the Chapter 11 proceedings in the Bankruptcy Court, there are no actions or proceedings pending or threatened against Debtor by or before any Governmental Authority or by or on behalf of any Person which, if adversely determined, would restrain or prohibit or otherwise adversely affect the ability of Debtor to consummate the transactions contemplated hereby.

    4.5    <u>Brokers</u>.  Except for the investment banker, Jones Lang LaSalle Hotels and Alpine Realty Capital, LLC, Seller has not used any broker or finder in connection with the transactions contemplated hereby.

    4.6    <u>Exclusivity and Survival of Representations</u>.  The representations and warranties made by Seller in this Article IV are in lieu of, and are exclusive of, all other representations and warranties by Seller, including but not limited to any warranty or representation as to the condition or suitability of the Purchased Assets, which are being conveyed on an "AS IS, WHERE IS" basis. Seller hereby disclaims any representations or warranties, express or implied, not set forth in this Article IV or in any document to be delivered by Seller at Closing.  All of the representations and warranties made by Seller in this Article IV shall terminate as of Closing.  No claim for a breach of any such representations or warranty may be made by Buyer against Seller or Debtor after the Closing Date.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants as of the date hereof and as of the Closing Date:

    5.1    <u>Existence and Good Standing</u>. Buyer is a _____ duly organized, validly existing and in good standing under the laws of the State of _____.  Buyer is

duly qualified to transact business and is in good standing in each jurisdiction in which the nature of the assets owned, leased or operated by Buyer or the conduct of its business makes such qualification necessary

    5.2    <u>Due Authorization</u>.  Buyer has all requisite [corporate] power and authority to execute, deliver and perform its obligations under this Agreement and any ancillary agreements to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the transactions contemplated hereby have been duly and validly authorized by all necessary action on the part of the Buyer, and no other action or proceeding on the part of Buyer is necessary to authorize the execution, delivery and performance by Buyer of this Agreement or the transactions contemplated by this Agreement.  Buyer has duly and validly executed and delivered this Agreement.  This Agreement constitutes the legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

    5.3    <u>Consents</u>.  Except as set forth on <u>Schedule 5.3</u>, no consent of any Person not a party to this Agreement or any Governmental Authority (other than in connection with Seller's assignment of Permits) is required in connection with the execution, delivery and performance of this Agreement by Buyer, or the consummation of the transactions contemplated hereby.

    5.4    <u>Litigation</u>.  There are no actions or proceedings of any nature pending or asserted against Buyer by or before any Governmental Authority or by or on behalf of any Person which, if adversely determined, would restrain or prohibit or otherwise adversely affect the ability of Buyer to consummate the transactions contemplated hereby.

    5.5    <u>Brokers</u>.  Buyer has not used any broker or finder in connection with the transactions contemplated hereby.

    5.6    <u>Financial Capability</u>.  Buyer (i) at the Closing, will have sufficient funds available to pay the Purchase Price and any expenses incurred by the Buyer in connection with the transactions contemplated by this Agreement, (ii) at the Closing, will have the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and (iii) has not incurred, and will not incur, any obligation, commitment, restriction or liability of any kind, which would impair or adversely affect such resources and capabilities.

# ARTICLE VI

## COVENANTS OF SELLER

Seller hereby covenants with Buyer as follows:

6.1     <u>Debtor's Chapter 11 Bankruptcy Case</u>.  This Agreement and the transactions contemplated hereby are contingent upon the approval and authorization of the Bankruptcy Court, and Seller and Debtor shall have no liability under this Agreement unless and until such approval and authorization shall be given by the Bankruptcy Court.  In the event the Sale Approval Order is appealed, Seller shall use its reasonable efforts to defend such appeal, provided that Buyer and Seller shall proceed with the Closing despite the pendency of an appeal if no stay of the Sale Approval Order is in effect.

6.2     <u>Conduct of Business</u>.  Except as otherwise contemplated by this Agreement, and except as otherwise consented to by Buyer in writing, from the date hereof until the Effective Time, Seller shall direct the Debtor to:

(a)     maintain the operation of the Fairways Condominiums in the usual and ordinary course consistent with Debtor's current business practices taking into account reasonably anticipated demand and the fact that Debtor is in a bankruptcy case;

(b)     maintain insurance coverage on the Purchased Assets consistent with Debtor's past practices or if PNC is the successful credit bidder, such insurance as may be required by laws and regulations applicable to national banks;

(c)     comply in all material respects with all applicable Laws relating to the Purchased Assets; and

(d)     promptly notify the Buyer in writing of any casualty or accidents involving the Purchased Assets that resulted or could reasonably be expected to result in Losses in excess of $75,000.

# ARTICLE VII

## COVENANTS OF THE BUYER AND SELLER

7.1     <u>Post-Closing Confidentiality</u>.  If Buyer is not the Successful Bidder of the Purchased Assets, Buyer shall, and shall cause its officers, directors, employees, Affiliates, agents, and other representatives to, hold in confidence (and not release or disclose to any Person other than Seller and his authorized representatives) and not use for any purpose any (a) proprietary information regarding

10-15099-pmc    Doc 766-1    FILED 08/11/11    ENTERED 08/11/11 15:31:34    Page 17 of 30

Debtor or any of its businesses disclosed to Buyer or any of the other foregoing Persons in connection with any due diligence performed by Buyer, or (b) proprietary information relating to the Purchased Assets in the possession of Buyer or any of the other foregoing Persons. Buyer, if not the Successful Bidder, shall return all information delivered to Buyer from Seller or Debtor relating to the Purchased Assets. Notwithstanding the foregoing, the confidentiality obligations of this Section 7.1 shall not apply to information that: (i) is required to be disclosed pursuant to an order or request of a judicial authority or Governmental Authority having competent jurisdiction (provided Buyer provides Seller with reasonable prior written notice thereof), or (ii) can be shown to have been generally available to the public other than as a result of a breach of this Section 7.1.

       7.2    <u>Access to Information, Inspections</u>.

       (a)    During the period from the date of this Agreement through the Closing Date, and upon reasonable advance notice received from Buyer, Seller shall give Buyer and its authorized representatives, including, without limitation, environmental and real estate professionals, reasonable access during regular business hours, to the Fairways Condominiums and Books and Records of Debtor relating to the Purchased Assets, such access to be exercised in a manner that does not unreasonably interfere with Debtor's business operations.

       (b)    Buyer shall, at and after the Closing Date, afford promptly to Seller and its agents reasonable access during regular business hours, upon reasonable notice, to the properties, Books and Records of the Fairways Condominiums, to the extent reasonably necessary to permit Seller to determine any matter relating to or arising during any period ending on or before the Closing Date. If the Buyer proposes to destroy or otherwise dispose of any records relating to the Fairways Condominiums, other than in the ordinary course of business, consistent with its written document retention policy, Buyer shall first notify Seller in writing, and afford Seller the opportunity, for a period of at least ninety (90) days following the date of such notice, at Seller's expense, to take custody of such records or make extracts therefrom or copies thereof.

       7.3    <u>Title Evidence, Closing Fees and Proration of Utilities</u>.

       (a)    Upon Buyer's request, Seller shall deliver to Buyer the Title Commitment, together with copies of all exception documents, to permit Buyer the opportunity to obtain at Closing an ALTA Form B (1992) owner's title insurance policy for the Owned Real Property, with customary endorsements (including, without limitation, survey and the owner's comprehensive

endorsement); and relating to zoning, access, tax parcel, contiguity. Seller shall also provide to Buyer a copy of any survey(s) of the Property which it has in its possession.

(b)     If the Title Commitment, survey or other evidence ("Title Evidence") of title discloses a material title defect, exceptions to title or other encumbrance to which Buyer reasonably objects (other than Permitted Encumbrances and other than those Encumbrances which will be sold free and clear pursuant to the Sale Approval Order), Buyer shall notify Seller of same within fifteen (15) days of receiving the Title Commitment. Seller shall use its reasonable efforts to cure such title objection as an exception to the Title Commitment. If Seller is unable to cure such title objection, Buyer shall have the right to exercise any of the following options: (1) waive the objection; or (2) elect to not purchase at the Auction the real property that is the subject the title objection.

(c)     All fees charged by the Title Company to obtain the title policy shall be paid solely by Buyer.

(d)     All real estate taxes, utility charges, including gas, oil, electricity, telephone, sewer and water, pertaining to the Purchased Assets shall be prorated between Debtor and Buyer as of the Closing Date, and accordingly, any invoices for utility charges received following the Closing Date which have accrued up to and including the Closing Date shall be for Debtor's account, and any invoices for utility charges which accrue after the Closing Date shall be for Buyer's account.

7.4     <u>Tax Matters</u>.

(a)     Buyer shall be solely responsible for the payment of all sales, use, value-added, stamp, transfer, registration, and similar Taxes, which may become due and payable and are required to be paid in connection with the transactions contemplated by this Agreement and any ancillary agreements (provided, for clarity, that Debtor shall be solely liable for any income or capital gains taxes of Debtor). Seller and Buyer each agree to cooperate with and assist the other in any reasonable efforts it may undertake to secure any available exemptions from any such transfer or similar Taxes, if applicable. Buyer shall pay all costs to record the bargain and sale deeds with liens against grantor's acts and the assumption of the Assumed Obligations pursuant to this Agreement.

(b)     After the Closing Date, Seller shall make available to Buyer and its representatives such records as Buyer may reasonably require for the preparation of any Tax Returns or other similar governmental reports or forms relating to the Purchased Assets and required to be filed by Buyer, as well as such additional records as Buyer may reasonably require for the defense of any audit, examination, administrative appeal or litigation concerning any such Tax Return or other

similar governmental report or form. Seller agrees to timely sign and deliver such certificates or forms as may be necessary or reasonably appropriate to establish an exemption from (or otherwise reduce) the Taxes referred to in Section 7.4(a). To the extent any Tax information may be relevant with respect to any Tax matters of the other party hereto, Seller and Buyer each agree to preserve such information, records and documents, in the original form if in existence, until the expiration of any applicable statutes of limitations or extensions thereof and as otherwise required by law. Buyer shall control the conduct of any Tax proceeding or contest that involves Taxes that are the responsibility of Buyer hereunder or involve Tax Returns filed by Buyer; provided, however, that Seller shall be kept reasonably informed of all matters relating to any such proceeding or contest which may result in any Tax liability with respect to which Seller may have any responsibility, and no such proceeding or contest shall be compromised or settled without Seller's consent, which will not be unreasonably withheld.

(c)     At or before the Closing Date, Seller shall provide a certificate to Buyer, in the form prescribed by Treasury Regulations under Section 1445 of the Code, that Seller is not a foreign person within the meaning of Section 1445 of the Code and the Treasury Regulations thereunder.

7.5     Bulk Sales Compliance. Buyer and Seller waive compliance with the provisions of any applicable statutes relating to bulk transfers or bulk sales.

# ARTICLE VIII
# CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER

The obligations of Buyer to consummate the transactions contemplated hereby are subject to the satisfaction or waiver by Buyer of the following conditions precedent on or before the Closing Date:

8.1     Accuracy of Representations and Warranties. The representations and warranties of Seller contained herein shall be true, accurate and correct as of the date of this Agreement and as of the Closing Date, as if made at and as of such date (unless any such representation or warranty refers specifically to a specified date, in which case such representation or warranty shall be true, accurate, and correct on and as of such specified date).

8.2　　Compliance with Agreements and Covenants.  Seller shall have materially performed and complied with all of his covenants, obligations, and agreements contained in this Agreement to be performed and complied with by him on or prior to the Closing Date.

8.3　　No Injunctions.  There shall not be in effect any temporary restraining order, preliminary injunction, injunction, or other pending or threatened action by any Person or any order of any court or Governmental Authority restraining or prohibiting the Closing of the transactions contemplated by this Agreement.

8.4　　Purchased Contracts.  The assumption and assignment of the Purchased Contracts and Equipment Leases shall have occurred as provided in this Agreement.

8.5　　Deliveries.  Seller shall have made, or be prepared to make at the Closing, all of the deliveries set forth in Section 10.2.

8.6　　Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Sale Approval Order with respect to the Purchased Assets.

8.7　　Water and Sewer Service.  An agreement for continued water and sewer service to the Fairways Condominiums after the Closing Date shall have been made to Buyer's reasonable satisfaction.

# ARTICLE IX
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller to consummate the transactions contemplated hereby are subject to the satisfaction or waiver by Seller of the following conditions precedent on or before the Closing Date:

9.1　　Accuracy of Representations and Warranties.  The representations and warranties of the Buyer contained herein shall be true, accurate, and correct as of the date of this Agreement and as of the Closing Date, as if made at and as of such date (unless any such representation or warranty refers specifically to a specified date, in which case such representation or warranty shall be true, accurate and correct on and as of such specified date).

9.2　　Compliance with Agreements and Covenants.  Buyer shall have performed and complied with all of its covenants, obligations, and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date.

10-15099-pmc　　Doc 766-1　　FILED 08/11/11　　ENTERED 08/11/11 15:31:34　　Page 21 of 30

9.3    No Injunctions.    There shall not be in effect any temporary restraining order, preliminary injunction, injunction, or other pending or threatened action by any Person or any order of any court or Governmental Authority restraining or prohibiting the closing of the transactions contemplated by this Agreement.

9.4    Bankruptcy Court Approval.    The Bankruptcy Court shall have entered the Sale Approval Order with respect to the Purchased Assets.

9.5    Deliveries.    Buyer shall have made, or be prepared to make at the Closing, all of the deliveries set forth in Section 10.3.

## ARTICLE X
## CLOSING

10.1    Closing.    The Closing shall take place at the offices of Seller's attorneys in Cleveland, Ohio, at 9:00 a.m. on the date which is ten (10) days after the date of the entry of the Sale Approval Order or, if all of the closing conditions set forth in Articles VIII and IX have not been satisfied or waived as of such date, on the first date on which such conditions have been satisfied or properly waived pursuant to the terms of this Agreement; provided, however that the Closing must occur prior to September 28, 2011, unless extended by the Seller.    The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."    The Closing shall be effective as of the Effective Time.

10.2    Deliveries by Seller.    At or prior to the Closing, Seller shall deliver to Buyer the following, each dated the Closing Date and duly executed by Seller, as applicable:

(a)    One or more Assignment and Assumption Agreements, together with bargain and sale deeds with warranties against grantor's acts for each parcel of Owned Real Property, bills of sale and other conveyance documents (collectively, the "Conveyance Documents") with respect to tangible property included in the Purchased Assets in forms that are necessary to transfer the Purchased Assets to Buyer or as required by respective state laws and requirements;

(b)    Possession of the Purchased Assets and the Real Property Leases, the Personal Property Leases and all other Purchased Contracts as set forth in this Agreement;

(c)    Other instruments of transfer reasonably requested by the Buyer to evidence the transfer of the Purchased Assets to the Buyer and consummation of the transactions contemplated hereby;

(d)     A certificate, in the form prescribed by Treasury regulations under Section 1445 of the Code, that Seller is not a foreign Person within the meaning of Section 1445 of the Code;

(e)     Certificates of Good Standing for Debtor for the State of New York;

(f)     The Sale Approval Order entered by the Bankruptcy Court with respect to the transactions contemplated by this Agreement;

10.3     <u>Deliveries by the Buyer</u>.  At the Closing, Buyer shall pay to Seller the Purchase Price as set forth in Article III and shall deliver to Seller the following, each dated the Closing Date and duly executed by the Buyer, as applicable:

(a)     One or more Assignment and Assumption Agreements under which the Purchased Contracts are assigned to Buyer and Buyer agrees to comply with all of Debtor's obligations under the Purchased Contracts which become due and dischargeable on or after the Closing Date;

(b)     A certificate, dated the Closing Date, of Buyer, certifying as to compliance by Buyer with Sections 9.1 and 9.2;

(c)     Certifying resolutions of the board of directors, the partners, the members, or the manager, of Buyer approving and authorizing this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby (together with an incumbency and signature certificate regarding the officer(s), partners, or members signing on behalf of the Buyer).  Buyer shall also provide to Seller any corporate, partnership or limited liability resolutions or approvals requested by Seller.

## ARTICLE XI
## TERMINATION

11.1     <u>Termination Events; Opportunity to Cure</u>.

(a)     Subject to 11.1(b), this Agreement may be terminated on written notice:

(i)     By either party, in the event of a Breach by the other party of its obligations under this Agreement which remains uncured after notice and an opportunity to cure as provided in Section 11.1(b);

(ii)     By Buyer, if any of the conditions in Article VIII of this Agreement have not been satisfied in all material respects as of the Closing Date and Buyer is not the reason why such conditions have not been satisfied, or if satisfaction of a condition is or becomes

impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived the condition on or before the Closing Date; or

(iii)    By Seller, if any of the conditions in Article IX have not been satisfied in all material respects as of the Closing Date, or if satisfaction of a condition is or becomes impossible (other than through the failure of Seller to comply with its obligations under this Agreement) and Seller has not waived such condition on or before the Closing Date.

(b)    The foregoing notwithstanding, this Agreement shall not be terminated under Section 11.1(a)(i), (ii) or (iii) if the noncompliance, nonperformance or breach can be cured or eliminated, in which event the party wishing to terminate shall not terminate unless and until (i) it has given the other party written notice that noncompliance, nonperformance or a breach has occurred, specifying the nature thereof and the action required to cure and (ii) such noncompliance, nonperformance or breach shall not have been cured or eliminated, or the party giving the notice shall not have otherwise been held harmless from the consequences of the noncompliance, nonperformance or breach, within thirty (30) days of the receipt of such notice.

11.2    <u>Effect of Termination</u>.

(a)    In the event of termination of this Agreement by Seller pursuant to Section 11.1(a)(i) or (iii), if the termination resulted from a breach of a representation, warranty or covenant by Buyer or by Buyer's noncompliance with its obligations under this Agreement, Buyer shall be liable to Seller for all Losses incurred or suffered by Seller and the Deposit shall retained by Seller.

(b)    In the event of termination of this Agreement by Buyer pursuant to Section 11.1(a)(ii), Buyer's sole remedy will be to terminate this Agreement in which event Seller shall return the Deposit to Buyer.

(c)    In the event of termination of this Agreement based on the fact that the condition set forth in Section 6.1 has not been satisfied, this Agreement shall forthwith become null and void and there shall be no liability or obligation on the part of any party hereto, or their respective officers or directors, and Seller shall return the Deposit to Buyer.  Buyer shall also return to Seller all copies of all information and documents furnished to Buyer by Seller and shall destroy all memoranda, notes, extracts and reproductions relating thereto.

10-15099-pmc    Doc 766-1    FILED 08/11/11    ENTERED 08/11/11 15:31:34    Page 24 of 30

# ARTICLE XII

## INDEMNIFICATION

12.1 <u>Indemnification by Seller</u>. All representations, warranties, covenants and agreements made by Seller in this Agreement shall terminate as of the Closing. Buyer shall bring no claim against Seller for any reason after Closing.

12.2 <u>Indemnification by Buyer</u>.

(a) Buyer will indemnify, defend and hold Seller harmless from and against any Losses arising directly or indirectly from any of the following, regardless of whether the claim arises under contract, breach of warranty, tort or other legal theory:

(i) any Breach of any representation or warranty made by Buyer in this Agreement;

(ii) any Breach by Buyer of any covenant or obligation of Buyer in this Agreement; or

(iii) any claim by any Person for brokerage or finder's fees or commissions or similar payments that remain unpaid after the Closing and which are based upon any agreement or understanding alleged to have been made by such Person with Buyer (or any Person acting on its behalf) in connection with the contemplated transactions.

(b) All of the representations, warranties, covenants, and agreements made by Buyer in this Agreement shall survive the Closing.

# ARTICLE XIII

## MISCELLANEOUS

13.1 <u>Entire Agreement.</u> With the exception of the provisions of the Confidentiality Agreement between the parties, this Agreement constitutes the entire understanding between the parties with respect to the subject matter contained herein and supersedes any prior understandings and agreements among them respecting such subject matter.

13.2 <u>Headings.</u> The headings in this Agreement are for convenience of reference only and shall not affect its interpretation.

13.3 <u>Notices.</u> All notices or other communications required hereunder shall be in writing and shall be deemed to have been given if emailed, delivered personally, on the next day if mailed

by overnight mail, or three (3) days after the date of mailing if mailed by certified or registered mail, postage prepaid, to the addresses of the Parties as follows:

If to Seller by mail or hand delivery:

> David O. Simon, Chapter 11 Trustee
> 1370 Ontario Street, #450
> Cleveland, Ohio 44113
> Email: dsimon@epiqtrustee.com

With a copy to:

> Mary K. Whitmer, Esq.
> Kohrman, Jackson & Krantz, P.L.L.
> One Cleveland Center, 20th Floor
> Cleveland, Ohio 44114
> Email: mkw@kjk.com

If to Buyer:

With a copy to:

13.4    **Exhibits and Schedules.**  Each Exhibit and Schedule referred to herein is incorporated into this Agreement by such reference.

13.5    **Severability.**  If any provision of this Agreement is held illegal, invalid or unenforceable such illegality, invalidity or unenforceability will not affect any other provision hereof.  This Agreement shall, in such circumstances be deemed modified to the extent necessary to render enforceable the provisions hereof.

13.6    **Waiver.**  Except as otherwise provided in this Agreement, the failure of any party to insist upon strict performance of any of the terms or conditions of this Agreement will not constitute a waiver of any of its rights hereunder.

13.7    **Assignment.**  Neither Seller nor Buyer may assign any of its rights or delegate any of its obligations hereunder without the prior written consent of the other party.

10-15099-pmc     Doc 766-1     FILED 08/11/11     ENTERED 08/11/11 15:31:34     Page 26 of 30

13.8    Successors and Assigns.  This Agreement binds, inures to the benefit of, and is enforceable by the successors and permitted assigns of the parties, including any liquidating trust which may be created under a plan of liquidation, and does not confer any rights on any other persons or entities.

13.9    Governing Law.  This Agreement, and all other documents executed in connection with this Agreement shall be construed and enforced in accordance with New York law.

13.10    Binding Effect.  Buyer's offer set forth in this Agreement shall remain a binding, nonrevocable offer until thirty (30) days following the Auction.

13.11    Agreement Regarding Post-Petition Venue.  Buyer and Seller agree that all actions brought, arising out of, or related to the transactions contemplated in this Agreement shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such actions.  Each party hereby irrevocably consents to the personal jurisdiction of the Bankruptcy Court.

13.12    Amendments.  This Agreement may be amended only by a written instrument duly executed by all of the parties.

13.13    Counterparts.  This Agreement may be executed in any number of counterparts and any party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  In order to facilitate execution of this Agreement, fax signatures shall be deemed to be original signatures.

13.14    No Third Party Beneficiaries.  This Agreement is solely for the benefit of the parties hereto and no provision of this Agreement shall be deemed to confer upon any other Person any remedy, claim, liability, reimbursement, cause of action or other right, including without limitation, rights of any Affected Employee in respect of any right to contract or any right to employment or continued employment with the Buyer.

13.15    Passage of Title and Risk of Loss.  Legal title, equitable title, and risk of loss in respect of the Purchased Assets will not pass to Buyer until such Purchased Assets are transferred at the Closing, which transfer, once it has occurred, will be deemed effective for tax, accounting, insurance and other computational purposes as of the Effective Time.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Asset Purchase and Sale Agreement as of the date first above written.

**BUYER:**

[_____]

By: _____

Name: _____

Title: _____

**SELLER:**

DAVID O. SIMON, as Chapter 11 Trustee for

Kiebler Recreation, LLC, Debtor

By: _____

    David O. Simon

## Schedule 2.1(b)

## Owned Real Property

ALL THAT TRACT OR PARCEL OF LAND situated in the Town of French Creek, County of Chautauqua and State of New York, being part of Lot 46, Town 1 and Range 15 of the Holland Land Company's survey and further bounded and described as follows:

COMMENCING at a set nail at the intersection of the centerline of Old Road with the centerline of Conway Road; thence N 52° 46' 53" E, 1728.62 feet to the POINT OF BEGINNING of the parcel hereinafter described, said point of beginning located northwesterly 50 feet ±, as measured at right angles from the existing centerline of Conway Road;

thence N 42° 5 l' 51" W, 46.48 feet to a point;

thence N 23 53' 28" E, 160.07 feet to a point;

thence N 15° 06' 46" W, 285.51 feet to a point;

thence N 47° 08' 09" E, 272.34 feet to a point;

thence S 81 ° 01' 25" E, 381.91 feet to a point;

thence S 42° 51' 51" E, 62.04 feet to a point, said point being located northwesterly 50 feet ±, as measured at right angles from the existing centerline of Conway Road; thence S 47° 08' 09" W, parallel with and 50 feet from the existing centerline of Conway Road, 224.35 feet to a point;

thence N 42° 51' 51" W, 141.95 feet to a point;

thence northwesterly on a curve to the left, 102.98 feet to a point, said curve having a radius 75.00 feet and a chord N 82° II' 56" W, 95.08 feet;

thence S 58° 27' 59" W, 99.62 feet to a point;

thence southwesterly on a curve to the left, 103.83 feet to a point, said curve having a radius 80.00 feet and a chord S 21 ° 17' 04" W, 96.70 feet;

thence S 15° 53' 51" E, 159.65 feet to a point; thence S 42° 51' 51" E, 50.60 feet to a point, said point being located northwesterly 50 feet ±, as measured at right angles from the existing centerline of Conway Road;

thence S 47° 08' 09" W, parallel with and 50 feet from the existing centerline of Conway Road, 246.61 feet to the point of beginning containing 129,218 square feet or 2.97 acres of land to be the same more or less.

TOGETHER WITH the right of ingress and egress to Conway Road.

**Schedule 5.3**

**<u>Consents</u>**